FILED

JUN 9 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1  LeAndre Johnson D-88755
   P.O. Box 4000 (13R1UP)
2  Vacaville, CA 95696-4000

3  In Pro Per

4

5

6            IN THE UNITED STATES DISTRICT COURT

7            NORTHERN DISTRICT OF CALIFORNIA

8                                                    MMC

9            E-filing                          (PR)

10

11  In re                          )
                                   )  CV No. 08 ___ 2883
12      LeAndre Johnson,           )
                                   )
13              Petitioner,        )
                                   )  PETITION FOR WRIT OF HABEAS CORPUS
14  v.                             )  AND MEMORANDUM OF POINTS AND
                                   )  AUTHORITIES IN SUPPORT THEREOF
15  Tom Carey, et. al.,            )
                                   )
16              Respondents,       )
                                   )
17  On Habeas Corpus.              )

18

19                      INTRODUCTION

20      Petitioner is alleging that his constitutional right to due

21  process was violated when the respondents failed to fulfill all of

22  the terms of the contract in which they agreed to during the plea

23  canvassing. In fact, petitioner's sentence has even been increased

24  beyond that agreed to by all the parties named herein.

25      Therefore, petitioner's plea was not knowingly, intelligently,

26  and voluntarily made and is void under the Fifth and Fourteenth

27  Amendments of the United States Constitution.

28

                              1

PARTIES

Petitioner, **LeAndre Johnson**, CDCR# D-88755, is a state prisoner within the California Department of Corrections and Rehabilitation, at all times herein housed at Solano State Prison, in Vacaville, California.

Respondent, **Tom Carey**, is the Warden of Solano State Prison and has direct custody of the petitioner. Included in his duties is that of complying with all the laws of the State of California. Including, the State and Federal Constitutions.



## STATEMENT OF FACTS

1. Petitioner was repeatedly informed that if he were to plead guilty that once he reached his initial parole hearing he would have a release date set, but he has not received one yet, even after attending his first parole hearing. See exhibit "A".

2. Petitioner was promised and informed during the court's plea canvassing that his parole period would be set at five years, but the petitioner has recently discovered that his parole period has been set at life. Had the petitioner known his parole period would be set at life he would never accepted the plea agreement. See exhibit "A", "B", and "C".

3. That had the petitioner known he would not have a release date set or that his sentence would be increased beyond that bargain-ed for, he would have never plead guilty. See exhibit "C".

1                        STATEMENT OF CASE

2

3      On April 4th, 1988 before the Honorable Courtland D. Arne, Judge

4  of the Superior Court of the State of California, in and for the

5  County of Alameda, petitioner entered into a plea agreement by and

6  through the Alameda County District Attorney's Office, case no.

7  91813A. See exhibit "A".

8      After appearing before the Parole Board for the first time and

9  not receiving the benefits as promised in exchange for his guilty

10  plea, the petitioner filed a Habeas Corpus in the Superior Court

11  seeking relief. However, on May 3, 2006 the Superior Court denied

12  his petition. See exhibit "D".

13      The petitioner filed in the appellate court, but that petition

14  was denied as well. See exhibit "E".

15      Finally, petitioner then received a denial from the California

16  Supreme Court on June 20, 2007. See exhibit "F".

17

18

19

20

21

22

23

24

25

26  1  2005 Hearing Transcripts (Ex"   ")

27

# CONTENTIONS

## I.

### PETITIONER HAS A CONSTITUTIONAL RIGHT TO HAVE THE STATE COMPLY WITH THEIR PART OF THE PLEA AGREEMENT

## II.

### PETITIONER MUST BE PERMITTED TO WITHDRAW HIS PLEA

## III.

### PLEA AGREEMENTS ARE CONTRACTS REQUIRING THE STATE TO LIVE UP TO THEIR PART OF THE CONTRACT

## PRAYER FOR RELIEF

Petitioner is without remedy save for habeas corpus. Accordingly, this court should grant the following relief which is being respectfully requested;

1. Issue a writ of habeas corpus;

2. Issue an order to show cause;

3. Order an evidentiary hearing;

4. Issue it's order that respondent's actions and inactions of not complying with the terms of the plea agreement is in violation of petitioner's constitutional rights;

5. Issue it's order declaring that petitioner be immediately released from prison;

6. Issue it's order that the petitioner be permitted to with-drawal his plea;

7. Appoint counsel or award reasonable attorney fees;

8. Grant any and all relief this court deems appropriate.

Dated this        day of            , 2008.


Respectfully submitted,


_____

LeAndre Johnson
In Pro Per

6

## VERIFICATION

I, LeAndre Johnson, CDCR# D-88755, hereby declare that:

I am the petitioner in this action and have read the foregoing petition for writ of habeas corpus. The facts stated therein are true and factual of my own knowledge, except as to those matters that are based on information and beliefs, and as to those matters I believe them to be true and correct copies of the original(s). I do declare the foregoing under the penalty of perjury and in accordance with the laws of the State of California.

Dated this      day of          , 2008.

_____

LeAndre Johnson
In Pro Per

7

MEMORANDUM OF POINTS AND AUTHORITES

IN SUPPORT OF PETITIONER'S CONTENTIONS


A. STANDARD OF REVIEW


Under **Santobello v. New York**, 404 U.S. 257, 261-62 (1971), a criminal defendant has a due process right to enforce the term of his plea agreement. See also **Brown v. Poole**, 337 F.3d 1155, 1159 (9th Cir. 2003); **Buckley v. Terhune**, (2006) DJDAR 3225. ("The defendant's due process rights conferred by the federal constitution allows him to enforce the terms of the plea agreement").

However important plea bargaining maybe in the administration of the criminal justice, United States Supreme Court opinions have established that a guilty plea is a serious and sobering occasion inasmuch as it constitutes a waiver of fundamental rights to a jury trial, **Duncan v. Lousianna**, 391 U.S. 145, 20 L. Ed. 2d 491, 88 S. Ct. 1444. These State and Federal rights may be waived through a guilty plea, but such waivers are not lightly presumed, and in fact, are viewed with the "utmost solicitude". **Boykins v. Alabama**, 395 U.S. 238, 243, 23 L. Ed 2d 274, 279, 89 S. Ct. 1709 (1969).

There is no need to belabor the fact that the Constitution guarantees to all criminal defendants the right to a trial by judge or jury, or, put another way, the "right to plead not guilty". **United States v. Jackson**, 390 U.S. 570, 581, 20 L. Ed. 2d 138, 146, 88 S. Ct. 1209 (1968). State convictions founded upon coerced or unfairly induced guilty pleas have also received increased scrutiny as more fundamental rights have been applied to the states,

8

1  **Santobello v. New York**, 404 U.S. 257, 262, 92 S. Ct. 495, 498, 30

2  L. Ed. 2d 427 (1971).

3      In **United States v. Anderson**, 970 F. 2d 602 (9th Cir. 1992) the

4  Ninth Circuit Court stated that under **Santobello**, the general rule

5  governing the enforcement of plea agreements is as follows:

6

7              "When a plea rest in any significant degree on a
               promise or agreement of the prosecutor, so that

8              it can be said to be part of the inducement or
               consideration, such promised must be fulfilled.

9              **Santobello v. New York**, 404 U.S. 257, 262, 92
               S. Ct. 495, 498, 30 L. Ed. 2d 427. In determin-

10             ing whether a plea agreement has been broken,
               courts look to what was reasonably understood by

11             the **defendant** when he entered his guilty plea.
               **United States v. Arnett**, 628 F. 2d 1162, 1164

12             (9th Cir. 1976) ). If disputed, be determined by
               objective standards. **Arnett,supra**, at 1164. The

13             government will be held to the "literal terms"
               of the agreement. **United States v. Garcia**, 519

14             F. 2d 1343, 1344-45 (9th Cir. 1975). (Emphasis
               added).

15

16  **United States v. Travis**, 735 F. 2d 1129, 1132 (9th Cir. 1984);

17  **McKenzie v. Risley**, 801 F. 2d 1519, 1527 (9th Cir. 1986). When the

18  state (respondents) breaks the bargain, they undercut the basis for

19  the waiver of constitutional rights implicit the plea. **Santobello**,

20  **supra**, 404 U.S. at 268, 92 S. Ct. at 502; **Pedro v. United States**,

21  79 F. 3d 1065 (11th Cir. 1996).

22      To determine whether a plea agreement has been breached, a

23  court must look to what the party reasonably understood to be the

24  terms of the agreement, when he plead guilty. See **United States v.**

25  **Anderson**, 970 F. 2d 602, 607 (9th Cir. 1992), **amended**, 990 F. 2d

26  1163 (1993); **United States v. Packwood**, 848 F. 2d 1009, 1011 (9th

27  Cir. 1988) and any ambiguity should be resolved against the state.

28  **Sutton,supra**, at 1423; **Arnett**, **supra**, at 1164; **United States v. Read**

9

778 F. 2d 1437, 1441 (9th Cir. 1985), cert. denied, 479 U.S. 835, 107 S. Ct. 131, 93 L. Ed. 2d 75 (1986); **United States v. Velez Carrero**, 77 F. 3d 11 (1st Cir.). Construing ambiguities in favor of the petitioner makes sense in light of the parties respective bargaining power and expertise. **United States v. Fuente**, 8 F. 3d 1333 (9th Cir. 1993); **United States v. Ingram**, 979 F. 2d 1179, 1189 (7th Cir. 1992).

In California, "a negotiated plea agreement is a form of contract, and it is interpreted according to general contract principles," **People v. Shelton**, 37 Cal. 4th 759, 767 (2006), according to the same rules as other contracts," **People v. Toscano**, 124 Cal. App. 4th 340, 344 (2004) cited with approval in **Shelton** along with other California cases to same effect dating back to 1982. Thus, under **Ricketts v. Adamson**, 483 U.S. 1, 6 n.3 (1987), California Courts are required to construe and interpret plea agreements in accordance with state contract law.

Plea agreements are "unique contracts" and the ordinary contract principles are supplemented with a concern that the bargaining process not violate petitioner's right to fundamental fairness under the due process clause. **United States v. Rourke**, 74 F. 3d 802, 805 (7th Cir.), cert. denied, 517 U.S. 1215, 116 S. Ct. 1840, 134 L. Ed. 2d 942 (1996). The state must fulfill any promise that it expressly or implies in exchange for petitioner's guilty plea. **United States v. Ingram**, 979 F. 2d 1179, 1184 (7th Cir. 1992) cert. denied, 507 U.S. 887, 113 S. Ct. 1616, 123 L. Ed. 2d 176 (1993) citing **Santobello**

And in this case, petitioner reasonably relied on the understanding and belief, and was promised that if he were to waive his rights and plead guilty he would receive the benefits cited below,

but he has not. Therefore, because of this, these, unkept promise(s) and the serious constitutional question whether petitioner's plea was voluntarily and knowingly made, **Santobello**; **Brady v. United States**, 397 U.S. 742, 755, 25 L. Ed. 2d 747, 90 S. Ct. 1463, he is entitled to relief in this court.

## I.

## PETITIONER HAS A CONSTITUTIONAL RIGHT TO HAVE
## THE STATE COMPLY WITH THEIR PART OF THE PLEA AGREEMENT

### A. PETITIONER WAS PROMISED A RELEASE DATE WOULD BE SET.

The United States Supreme Court has established standards for negotiated pleas in **Boykin v. Alabama**, (1969) 365 U.S. 238, 89 S. Ct. 1709, 23 L. Ed. 274. In **Boykin**, the court held that a guilty plea would not be accepted unless there was affirmative evidence that the plea was not only voluntary, but further concluded that the trial court must use the "utmost solicitude.... in canvassing the the matter with the accused to make sure that he has a full under-standing of what the plea connotes and it's consequences." **Boykin v. Alabama**, **supra**, 395 U.S. at 243-244, and 1712, 23 Ed. 2d at 280. and in this particular case the court failed to follow this and other established standards.

During the plea canvassing the following dialogue transpired in which the petitioner was promised that he would have a release date set by the Department of Corrections, but as of today's date he has failed to receive one and in fact, is not entitled to one under state law.

1    THE COURT:  Now, when you appear in the superior court, then
2                          pursuant to this agreement, the judge is going to
3                          sentence you on one count to 25 years to life. Do
4                          you understand that?

5

6    THE WITNESS: (Witness nods head.)

7

8    THE COURT: Do you understand that?

9

10   THE WITNESS: Yes.

11

12   THE COURT: When you are released from state prison, you will
13                          be on parole. And it is at least theoretically
14                          possible to be on parole for as long as five years.
15                          If at anytime while on parole you violate your
16                          parole, you can be returned to state prison for up
17                          to one year for each separate violation. Do you
18                          understand that?

19

20   THE WITNESS: Yes.

21

22   THE COURT: Has anyone made you any promises in connection with
23                          your plea to these charges that have not been stated
24                          here in open court and in front of me this afternoon
25                          and on the record?

26

27   THE WITNESS: Certain circumstances would be dropped?

28

12

1    THE COURT: They would move the court to drop the charges.

2

3    THE WITNESS: Yeah.

4

5    THE COURT: Have any promises been made to you which I haven't

6                heard about this afternoon on the record?

7

8    THE WITNESS: No, not really. How many years of that would I do?

9

10   THE COURT: Your attorney can advise you.

11

12   MR. COLE: That essentially is up to the Deaprtment of Correc-

13             tions. And we discussed that currently what the rough

14             estimate is. But the court is not in charge of that.

15             so, that is something between you and the Department

16             of Corrections once you enter the system. And I

17             believe you know as much about that as anybody because

18             that is something that the court can't address because

19             it's not up to the judge. And you will be released in

20             due course of parole essentially, and that would be

21             up to the Department of Corrections. And that would

22             depend on your sentence and conduct in prison.

23

24   THE WITNESS: All right.

25

26   THE COURT: All right. Now, my question to you is: Has anyone

27             made you any promises in connection with pleading

28             guilty to these charges today that I haven't heard

                               13

1    about here in open court this afternoon on the

2    record?

3

4    THE WITNESS: That I would have a release date?

5

6    THE COURT: Well, you will indeed. That is an automatic with

7    the Department of Corrections. They will set that

8    date.

9    ( CT. Pages 7-10, lines 2-4)    (Exhibit "A ")

10

11    During the plea canvassing conducted by the court petitioner

12    was asked "has anyone made you any promises in connection with

13    pleading guilty to these charges today that I haven't heard about

14    right here in open court this afternoon on the record ?". Petitioner

15    responded by stating "that I would have a release date?". Then the

16    court went on to state that "well, you will indeed. That is an

17    automatic with the Department of Corrections. They will set that

18    date." However, petitioner recently appeared before the Board of

19    Parole Hearings and did not have a parole date set in accordance

20    with the promise made to him, a direct violation of the terms of

21    the contract.

22    In fact, under California Penal Code section 3041 and Califor-

23    nia's indeterminate sentencing laws the Board of Parole Hearings is

24    not required to ever set a release date for the petitioner. Had the

25    petitioner known that he would not be given a release date he would

26    not have ever plead guilty. Exhibit "C ". Petitioner asserts that

27    he was deceived, misinformed, and promised inducements that were

28    unfulfillable.

14

Therefore, petitioner's plea is <u>void</u> under the Fifth and Fourteenth Amendments to the United States Constitution as a denial of due process, unless petitioner knowingly, intelligently, and voluntarily plead guilty. See **Boykin v. Alabama**, 395 U.S. 238, 242, 89 S. Ct. 1709, 1711, 23 L. Ed. 2d 274 (1969); **Brady v. United States**, 397 U.S. 742, 748, 90 S. Ct. 1463, 1468-69, 25 L. Ed. 2d 747 (1970). The circumstances surrounding the petitioner's plea of guilty and during the plea canvassing dispel any finding that he made an intelligent, knowing, and voluntary decision when he waived his rights in exchange for a "**phantom release date**" promised to him by not only the respondents, but the court itself. **Exhibit "A".**

## B. PAROLE PERIOD NOT TO EXCEED FIVE YEARS.

Federal courts have time and again vacated or forced compliance with pleas when defendants have been able to show that they have been unfairly subjected to punishment beyond that bargained for in the plea negotiation. A plea is not voluntary and hence, a violation of due process, if induced by **misrepresentations** (including fulfill-ed or unfulfilled promises). **Brady v. United States**, (1970) 397 U.S. 742, 755, 90 S. Ct. 1463, 1472, 25 L. Ed. 2d 747, 760.

In this particular instance, the petitioner was promised that if he were to plead guilty a parole period of five years would be imposed upon his release.

> "THE COURT: When you are released from state
> prison, you will be on parole. And it is at
> least theoretically possible to be on parole
> for as long as five years."

**Exhibit "A"**, at pg. 7, line 18-21.

15

1    However, petitioner recently discovered that his parole period has

2    been set at life, not five years as promised. In fact, the imposi-

3    tion of a five year parole period is not even allowed or legal under

4    state law.

> (a) In the case of any inmate sentenced under
> section 1168 for any offense of first or second
> degree murder with a maximum of life imprison-
> ment, the period of parole, if parole is granted,
> shall be the remainder of the inmate's life.

P.C. section 3000.1.(a).

9    Therefore, petitioner now faces additional punishment and more

10   restraint upon his liberty and / or actual incarceration that can

11   and often does result during the period of parole and this consti-

12   tutes punishment beyond the terms of the plea bargain entered into

13   by the petitioner. It is uncontrovertable that "The conditions of

14   parole place a number of onerous burdens on the liberty of paroled

15   individuals", including the possibility of being returned to prison

16   for a technical parole violation. **United States ex rel. Baker v.**

17   **Finkbeiner**, (1977) 551 F. 2d 180, 184; and fn.6. And had petitioner

18   known that his parole period would be fixed at "life" he would not

19   have ever accepted the plea offer. **See exhibit "C".** Thus, the

20   petitioner is entitled to relief in this court.

21   Now there can be no question that plea agreements are inter-

22   preted according to the reasonable expectations of the parties.

23   **United States v. Sophie**, 900 F. 2d 1064, 1071 (7th Cir. 1990), <u>cert.</u>

24   <u>denied</u>, 498 U.S. 843, 111 S. Ct. 124, 112 L. Ed. 2d 92 (1990);

25   **United States v. Fields**, 776 F. 2d 1161 (7th Cir. 1985). It follows

26   that when the respondents breaches the terms of the contract with

27   respect to an executed plea agreement, petitioner plead guilty on

28   false promise, and hence his conviction cannot stand. **Santobello**.

16

,**ante**. Petitioner's plea agreement can truly be said to be "volun-
tary" only when "the bargain represented by the plea agreement is
not frustrated. **United States v. Peglera**, 33 F. 3d 412, 413 (4th
Cir. 1994); **United States v. Jureidini**, 846 F. 2d 964, 965-966 (4th
Cir. 1988). Because a state that lives up to its commitments is the
essence of liberty under law, the harm generated by allowing the
the state to forego its plea bargain obligations is one which cannot
be tolerated.

As a general rule, fundamental fairness means that the courts
will enforce promises made during the plea bargaining process that
induce petitioner to waive his constitutional rights and plead
guilty. **Staten v. Neal**, 880 F. 2d 962, 963 (7th Cir. 1989). In the
present case, there is no question that an agreement was reached,
nor that petitioner has fulfilled his part of the agreement by
pleading guilty, so that he is entitled to an appropriate remedy if
the state breached the agreement. **United States v. Harvey**, 791 F.
2d 294, 300 (4th Cir. 1986) (citing **Santobello**, 404 U.S. 257)
(where a defendant fulfills his promise in entering a guilty plea,
the prosecution is bound to fulfill any promise made in exchange).
**Santobello**, at 262, 92 S. Ct. at 499; **United States v. Robinson**,
924 F. 2d 612, 613 (6th Cir. 1991).

The state is to be held to the literal terms of the agreement;
complying with all the promises made at the time petitioner entered
into a contractual agreement with the people. **Read**, **supra** at 1441,
**Anderson**,**supra** at 607 and ordinarily the state must bear responsi-
bility for any lack of clarity. **United States v. Herrera**, 928 F. 2d
769, 772 (6th Cir. 1991); **United States v. Giorgi**, 840 F. 2d 1022,
1026 (1st Cir. 1988). The vital principle is that he who by his

17

language or conduct leads another to do what he would not otherwise have done shall not subject such person to loss or injury by disappointing the expectation upon which he acted. Such a change of position is sternly forbidden. It involves fraud and falsehood, and the law abhors both. **Wade v. Markwell & Co.**, 118 Cal. App. 2d 410, 421; **Pruitt v. Fontana**, 143 Cal. App. 2d 675, 687.

An executed agreement is one the object or terms of which have been fully performed. Civil Code 1661; **Henehan v. Hart**, 127 Cal. 656; **Treadwell v. Nickel**, 194 Cal. 243. In this case, petitioner pleading guilty to first degree murder. The Ninth Circuit has stated that it is the reasonable understanding of the parties that determines the meaning of disputed terms. **See** e.g. **United States v. Gerace**, 997 F. 2d 1293 (9th Cir. 1993); **Keller, supra** 902 F. 2d at 1393. As a practical matter, because the Ninth Circuit employs an objective standards - it is the parties or petitioner's reasonable beliefs that control - the difference between stating that the petitioner's or the parties beliefs control is minimal. The construction the court adopts, however, incorporates the general rule that ambiguities are construed in favor of petitioner. Focusing on petitioner's reasonable understanding also reflects the proper constitutional focus on what induced petitioner to plead guilty. See generally, **Mabry v. Johnson**, 467 U.S. 504, 501-11, 81 L. Ed. 2d 437, 104 S. Ct. 2543 (1984). If the petitioner was induced with the promise that he would have a parole date and that his parole period would be five years in exchange for his plea of guilty; then petitioner's proffered interpretation should prevail. As such is equally plausible.

The Ninth Circuit has further noted that several of it's cases have held that it is petitioner's understanding at the time of the plea that controls. See e.g. **United States v. Anderson**, _supra_, 970 F. 2d at 607, _amended_ 990 F. 2d 1163 (1993); **United States v. Packwood**, 848 F. 2d 1009, 1011; **United States v. Quan**, 789 F. 2d 711 (9th Cir. 1986). Which the court has ruled they are not free to disregard this controlling precedent. **United States v. Fuente**, 8 F. 3d 1333 (9th Cir. 1993). In short, the liberty interest from prolonged incarceration is great, and procedures for decreasing erroneous incarceration must be provided.

## II.

## PETITIONER MUST BE

## PERMITTED TO WITHDRAW HIS PLEA

The punishment imposed by the court may not significantly exceed that which the parties agreed on, Cal. Crim. Proc. 1050; **People v. Walker**, (1991) 54 Cal. 3d 1013, 1024, 1 Cal. Rptr. 902, 908. Petitioner would not have plead guilty had he known he would not have a determinate date set as promised by the Court and the respondents, thereby prolonging his period of incarceration without affording him due process. the remedy for this violation would be the withdrawal of his plea.

When the state breaches the express or implied terms of a plea agreement, a violation of due process occurs. **Ashe v. Styles**, 67 F. 3d 46, 52 (4th Cir. 1995); **United States v. Martin**, 25 F. 3d 211, 217. Petitioner's guilty plea was clearly induced by an unkept promise, and therefore was not free and willing choice of petitioner and should be set aside by this court. An unkept bargain which has induced a guilty plea is grounds for relief. **Santobello,supra**; **Blackledge v. Allison**, 431 U.S. 63, 52 L. Ed. 2d 136, 97 S. Ct. 1621 (1997).

## III.

## PLEA AGREEMENTS ARE CONTRACTS REQUIRING THE

## STATE TO LIVE UP TO THEIR PART OF THE CONTRACT

Plea agreements contracts and the state's obligations are to be determined by the language of the agreement. **Doe v. United States**,

20

61 F. 3d 693, 701 (7th Cir.) cert. denied, 116 S. Ct. 205; **United States v. De La fuente**, 8 F. 3d 1333 (9th Cir. 1993). There can be no mistake that it was reasonably understood when petitioner entered his plea that he would have a release date set by the Department of Corrections and this parole period would be fixed at five years in exchange for his guilty plea, but he has received neither benefit.

It is well established that the interpretation of plea agreements is rooted in contract law, **United States v. Keller**, 902 F. 2d 1391, 1393 (9th Cir. 1990), and that each party must receive the benefit of its bargain. **Ashe,supra** at 52; **United States v. Peglera**, 33 F. 3d 412, 413 (4th Cir. 1994). Under the principles of contract law, a party may avoid the obligation of an agreement gained by misrepresentation or fraud. **United States v. Texarkana Trawlers**, 846 F. 2d 297, 304 (5th Cir.) cert. denied, 488 U.S. 943, 109 S. Ct. 369, 102 L. Ed. 2d 358 (1988); **United States v. ballis**, 28 F. 3d 1399, 1409 (5th Cir. 1994). An any arrangement mutually agreeable to both parties to a valid contract which has been wholly executed to their mutual satisfaction leaves no question of consideration of adjudication. **Fox Chicago realty Corp. v. Zukor's Dresse, Inc.**, 50 Cal. App. 2d 129, 136.

Contract interpretation presents a question of law which should be independtly. **Golden West Baseball Co. v. City of Anaheim**, (1994) 25 Cal. App. 4th 11, 22, 31 Cal Rptr. 2d 378; **Vaillette v. Fireman's Fund Ins. Co.**, (1993) 18 Cal. App. 4th 680, 686, 23 Cal. Rptr. 2d 807. A contract must be interpreted to give effect to mutual, expressed intention of parties. The state, nor the court can now create for the parties a contract language which one of the parties

21

now wishes was there. **Levi Strauss & Co. Aetna v. Casualty & Surely Co.**, (1986) 184 Cal. App. 3d 1479, 1486, 229 Cal. Rptr. 434; **Ben-Zvi v. Edmar Co.**, (1995) 40 Cal. App. 4th 468, 47 Cal. Rptr. 2d 12. The court may find that a contract includes an implied term or convenient.

Adequate our due process depends upon the nature of the interest affected. See **Morrissey v. Brewer**, 408 U.S. 471, 481-482, 92 S. Ct. 2593, 2600-01, 33 L. Ed. 2d 484 (1972), the more important the interest and greater the effects of its impairment, greater the procedural safeguards the state must provide to satisfy due process. **Id.** at 481, 92 S. Ct. at 2600; **Haygood v. Younger**, 780 F. 2d 1355, 1356 (9th Cir. 1985). Petitioner's loss of liberty through continual incarceration falls among the major deprivations in life. After life itself, no right is more jealously guarded by our constitution, legal system, and our culture more than freedom.

The "contract" principles emerging from these cases are that courts will use objective canons of interpretations to - that courts have some remedial power to enforce plea bargains. Where the government breaches the a plea bargain, it may be appropriate for the court to order "specific performance" of the bargain, **United States v. Herrera**, 640 F. 2d 958, 960 (9th Cir. 1981); 2W. Lafave & J. Israel, Criminal Procedure. "When the breach was a failure by the state to carry out a promise which was fulfillable, then certainly the petitioner's request for relief should be granted.

The respondents now cannot argue that petitioner is not entitled to relief even if the state breached the petitioner's plea agreement. This argument is meritless. If the court is to accept it, it would, in effect, allow the state, any time it might have second

22

thoughts about a plea bargain to breach the agreement by reindicting petitioner on greater charges, thereby restoring petitioner's right to trial on those charges. Such a practice, of course, renders the state's plea agreement obligations meaningless. **Santobello**, 404 U.S. at 262 "When a plea rest in any significant degree on a promise or agreement of the prosecutor, such promise must be fulfilled.

For all the aforementioned reasons the petitioner's writ of habeas corpus should be granted.

23

UNITED STATES DISTRICT COURT
Clerk of the Court
U.S. Courthouse
450 Golden Gate Ave.
San Francisco, CA 94102-3483

LeAndre Johnson, CDCR# D-88755
P.O. Box 4000, (13-M6-Low)
Vacaville, CA 95696-4000

Date: May 27, 2008

Re: The enclosed petition, Case No. C-07-5187 MJJ (PR)

Dear Clerk,

      previously the petitioner filed a petition for Writ of
Habeas Corpus, but it was dismissed for failure to pay the
required $5.00 filing fee. (see attached arder) When in fact, he
did pay, but for some reason it was not received by your office
until after the dismissal order was issued. (see attached
letter and copy of this court's payment receipt) Thus, the
petitioner is refiling his petition and requesting that the
$5.00 previously paid is considered and received as payment for
this petition.

      In closing, thank you in advance for all of your time and
efforts in this matter. Have a nice day.


Respectfully Submitted,


LeAndre Johnson

In Pro Per

```
Court Name: U.S. District Court, NDCA
Division: 3
Receipt Number: 34611813310
Cashier ID: almaceh
Transaction Date: 12/07/2007
Payer Name: SAHDRA M TOBIAS
-----------------------------------
WRIT OF HABEAS CORPUS
 For: LEANDRE JOHNSON
 Amount:        $5.00
-----------------------------------
CHECK
 Check/Money Order Num: 1056
 Amt Tendered: $5.00
-----------------------------------
Total Due:       $5.00
Total Tendered: $5.00 .
Change Amt:      $0.00

C07-5187 MJJ (PR)


Checks and drafts are accepted
subject to collections and full
credit will only be given when the
check or draft has been accepted by
the financial institution on which
it  was drawn.
```

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| LEANDRE JOHNSON, | ) | No. C 07-5187 MJJ (PR) |
| Petitioner, | ) | **ORDER OF DISMISSAL** |
| v. | ) | |
| D.K. SISTO, Warden, | ) | |
| Respondent. | ) | |
| _____ | ) | |

Petitioner filed a pro se petition for a writ of habeas corpus on October 10, 2007. That same day, the court notified petitioner he had neither paid the filing fee nor submitted a completed application for leave to proceed in forma pauperis ("ifp"). Specifically, the notice informed petitioner he had not submitted a certificate of funds in his trust account completed and signed by a prison official, nor had he submitted a copy of his prisoner trust account statement showing transactions for the last six months. A copy of the court's form ifp application was provided to petitioner with the notice, along with a postage paid return envelope and instructions for completing the ifp application, including the filing of a completed certificate of funds form and the requisite trust account statement. Petitioner was informed that if he did not either pay the fee or file the completed ifp application within thirty days the case would be dismissed. No response has been received.

G:\PRO-SE\MJJ\HC.07\johnson.dfp.wpd

1    As petitioner has neither paid the filing fee nor filed a completed ifp application, this

2    case is hereby DISMISSED without prejudice.

3    The Clerk shall close the file.

4    IT IS SO ORDERED.

5    DATED: 11/26/07

6    _____
     MARTIN J. JENKINS
7    United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA

LEANDRE D. JOHNSON,

       Plaintiff,

  v.

D.K. SISTO et al,

       Defendant.

_____/

Case Number: CV07-05187 MJJ

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on November 28, 2007, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Leandre Demund Johnson
CSP-Solano II
Prisoner Id D-88755
P.O. Box 4000
Vacaville, CA 95696

Dated: November 28, 2007

Richard W. Wieking, Clerk
By: R.B. Espinosa, Deputy Clerk

United States District Court
Clerk of the Court
450 Golden Gate Avenue
San Francisco, CA 94102-3483


LeAndre Johnson, CDCR#D-88755
P.O. Box 4000, (14-N-5Low)
Vacaville, CA 95696-4000

**E-filing**

Date: April 21, 2008

CV 08   2883

Re: Case No. C-07-5187 MJJ (PR).


Dear Clerk,

        on December 7, 2007 I paid my $5.00 required filing fee
to process my petition for Writ of Habeas Corpus. In fact, I even
received a receipt of payment from this Court (see attached), but
as of today's date I have not received anything from this Court.
Therefore, can you please check on the status of my case to make
sure that I did not slip through the cracks somehow?

        In closing, thank you in advance for all of your time
and assistance in this matter, both are appreciated very much.
Have a nice day.


Sincerely,

LeAndre Johnson
In Pro Per

E-filing

CV 08    2883

MMC

(PR)

# EXHIBIT A

IN THE MUNICIPAL COURT

IN THE OAKLAND-PIEDMONT-EMERYVILLE JUDICIAL DISTRICT

**FILED**

ALAMEDA COUNTY

APR 19 1988

RENE C. DAVIDSON, County Clerk

by Donna delaSerg

1
2
3
4   THE PEOPLE OF THE        )
5   STATE OF CALIFORNIA,     )
                             )
6         PLAINTIFFS,        )
                             )
7   VS.                      )      NO. 298092B
                             )      DEPARTMENT 16
8   LEANDRE DEMUND JOHNSON,  )      (GUILTY PLEA)
                             )
9         DEFENDANT.         )
    _____)

10
                                        9/8/13A
11
12
13
14              TRANSCRIPT OF GUILTY PLEA
15      BEFORE THE HONORABLE JUDGE COURTLAND D. ARNE
                    APRIL 4, 1988
16                    2:35 P.M.
17
18
19  APPEARANCES:

20  FOR THE PEOPLE:           GENE FRANKLIN
                              ASSISTANT DISTRICT ATTORNEY
21
22  FOR THE DEFENDANT:        WILLIAM COLE, ESQ.
                              APPOINTED DEFENSE ATTORNEY
23
24
25
26  COURT REPORTER:           SONJA VON KAMPERMANN, CSR
27
28

I

I N D E X

WITNESS                           VOIR DIRE EXAMINATION

   LEANDRE DEMUND JOHNSON                    13

2

1          THE COURT:  ON THE RECORD.  THIS IS DOCKET NO.

2   298092B.  THE PEOPLE VERSUS LEANDRE -- HOW DO YOU SAY YOUR

3   MIDDLE NAME?

4          THE WITNESS:  DEMUND.

5          THE COURT:  LEANDRE DEMUND JOHNSON.

6          AND THE RECORD WILL SHOW THE DEFENDANT IS

7   PRESENT IN COURT WITH HIS COUNSEL, MR. COLE, AND MR. FRANKLIN

8   IS PRESENT FOR THE PEOPLE.

9          AND I UNDERSTAND THAT THERE IS A PROPOSED

10  NEGOTIATED DISPOSITION IN THIS MATTER?

11         MR. FRANKLIN:  THAT IS CORRECT, YOUR HONOR.

12         THE COURT:  WOIULD YOU CARE TO STATE IT FOR

13  THE RECORD?

14         MR. FRANKLIN:  YES.  I WILL.

15         IT IS THE UNDERSTANDING OF THE PEOPLE THAT

16  MR. JOHNSON IS GOING TO PLEAD TO COUNT ONE OF 187 FIRST

17  DEGREE WITH A USE CLAUSE PLUS TWO COUNTS OF 211.

18         THE COURT:  WHICH TWO COUNTS ARE THOSE?

19         MR. FRANKLIN:  THOSE TWO COUNTS WOULD BE COUNT

20  TWO AND COUNT FIVE.

21         THE COURT:  ALL RIGHT.

22         MR. FRANKLIN:  AND IN RETURN FOR THAT PLEA,

23  IT IS AGREED THAT MR. JOHNSON WILL RECEIVE 25 YEARS TO

24  LIFE PLUS -- STRIKE THAT.  THAT IS 25 YEARS TO LIFE ON

25  COUNT ONE OF 187 FIRST DEGREE, PLUS TWO YEARS ON THE USE

26  CLAUSE FOR A TOTAL OF 27 YEARS.

27         ANY TIME ON THE 211 MAY BE CONCURRENT TO THE

28  ABOVE SENTENCE.

1          MR. COLE:  IN FACT, IT WILL BE.

2          MR. FRANKLIN:  IT IS AGREED THAT MR. JOHNSON

3  WILL MAKE AN INITIAL DECLARATION INDICATING HIS INVOLVEMENT

4  AND ANY INVOLVEMENT OF HIS CO-DEFENDANTS.

5          THE COURT:  ALL RIGHT.  MR. COLE, DOES THAT

6  FULLY STATE ALL OF THE TERMS OF THE PROPOSED DISPOSITION?

7          MR. COLE:  THE ROBBERIES WILL BE CONCURRENT?

8          MR. FRANKLIN:  THEY WILL BE CONCURRENT.

9          THE COURT:  THE RECORD WILL REFLECT THAT.

10          AND, MR. JOHNSON, DO YOU UNDERSTAND THE

11  PROPOSED DISPOSITION OF YOUR CASE?

12          THE WITNESS:  YEAH.  TO THE POINT WHERE SAY

13  WHEN HE SAID TELL HIM ABOUT WHAT HAPPENED.

14          THE COURT:  ALL RIGHT.  WHAT IS IT THAT YOU

15  WANT TO SAY ABOUT THAT?

16          THE WITNESS:  I THOUGHT I WAS COMING TO PLEAD

17  GUILTY.

18          THE COURT:  AS I UNDERSTAND IT, PART OF THE

19  PROPOSED DISPOSITION IS, I TAKE IT, YOU ARE GOING TO

20  DISMISS SOME OTHER COUNTS AGAINST THIS DEFENDANT: COUNT THREE,

21  FOUR, SIX, SEVEN, AND EIGHT IN RETURN, AND STRIKE THE ARMED

22  AND SPECIAL CIRCUMSTANCES CLAUSES?

23          MR. FRANKLIN:  THAT'S CORRECT, YOUR HONOR.

24          MR. COLE:  LET ME HAVE A WORD WITH MY CLIENT.

25                    (WHEREUPON, A SHORT DISCUSSION
                      WAS HELD OFF THE RECORD WITH
26                    MR. COLE AND LEANDRE JOHNSON.)

27          THE COURT:  ALL RIGHT.

28          MR. COLE:  WE ARE READY TO PROCEED.

4

1              THE COURT: ' MR. JOHNSON, HAVE YOU DISCUSSED

2  ALL OF THIS WITH YOUR ATTORNEY, MR. COLE?

3              THE WITNESS:  YES.  I HAVE.

4              THE COURT:  AND YOU UNDERSTAND THE PROPOSED

5  DISPOSITION OF YOUR CASE?

6              THE WITNESS:  YEAH.  TO A CERTAIN EXTENT.

7              THE COURT:  TO WHAT EXTENT DO YOU NOT

8  UNDERSTAND?

9              THE WITNESS:  WHAT AM I SUPPOSED TO TELL, WHAT

10  HAPPENED?

11             THE COURT:  THE DISTRICT ATTORNEY WILL BE

12  ASKING YOU SOME QUESTIONS IN THAT REGARD.  YES.

13             THE WITNESS:  ALL RIGHT.

14             THE COURT:  DO YOU UNDERSTAND?

15             THE WITNESS:  YES.

16             THE COURT:  ALL RIGHT.  AS YOUR CASE SITS

17  BEFORE ME AT THIS MOMENT, YOU HAVE THE RIGHT TO HAVE A

18  PRELIMINARY EXAMINATION ON THESE CHARGES.

19             DO YOU UNDERSTAND WHAT A PRELIMINARY EXAMINATION

20  IS?

21             THE WITNESS:  YES.

22             THE COURT:  YOU HAVE DISCUSSED THAT WITH

23  MR. COLE?

24             THE WITNESS:  (WITNESS NODS HEAD.)

25             THE COURT:  IS THAT CORRECT?

26             THE WITNESS:  YES.

27             THE COURT:  ALL RIGHT.

28             MR. COLE:  HE HAS DISCUSSED ALL OF THESE

1  MATTERS WITH MR. STRELLIS AS LATE AS THIS MORNING.

2           THE COURT:  DO YOU UNDERSTAND THAT IF YOU ENTER

3  A PLEA OF GUILTY TO THESE CHARGES THIS AFTERNOON, THAT

4  THE FIRST RIGHT THAT YOU ARE GOING TO GIVE UP IS YOUR RIGHT

5  TO HAVE A PRELIMINARY EXAMINATION?

6           DO YOU UNDERSTAND THAT?

7           THE WITNESS:  YES.  I UNDERSTAND THAT.

8           THE COURT:  DO YOU GIVE UP THAT RIGHT?

9           THE WITNESS:  I KNOW THAT.  YEAH.

10           THE COURT:  WHEN YOU SAY "YEAH", DO YOU MEAN

11  "YES"?

12           THE WITNESS:  YES.

13           THE COURT:  ALL RIGHT.  AT THE PRELIMINARY

14  EXAMINATION YOU WOULD HAVE THE RIGHT TO SEE, TO HEAR, AND

15  TO QUESTION ALL OF THE WITNESSES CALLED TO COURT TO TESTIFY

16  IN THAT PROCEEDING.

17           I AM SURE THAT IT'S OBVIOUS TO YOU THAT IF

18  THERE IS NO PRELIMINARY EXAMINATION, NO ONE WILL TESTIFY

19  THERE.  AND, THEREFORE, BY PLEADING GUILTY, YOU ARE ALSO

20  GIVING UP THAT RIGHT?

21           DO YOU UNDERSTAND THAT?

22           THE WITNESS:  UM-HUM.

23           THE COURT:  IS THAT A "YES"?

24           THE WITNESS:  YES.

25           THE COURT:  ALL RIGHT.  AND DO YOU GIVE UP

26  THAT RIGHT?

27           THE WITNESS:  YES.

28           THE COURT:  IF YOU  ARE HELD TO ANSWER TO THESE

1  CHARGES IN THE SUPERIOR COURT, YOU WOULD HAVE THE RIGHT TO

2  HAVE A TRAIL EITHER BEFORE A JUDGE OR A JURY.  HOWEVER, IF

3  YOU PLEAD GUILTY TODAY, YOU ARE GIVING UP YOUR RIGHT TO A

4  TRIAL EITHER BEFORE A JUDGE OR A JURY BECAUSE THERE WILL

5  NOT BE ANY TRIAL AT ALL.

6         DO YOU UNDERSTAND THAT?

7         THE WITNESS:  YES.

8         THE COURT:  AND DO YOU GIVE UP THAT RIGHT?

9         THE WITNESS:  YES.

10        THE COURT:  AGAIN, AT THE TIME OF TRIAL YOU

11 WOULD HAVE THE RIGHT TO SEE, TO HEAR, AND TO QUESTION ALL

12 OF THE WITNESSES CALLED TO COURT TO TESTIFY IN THAT

13 PROCEEDING.

14        ONCE AGAIN, I AM SURE THAT IT'S EVIDENT TO YOU

15 THAT IF THERE IS NO TRIAL, NO ONE WILL TESTIFY THERE.

16 AND, THEREFORE, BY PLEADING GUILTY, YOU ARE ALSO GIVING UP

17 THAT RIGHT.

18        DO YOU UNDERSTAND THAT?

19        THE WITNESS:  YES.

20        THE COURT:  AND DO YOU GIVE UP THAT RIGHT?

21        THE WITNESS:  YES.

22        THE COURT:  WHENEVER YOU PLEAD GUILTY, YOU ARE

23 GIVING UP YOUR RIGHT TO REMAIN SILENT AND YOUR PRIVILEGE

24 AGAINST SELF-INCRIMINATION, AND YOU ARE CONVICTING YOURSELF

25 OF THESE OFFENSES BY YOUR OWN PLEA OF GUILTY TO EACH CHARGE.

26        DO YOU UNDERSTAND THAT?

27        THE WITNESS:  YES.

28        THE COURT:  AND DO YOU GIVE UP THESE RIGHTS?

1          THE WITNESS:  YES.

2          THE COURT:  NOW, WHEN YOU APPEAR IN THE SUPERIOR

3    COURT, THEN PURSUANT TO THIS AGREEMENT, THE JUDGE IS GOING

4    TO SENTENCE YOU ON COUNT ONE TO 25 YEARS TO LIFE.

5          DO YOU UNDERSTAND THAT?

6          THE WITNESS:  (WITNESS NODS HEAD.)

7          THE COURT:  DO YOU UNDERSTAND THAT?

8          THE WITNESS:  YES.

9          THE COURT:  AND BASED UPON THE ADMISSION OF THE

10   USE CLAUSE, YOU WILL RECEIVE AN ADDITIONAL TWO YEARS.

11         DO YOU UNDERSTAND THAT?

12         THE WITNESS:  YES.

13         THE COURT:  AND AT THE TIME THE JUDGE SENTENCES

14   YOU ON THE COUNTS OF ROBBERY, IT WILL RUN CONCURRENT AT THE

15   SAME TIME AS THE OTHER SENTENCE.

16         DO YOU UNDERSTAND THAT?

17         THE WITNESS:  YES.

18         THE COURT:  WHEN YOU ARE RELEASED FROM STATE

19   PRISON, YOU WILL BE ON PAROLE.  AND IT IS AT LEAST

20   THEORETICALLY POSSIBLE TO BE ON PAROLE FOR AS LONG AS FIVE

21   YEARS.

22         IF AT ANY TIME WHILE ON PAROLE YOU VIOLATE

23   YOUR PAROLE, YOU CAN BE RETURNED TO STATE PRISON FOR UP TO

24   ONE YEAR FOR EACH SEPARATE VIOLATION.

25         DO YOU UNDERSTAND THAT?

26         THE WITNESS:  YES.

27         THE COURT:  I WANT TO POINT OUT TO YOU THAT THE

28   THREE CHARGES ARE ALL FELONY CRIMES, AND SHOULD YOU BE

8

1    CHARGED WITH A FELONY CRIME IN THE FUTURE, THESE

2    CONVICTIONS CAN BE CHARGED AS PRIOR CONVICTIONS ON ANY NEW

3    COMPLAINT.

4            AND IF YOU WERE CONVICTED OF A NEW FELONY IN

5    THE FUTURE AND THESE PRIORS WERE PROVEN, THAT COULD MAKE

6    ANY FUTURE PUNISHMENT MORE SEVERE.

7            DO YOU UNDERSTAND THAT?

8            THE WITNESS:  YES.

9            THE COURT:  MOST PARTICULARLY, SINCE THESE ARE

10   SERIOUS FELONIES, IF YOU ARE CHARGED IN THE FUTURE WITH A

11   SERIOUS CRIME AND CONVICTED OF THAT CRIME AND THESE

12   PRIORS ARE PROVEN, THAT WOULD INCREASE ANY FUTURE SENTENCE

13   BY FIVE YEARS.

14           DO YOU UNDERSTAND THAT?

15           THE WITNESS:  YES.

16           THE COURT:  ALSO, I WANT TO INFORM YOU THAT IF

17   YOU ARE NOT A CITIZEN OF THE UNITED STATES, A CONVICTION OF

18   A FELONY CRIME CAN AFFECT YOUR RIGHT TO BECOME A NATURALIZED

19   CITIZEN OF THIS COUNTRY AS WELL AS IT CAN AFFECT YOUR

20   RESIDENCY STATUS HERE.

21           DO YOU UNDERSTAND THAT?

22           THE WITNESS:  YES.

23           THE COURT:  HAS ANYONE MADE YOU ANY PROMISES IN

24   CONNECTION WITH YOUR PLEA TO THESE CHARGES THAT HAVE NOT

25   BEEN STATED HERE IN OPEN COURT AND IN FRONT OF ME THIS

26   AFTERNOON AND ON THE RECORD?

27           THE WITNESS:  CERTAIN CIRCUMSTANCES WOULD BE

28   DROPPED?

1       THE COURT: THEY WOULD MOVE THE COURT TO DROP

2   THE CHARGES.

3       THE WITNESS: YEAH.

4       THE COURT: HAVE ANY PROMISES AT ALL BEEN MADE

5   TO YOU WHICH I HAVEN'T HEARD ABOUT THIS AFTERNOON ON THE

6   RECORD?

7       THE WITNESS: NO, NOT REALLY.

8       HOW MANY YEARS WOULD I DO OF THAT?

9       THE COURT: YOUR ATTORNEY CAN ADVISE YOU.

10      MR. COLE: THAT ESSENTIALLY IS UP TO THE

11  DEPARTMENT OF CORRECTIONS. AND WE DISCUSSED THAT CURRENTLY

12  WHAT THE ROUGH ESTIMATE IS.

13      BUT THE COURT IS NOT IN CHARGE OF THAT. SO,

14  THAT IS SOMETHING THAT IS BETWEEN YOU AND THE DEPARTMENT

15  OF CORRECTIONS ONCE YOU ENTER THAT SYSTEM.

16      AND I BELIEVE YOU KNOW AS MUCH ABOUT THAT AS

17  ANYBODY BECAUSE THAT IS SOMETHING THE COURT CAN'T ADDRESS

18  BECAUSE IT'S NOT UP TO THE JUDGE.

19      AND YOU WILL BE RELEASED IN DUE COURSE OF

20  PAROLE ESSENTIALLY, AND THAT WOULD BE UP TO THE DEPARTMENT

21  OF CORRECTIONS. AND THAT WOULD DEPEND ON YOUR SENTENCE AND

22  CONDUCT IN PRISON.

23      THE WITNESS: ALL RIGHT.

24      THE COURT: ALL RIGHT. NOW, MY QUESTION TO

25  YOU IS: HAS ANYONE MADE YOU ANY PROMISES IN CONNECTION WITH

26  PLEADING GUILTY TO THESE CHARGES TODAY THAT I HAVEN'T HEARD

27  ABOUT RIGHT HERE IN OPEN COURT THIS AFTERNOON ON THE

28  RECORD?

10

1      THE WITNESS:  THAT I WOULD HAVE A RELEASE DATE?

2      THE COURT:  WELL, YOU WILL, INDEED.  THAT IS AN

3  AUTOMATIC WITH THE DEPARTMENT OF CORRECTIONS.  THEY WILL

4  SET THAT DATE.

5      I WANT TO KNOW IF ANYONE HAS MADE ANY PROMISES

6  TO YOU TO GET YOU TO PLEAD GUILTY TO THESE CHARGES THAT I

7  HAVEN'T BEEN TOLD ABOUT HERE IN OPEN COURT AND ON THE

8  RECORD?

9      THE WITNESS:  NO.

10      THE COURT:  HAS ANYONE THREATENED YOU IN ANY

11  MANNER TO MAKE YOU CHANGE YOUR PLEA?

12      THE WITNESS:  NO.

13      THE COURT:  ARE YOU ENTERING INTO THIS PLEA

14  FREELY AND VOLUNTARILY?

15      THE WITNESS:  YES.

16      THE COURT:  ALL RIGHT.  AND, MR. COLE, ARE YOU

17  STIPULATING THAT THERE IS A BASIS IN FACT FOR THE

18  DEFENDANT'S PLEA OF GUILTY THEN TO COUNT ONE AND TO COUNT

19  TWO AND FIVE OF THIS COMPLAINT?

20      MR. FRANKLIN:  BEFORE THE COURT PROCEEDS, I WOULD

21  LIKE TO KNOW IF THE COURT HAS ADMONISHED MR. JOHNSON ABOUT

22  THE FELONY ENHANCEMENT?

23      THE COURT:  NO.  JUST THE SERIOUS --

24      MR. FRANKLIN:  IT'S MY UNDERSTANDING THAT ALSO

25  THERE IS A VIOLENT FELONY ENHANCEMENT.

26      THE COURT:  YOU MAY COVER THAT WHEN YOU COVER

27  YOUR OWN QUESTIONS.

28      ARE YOU STIPULATING THAT THERE IS A BASIS IN

1  FACT FOR THE DEFENDANT'S PLEA OF GUILTY TO COUNT ONE, TWO,

2  AND FIVE?

3           MR. COLE:  SO STIPULATED.  YES.

4           MR. FRANKLIN:  YES.

5           THE COURT:  YOU ARE JOINING IN THAT?

6           MR. FRANKLIN:  SO STIPULATED.

7           THE COURT:  ALL RIGHT.  ONE OTHER MATTER,

8  MR. JOHNSON, YOU DO UNDERSTAND THAT YOU WOULD ALSO HAVE

9  THE RIGHT TO HAVE A JURY DETERMINE WHETHER OR NOT YOU DID,

10 IN FACT, PERSONALLY USE A FIREARM TO WIT: A SHOTGUN IN

11 CONNECTION WITH THE COMMISSION OF THE FELONY OF 187 CHARGING

12 YOU IN COUNT ONE BEING A FELONY OF MURDER.

13          DO YOU UNDERSTAND THAT?

14          THE WITNESS:  YES.

15          THE COURT:  AND YOU REALIZE THAT IF YOU PLEAD

16 GUILTY THIS AFTERNOON THAT YOU ARE GIVING UP YOUR RIGHT TO

17 HAVE THE JURY MAKE THAT DETERMINATION?

18          THE WITNESS:  YES.

19          THE COURT:  DO YOU GIVE UP THAT RIGHT?

20          THE WITNESS:  YES.

21          THE COURT:  IN THAT REGARD, YOU WOULD HAVE THE

22 RIGHT TO SEE, TO HEAR, AND TO QUESTION ANY WITNESSES WHO

23 WERE CALLED TO TESTIFY IN THAT MATTER.

24          I AM SURE THAT IT'S OBVIOUS TO YOU THAT NO ONE

25 IS GOING TO BE CALLED TO TESTIFY IF YOU PLEAD GUILTY BECAUSE

26 THERE WON'T BE ANY TRIAL?

27          THE WITNESS:  YES.

28          THE COURT:  AND DO YOU UNDERSTAND THAT?

1          THE WITNESS:  YES.

2          THE COURT:  AND DO YOU GIVE UP THAT RIGHT?

3          THE WITNESS:  YES.

4          THE COURT:  IN CONNECTION WITH THE USE CLAUSE,

5    YOU ARE ALSO GIVING UP YOUR RIGHT TO REMAIN SILENT AND YOUR

6    PRIVILEGE AGAINST SELF-INCRIMINATION.

7          DO YOU UNDERSTAND THAT?

8          THE WITNESS:  YES.

9          THE COURT:  DO YOU GIVE UP THOSE RIGHTS?

10          THE WITNESS:  YES.

11          THE COURT:  ALL RIGHT.  VERY WELL.

12          DID YOU WANT TO VOIR DIRE THE DEFENDANT FURTHER,

13    COUNSEL?

14          MR. FRANKLIN:  ONLY TO THE EXTENT, YOUR HONOR,

15    OF THE VIOLENT FELONY ENHANCEMENT AS PROVIDED BY PENAL CODE

16    SECTION 667.5A WHICH PROVIDES THAT ONE OF THE NEW OFFENSES

17    IS ONE OF A VIOLENT FELONY SPECIFIED IN SUBSECTION C IN

18    ADDITION AND CONSECUTIVE TO ANY OTHER PRISON TERMS THAT

19    THE COURT SHALL IMPOSE A THREE YEAR TERM FOR EACH PRIOR

20    SEPARATE PRISON TERM SERVED BY THE DEFENDANT WHERE THE

21    PRIOR WAS ONE OF A VIOLENT FELONY SPECIFIED IN SUBDIVISION C

22    WHICH INCLUDES PENAL CODE SECTION 187 AND PENAL CODE SECTION

23    211.

24          THE COURT:  I TAKE IT, IF THE DEFENDANT WERE

25    CONVICTED OF A SERIOUS FELONY IN THE FUTURE, THAT HIS

26    SENTENCE WOULD BE ENHANCED BY A TOTAL OF EIGHT YEARS?

27          MR. FRANKLIN:  THAT'S CORRECT, YOUR HONOR.

28          THE COURT:  DO YOU UNDERSTAND THAT, MR. JOHNSON?

1     THE WITNESS:  (WITNESS NODS HEAD.)

2     THE COURT:  IS THAT A "YES"?

3     THE WITNESS:  YES.

4     THE COURT:  ALL RIGHT.  NOW, YOU HAD SOME OTHER

5 QUESTIONS THAT YOU WANTED TO ASK THE DEFENDANT BEFORE I

6 TAKE HIS PLEA?

7     MR. FRANKLIN:  YES.  I WOULD LIKE TO HAVE THE

8 DEFENDANT SWORN TO GO THROUGH THESE QUESTIONS THAT I HAVE.

9     THE COURT:  ALL RIGHT.  THE CLERK WILL SWEAR

10 THE DEFENDANT.

11     LEANDRE DEMUND JOHNSON, SWORN

12     VOIR DIRE EXAMINATION

13 BY MR. FRANKLIN:

14     Q.    MR. JOHNSON, YOU HAVE PREVIOUSLY TALKED WITH

15 SOMEONE FROM MY OFFICE REGARDING THE EVENTS WHICH OCCURRED

16 ON OCTOBER 21ST OF 1987; IS THAT CORRECT?

17     A.    YES.

18     Q.    THE SHOOTING THAT OCCURRED AT KNOWLAND ZOO?

19     A.    YES.

20     Q.    I WOULD LIKE FOR YOU TO TELL ME NOW EXACTLY

21 WHAT YOUR INVOLVEMENT WAS IN THAT SHOOTING AND RESULTING

22 IN THE DEATH OF GARY BRADFORD ON OCTOBER 21ST, 1987?

23     A.    I ACCIDENTALLY SHOT HIM.

24     Q.    ON OCTOBER 21ST, WHAT TIME DID YOU ARRIVE AT THE

25 ZOO?

26     A.    I AM NOT SURE.

27     Q.    WERE YOU WITH SOMEONE WHEN YOU ARRIVED AT THE

28 ZOO?

14

1   A.   YES.

2   Q.   WHO WERE YOU WITH?

3   A.   MY FRIEND, STEVE MONGER.

4   Q.   NOW, HOW DID YOU GET TO THE ZOO THAT DAY?

5   A.   HIS CAR.

6   Q.   WHEN DID YOU FIRST SEE GARY BRADFORD?

7   A.   I AM NOT SURE.

8   Q.   WAS IT AT THE ZOO?

9   A.   YES.

10  Q.   WHAT WAS HE DOING WHEN YOU FIRST SAW HIM?

11  A.   HE WAS USING THE TELEPHONE.

12  Q.   DID YOU OVERHEAR HIS CONVERSATION?

13  A.   YES.

14  Q.   CAN YOU RECALL ANYTHING THAT YOU MIGHT HAVE

15  SAID?

16  A.   NOT REALLY.

17  Q.   DID YOU AND MR. MONGER HAVE A PARTICULAR PURPOSE

18  FOR BEING AT THE ZOO ON OCTOBER 21ST?

19  A.   TO SEE THE ANIMALS.

20  Q.   WHEN YOU SAW MR. BRADFORD, DID YOU AND MR. MONGER

21  DISCUSS MR. BRADFORD IN ANY WAY?

22  A.   NO.

23  Q.   YOU SAY YOU DON'T RECALL HEARING ANY OF THE

24  CONVERSATION THAT TOOK PLACE ON THE PHONE?

25  A.   YES.  I DID HEAR IT, BUT I AM NOT SURE WHAT IT

26  WAS.

27  Q.   CAN YOU RECALL ANY OF IT AT ALL?

28  A.   YEAH.  IT WAS ABOUT DRUGS.

1    Q.    AFTER HEARING MR. BRADFORD DISCUSS DRUGS, DID

2  YOU AND MR. MONGER DECIDE TO DO SOMETHING?

3    A.    YEAH.

4    Q.    AND WHAT WAS THAT?

5    A.    TO TALK TO HIM.

6    Q.    DID YOU TALK TO HIM AT THAT POINT?

7    A.    NO.

8    Q.    WHAT DID YOU DO?

9    A.    I ACCIDENTALLY SHOT HIM.

10   Q.    YOU WHAT?

11   A.    I ACCIDENTALLY SHOT HIM.

12   Q.    NOW, BEFORE YOU SHOT HIM, AS YOU JUST

13  TESTIFIED, DID YOU DECIDE TO GO BACK TO YOUR CAR?

14   A.    YEAH.

15   Q.    FOR WHAT PURPOSE?

16   A.    TO GET WEAPONS.

17   Q.    WERE THERE WEAPONS IN YOUR CAR?

18   A.    YES.

19   Q.    WHAT KIND OF WEAPONS DID YOU AND MR. MONGER

20  GET FROM YOUR CAR?

21   A.    A SHOTGUN.

22   Q.    WHO TOOK THE SHOTGUN?

23   A.    ME.

24   Q.    DID MR. MONGER ALSO TAKE A WEAPON?

25   A.    YES.  HE HAD A BAT.

26   Q.    WHAT KIND OF BAT WAS IT?

27   A.    AN ALUMINUM BAT.

28   Q.    AFTER TAKING THESE WEAPONS OUT OF THE CAR,

WHAT DID YOU AND MR. MONGER DO?

     A.     WE ASSAULTED HIM.

     Q.     DID YOU GO BACK TO THE ZOO?

     A.     YES.

     Q.     WHERE WAS YOUR CAR PARKED?

     A.     I AM NOT SURE.

     Q.     WAS IT OUTSIDE OF THE ZOO GROUNDS OR ON THE

ZOO GROUNDS?

     A.     ON THE ZOO'S GROUNDS.

     Q.     WHEN YOU WENT BACK TO THE CAR -- STRIKE THAT.

           ABOUT WHAT TIME OF DAY WAS THIS, MR. JOHNSON?

     A.     I AM NOT SURE.

     Q.     WAS IT MORNING, AFTERNOON, OR EVENING?

     A.     AFTERNOON.

     Q.     WAS IT STILL LIGHT OUT?

     A.     YEAH.

     Q.     NOW, WHEN YOU GOT BACK TO THE ZOO, AND THAT IS

WHERE MR. BRADFORD WAS, WHERE WAS MR. BRADFORD WHEN YOU GOT

THERE?

     A.     ON THE TELEPHONE.

     Q.     WHEN YOU GOT BACK, WHAT DID YOU DO, YOU AND

MR. MONGER?

     A.     WE WENT UP TO HIM, AND HE GOT SHOT.

     Q.     DID YOU ASK HIM -- STRIKE THAT.

           WHEN YOU GOT BACK, DID YOU SAY ANYTHING TO

MR. BRADFORD BEFORE YOU SHOT HIM?

     A.     YEAH.

     Q.     WHAT DID YOU SAY TO HIM?

```
1        A.      "HANG UP THE TELEPHONE."

2        Q.      WHO SAID THAT?

3        A.      I AM NOT SURE.

4        Q.      WHAT DID MR. BRADFORD DO?

5        A.      HUNG UP THE TELEPHONE.

6        Q.      AT SOME POINT DID YOU SHOW HIM THE BAT AND

7   THE GUN BEFORE YOU SHOT HIM?

8        A.      HE SEEN IT.

9        Q.      YOU HAD IT OUT IN THE OPEN?

10       A.      (NODS HEAD.)

11       Q.      DID YOU SAY ANYTHING TO HIM AFTER HE HUNG UP

12   THE PHONE?

13       A.      NO.

14       Q.      DID MR. MONGER SAY ANYTHING TO HIM?

15       A.      NO.

16       Q.      SO, IT'S MY UNDERSTANDING IT'S YOUR TESTIMONY

17   THAT HE HUNG UP THE PHONE, AND YOU IMMEDIATELY SHOT HIM?

18       A.      AFTER HE STARTED HITTING HIM WITH THE BAT.

19       Q.      WHO HIT HIM WITH THE BAT?

20       A.      STEVE.

21       Q.      DID HE SAY ANYTHING TO HIM BEFORE HE HIT HIM

22   WITH THE BAT?

23       A.      I AM NOT SURE.  IT'S BEEN FIVE MONTHS AGO.

24       Q.      I UNDERSTAND THAT, MR. JOHNSON.

25               DID YOU ASK MR. BRADFORD FOR MONEY?

26       A.      NO.

27       Q.      DID MR. MONGER ASK HIM FOR MONEY?

28       A.      NO.
```

18

1     Q.      DID YOU GO BACK WITH THE WEAPONS THAT YOU HAD

2  TAKEN FROM THE CAR TO ROB MR. BRADFORD?

3     A.      DID WE DO WHAT?

4     Q.      DID YOU GO BACK -- STRIKE THAT.

5             DID YOU TAKE THE WEAPONS OUT OF THE CAR, YOU WITH

6  THE SHOTGUN AND MR. MONGER WITH THE BAT?  DID YOU GO BACK

7  WITH THE INTENT OF ROBBING MR. BRADFORD, THE GUY YOU SAW

8  ON THE PHONE?

9     A.      YES.

10     Q.      DID YOU AND MR. MONGER DISCUSS ROBBING

11  MR. BRADFORD BEFORE YOU GOT BACK TO HIM WITH THE WEAPONS?

12     A.      NO.  WE JUST SAID WE WAS GOING TO HIT HIM.

13     Q.      WHEN YOU AND MR. MONGER FIRST HEARD MR. BRADFORD

14  ON THE TELEPHONE DISCUSSING POSSIBLE DRUGS, DID YOU AND

15  MR. MONGER SAY ANYTHING BETWEEN THE TWO OF YOU ABOUT

16  GETTING THE WEAPONS AND GOING BACK?

17     A.      I AM NOT SURE.

18     Q.      WHO DISCUSSED GOING BACK TO THE CAR TO GET THE

19  WEAPONS?

20     A.      MONGER.

21     Q.      WHAT DID HE SAY?

22     A.      LET'S GO BACK TO THE CAR.

23     Q.      DID HE SAY FOR WHAT PURPOSE?

24     A.      YES.  TO GET THE WEAPONS.

25     Q.      AND WHAT DID HE SAY ABOUT WHAT YOU WERE GOING

26  TO DO WITH THE WEAPONS AFTER YOU GOT THEM OUT OF THE CAR?

27     A.      SCARE HIM.

28     Q.      WHY DID YOU AND MR. MONGER WANT TO SCARE HIM?

1    A.    EXCUSE ME?

2    Q.    WHY DID YOU -- STRIKE THAT.

3          DID YOU AND MR. MONGER DISCUSS WHY YOU WANTED

4    TO SCARE MR. BRADFORD?

5    A.    I CAN'T REMEMBER.

6    Q.    DID YOU PLAN, MEANING DID YOU AND MR. MONGER

7    DISCUSS ROBBING MR. BRADFORD IN ADDITION TO SCARING HIM?

8    A.    NO.  I AM NOT SURE.

9    Q.    DID YOU ASK MR. BRADFORD FOR MONEY WHEN YOU

10   GOT BACK?

11   A.    NO.

12   Q.    DO YOU RECALL IF EITHER YOU OR MR. MONGER SAID

13   ANYTHING TO MR. BRADFORD BEFORE YOU SHOT HIM?

14   A.    NO.

15             MR. FRANKLIN:  CAN WE GO OFF THE RECORD FOR

16   JUST A MOMENT?

17             THE COURT:  YOU MAY.

18                           (WHEREUPON, A SHORT DISCUSSION
                              WAS HELD OFF THE RECORD BETWEEN
19                            MR. FRANKLIN AND THE COURT.)

20             MR. FRANKLIN:  ON THE RECORD.

21             MR. COLE:  JUST A MOMENT, JUST ONE FURTHER

22   MOMENT.

23                           (WHEREUPON, A SHORT DISCUSSION
                              WAS HELD OFF THE RECORD BETWEEN
24                            MR. COLE AND MR. JOHNSON.)

25   BY MR. FRANKLIN:

26   Q.    NOW, MR. JOHNSON, WHEN YOU AND MR. MONGER GOT

27   BACK TO THE ZOO AND YOU HAD THE SHOTGUN AND MR. MONGER HAD

28   THE BAT, WHO SPOKE FIRST?

1      A.    I AM NOT SURE.

2      Q.    NOW, YOU TESTIFIED THAT AT SOME POINT MR. MOGNER

3  USED THE BAT TO STRIKE MR. BRADFORD; IS THAT RIGHT?

4      A.    YES.

5      Q.    WHERE DID HE STRIKE HIM?

6      A.    ACROSS THE LEGS.

7      Q.    WHY DID HE STRIKE HIM?

8      A.    I DON'T KNOW.  I DON'T REMEMBER.

9      Q.    ON OCTOBER 21ST WHERE WERE YOU COMING FROM WHEN

10  YOU WENT TO THE ZOO, MR. JOHNSON?

11      A.    COMING FROM HOME.

12      Q.    WHERE IS THAT?

13      A.    SACRAMENTO.

14      Q.    WHERE DID YOU MEET UP WITH MR. MONGER THAT DAY?

15      A.    AT MY HOUSE.

16      Q.    IN SACRAMENTO?

17      A.    YES.

18      Q.    AND THE TWO OF YOU GOT TOGETHER AND DECIDED

19  TO GO TO OAKLAND; IS THAT RIGHT?

20      A.    YES.

21      Q.    WHY DID YOU DECIDE TO COME TO OAKLAND?

22      A.    TO GO SEE MY MOTHER.

23      Q.    IS THERE ANY OTHER REASON THAT YOU CAME TO OAKLAND

24  THAT DAY?

25      A.    NO.

26      Q.    DID YOU AND MR. MONGER DISCUSS POSSIBLY ROBBING

27  SOME DRUG DEALERS THAT DAY?

28      A.    I AM NOT SURE.

1          MR. COLE:  JUST A MOMENT.

2                         (WHEREUPON, A SHORT DISCUSSION
                           WAS HELD OFF THE RECORD BETWEEN
3                          MR. COLE AND MR. JOHNSON.)

4          MR. COLE:  ON THE RECORD.  WHY DON'T YOU ASK

5  HIM THAT QUESTION AGAIN.

6          MR. FRANKLIN:  WOULD YOU REPEAT THE QUESTION

7  PLEASE?

8                         (WHEREUPON, THE QUESTION WAS READ
                           BACK BY THE REPORTER.)
9

10         THE WITNESS:  YES.

11  BY MR. FRANKLIN:

12     Q.    WHERE WAS THAT?  WHERE DID THAT DISCUSSION TAKE

13  PLACE?

14     A.    I AM NOT SURE.

15     Q.    WAS IT IN SACRAMENTO?

16     A.    YEAH.

17     Q.    NOW, WHEN YOU GOT BACK TO THE ZOO -- STRIKE THAT.

18         WHEN YOU AND MR. MONGER APPROACHED MR. BRADFORD,

19  YOU HAD -- ON THE SECOND OCCASION WHEN YOU HAD THE SHOTGUN

20  AND HE HAD THE BAT, WAS MR. MONGER STRIKING MR. BRADFORD

21  BECAUSE MR. BRADFORD WAS RESISTING GIVING HIM ANY MONEY?

22     A.    HE DIDN'T ASK FOR MONEY.

23     Q.    WHAT DID HE ASK FOR?

24     A.    HE JUST TOLD HIM, "BE STILL" OR SOMETHING.

25     Q.    DID HE TELL HIM WHY HE WANTED HIM TO BE STILL?

26     A.    NO.

27     Q.    AFTER HE, MR. MONGER, TOLD MR. BRADFORD TO BE

28  STILL, HE BEGAN TO HIT HIM WITH THE BAT; IS THAT CORRECT?

22

1      A.      YES.

2      Q.      NOW, YOU TESTIFIED THAT YOU AND MR. MONGER HAD

3   DISCUSSED COMING DOWN TO OAKLAND TO ROB SOME DRUG DEALERS;

4   IS THAT CORRECT?

5      A.      YES.

6      Q.      NOW, WAS IT YOUR UNDERSTANDING AND MR. MONGER'S

7   UNDERSTANDING THAT MR. BRADFORD WAS A DRUG DEALER?

8      A.      EXCUSE ME?

9      Q.      WAS IT YOUR UNDERSTANDING THAT MR. BRADFORD,

10  GARY BRADFORD, WAS A DRUG DEALER?

11     A.      YES.

12     Q.      BECAUSE YOU HEARD THE CONVERSATION OVER THE

13  PHONE?

14     A.      YES.

15     Q.      AND YOU AND MR. MONGER WENT BACK TO THE CAR

16  WITH THE INTENT OF GETTING WEAPONS OUT TO ROB MR. BRADFORD;

17  IS THAT CORRECT?

18     A.      YES.

19     Q.      NOW, YOU SAID THAT MR. MONGER HIT MR. BRADFORD

20  WITH THE BAT.  DID MR. BRADFORD BEGIN TO RESIST AT THAT

21  POINT?

22     A.      YES.

23     Q.      IS THAT WHEN YOU SHOT HIM?

24     A.      YES.

25     Q.      WHAT DID YOU AND MR. MONGER DO AFTER YOU SHOT

26  MR. BRADFORD?

27     A.      HE RAN.

28     Q.      YOU WENT BACK TO THE CAR?

1    A.    YES.

2    Q.    AND WHO DROVE?

3    A.    MONGER DROVE.

4    Q.    WE WENT TO SAN JOSE.

5    Q.    DID YOU GET IN THE CAR ALSO?

6    A.    YES.

7    Q.    ON THE RIGHT PASSENGER SIDE?

8    A.    YES.

9    Q.    AND YOU WENT TO SAN JOSE?

10   A.    YES.

11   Q.    DID EITHER OF YOU DISCUSS WHAT JUST HAD

12   OCCURRED AT THE ZOO?

13   A.    NO.

14   Q.    WHAT DID YOU DO WITH THE BAT AND THE GUN AFTER

15   YOU GOT TO SAN JOSE?

16   A.    PUT IT AWAY.

17   Q.    WHERE WAS THAT?

18   A.    IN THE CASE.

19   Q.    YOU HAD A CASE?

20   A.    YES.

21   Q.    WHEN YOU LEFT THE ZOO, WHERE WAS THE CASE?

22   A.    I AM NOT SURE.

23   Q.    WAS IT IN THE CAR?

24   A.    YES.  IT WAS.

25   Q.    NOW, IS IT CORRECT TO SAY THAT YOU KEPT THE

26   BAT AND THE GUN IN THE PASSENGER COMPARTMENT OF THE CAR

27   UNTIL YOU GOT TO SAN JOSE?

28   A.    I DON'T KNOW.

24

1     Q.    DID YOU MAKE ANY STOPS ALONG THE WAY TO SAN JOSE?

2     A.    NO.

3     Q.    WHEN  YOU GOT TO SAN JOSE WHAT DID YOU DO WITH

4 THE BAT AND THE SHOTGUN?

5     A.    PUT IT AWAY.

6     Q.    OKAY.  WHEN YOU SAY "PUT IT AWAY", DOES THAT

7 MEAN YOU PUT THE GUN INTO SOME SORT OF CASE?

8     A.    YES.

9     Q.    AND YOU PUT THE CASE IN THE TRUNK OF THE CAR?

10    A.    NO.

11    Q.    WHERE DID YOU PUT THE CASE?

12    A.    ON  THE FLOOR.

13    Q.    THE FRONT FLOOR OR THE BACK?

14    A.    THE FRONT FLOOR.

15    Q.    WHERE DID YOU PUT THE BASEBALL BAT?

16    A.    I DON'T KNOW.  I DID NOT HAVE IT.

17    Q.    NOW, MR. JOHNSON, AS TO THE SECOND COUNT OF

18 THIS COMPLAINT --

19          MR. COLE:  JUST ONE MOMENT.

20                  (WHEREUPON, A SHORT DISCUSSION
                            WAS HELD OFF THE RECORD BETWEEN
21                            MR. COLE AND MR. JOHNSON.)

22 BY MR. FRANKLIN:

23    Q.    NOW, MR. JOHNSON, AS TO THE SECOND COUNT IN THIS

24 COMPLAINT, YOU ARE CHARGED WITH ROBBERY WHICH WAS COMMITTED

25 ON THE 25TH OF SEPTEMBER, 1987 IN THAT YOU TOOK SOME SHOES

26 AND MONEY FROM MR. KENNETH WEISNER, W-E-I-S-N-E-R.  DO YOU

27 RECALL THAT INCIDENT, MR. JOHNSON?

28    A.    YES.

1     Q.     WHO WAS WITH YOU ON THAT OCCASION?

2     A.     I DON'T KNOW.

3     Q.     ON THE 25TH OF SEPTEMBER, WHERE DID YOU FIRST

4     SEE MR. KENNETH WEISNER?  WHERE WAS HE?

5     A.     I DON'T KNOW WHO HE IS.

6     Q.     IS IS THE GENTLEMAN THAT YOU TOOK THE SHOES

7     AND THE MONEY FROM IN SEPTEMBER OF 1987.  DO YOU RECALL

8     THAT INCIDENT?

9     A.     WHERE?

10    Q.     THIS WAS ON 11TH AVENUE IN OAKLAND.

11    A.     OH, YEAH.

12    Q.     DO YOU RECALL IT NOW?

13    A.     UH-HUH.

14    Q.     WHO WAS WITH YOU ON THAT OCCASION?

15    A.     STEVE MONGER.

16    Q.     THIS WAS ABOUT 10:30 IN THE EVENING?

17    A.     YEAH.

18    Q.     AND --

19    A.     I GUESS.

20    Q.     AND WERE YOU AND MR. MONGER -- STRIKE THAT.

21          WERE YOU AND MR. MONGER -- STRIKE THAT.

22          WHEN DID YOU FIRST SEE MR. MONGER ON THE 25TH

23    OF SEPTEMBER.  DO YOU RECALL?

24    A.     NO.  I DON'T.

25    Q.     DID YOU AND MR. MONGER HAVE A PARTICULAR

26    PURPOSE FOR BEING TOGETHER ON THAT DATE?

27    A.     I AM NOT SURE.

28    Q.     WERE YOU LOOKING FOR -- DO YOU RECALL IF YOU

1    WERE LOOKING FOR DRUG DEALERS TO HOLD UP THAT DAY?

2          A.    IF WE WAS, IF WE WAS THERE, PROBABLY SO.

3          Q.    AND THIS OCCURRED ON 11TH AVENUE IN OAKLAND?

4          A.    YES.

5          Q.    IS IT YOUR TESTIMONY THAT YOU BOTH CAME FROM

6    SACRAMENTO TOGETHER PRIMARILY TO LOOK FOR DRUG DEALERS AND

7    TO HOLD THEM UP AND ROB THEM; IS THAT CORRECT?

8          A.    YES.

9          Q.    IS THAT CORRECT?

10         A.    YES.

11         Q.    SO, ON THE 25TH OF SEPTEMBER, YOU AND MR. MONGER

12   WERE TOGETHER WHEN YOU ROBBED MR. KENNETH WEISNER OF MONEY

13   AND SHOES; IS THAT CORRECT?

14         A.    YES.

15         Q.    NOW, DO YOU RECALL WHAT KIND OF SHOES THAT YOU

16   TOOK FROM MR. WEISNER THAT EVENING?

17         A.    NO.

18         Q.    DO YOU RECALL WHEN YOU FIRST SAW MR. WEISNER ON

19   THAT OCCASION?

20         A.    STANDING AT THE BUS STOP.

21         Q.    WHAT DID YOU DO WHEN YOU FIRST SAW HIM?

22         A.    PULLED AROUND THE CORNER.

23         Q.    WHO WAS DRIVING?

24         A.    ME.

25         Q.    DID MR. MONGER SAY ANYTHING?

26         A.    I AM NOT SURE.

27         Q.    AFTER YOU PULLED AROUND THE CORNER, DID YOU GET

28   OUT OF THE CAR, YOU AND MR. MONGER?

27

```
1      A.     I DID NOT.

2      Q.     DID MR. MONGER GET OUT OF THE CAR?

3      A.     YES.

4      Q.     DID HE TAKE  ANYTHING WITH HIM?

5      A.     YES.

6      Q.     WHAT DID HE TAKE WITH HIM?

7      A.     TOOK A SHOTGUN WITH HIM.

8      Q.     WAS THE SHOTGUN LOADED?

9      A.     I AM -- I DON'T KNOW.

10     Q.     NOW, WHEN MR. MONGER GOT OUT OF THE CAR, DID HE

11  TELL YOU WHERE HE WAS GOING?

12     A.     YEAH.

13     Q.     WHERE DID HE TELL YOU HE WAS GOING?

14     A.     AROUND THE CORNER.

15     Q.     DID HE TELL YOU FOR WHAT PURPOSE?

16     A.     NO.  I KNEW WHAT PURPOSE.

17     Q.     THAT WAS TO ROB MR. WEISNER; IS THAT CORRECT?

18     A.     YES.

19            MR. COLE:  EXCUSE ME FOR JUST A MOMENT.  CAN WE

20  GO OFF THE RECORD?

21            THE COURT:  ALL RIGHT.

22                        (WHEREUPON, A SHORT DISCUSSION
23                         WAS HELD OFF THE RECORD BETWEEN
                           MR. COLE AND MR. JOHNSON.)

24            MR. FRANKLIN:  ON THE RECORD.

25     Q.     MR. MONGER, ON THE 26TH OF SEPTEMBER, 1987 --

26            THE WITNESS:  I AM MR. JOHNSON.

27            MR. FRANKLIN:  STRIKE THAT.

28     Q.     MR. JOHNSON, ON THE 26TH OF SEPTEMBER, WHICH WAS
```

1    THE NEXT DAY, WERE YOU WITH MR. MONGER WHEN HE CAME BACK TO

2    OAKLAND AND WENT TO 1142 FOOTHILL BOULEVARD?

3         A.    YEAH.  I WAS WITH HIM.

4              MR. COLE:  EXCUSE ME.

5                             (WHEREUPON, A SHORT DISCUSSION
                              WAS HELD OFF THE RECORD BETWEEN
6                             MR. COLE AND MR. JOHNSON.)

7    BY MR. FRANKLIN:

8         Q.    IS THAT THE OCCASION WHERE MR. MONGER ASSAULTED

9    A CONNIE BIRCH?

10        A.    NO.  I WASN'T -- NO.  THAT WASN'T ME.

11        Q.    YOU WEREN'T WITH HIM THAT DAY?

12        A.    I WAS WITH HIM, BUT I DIDN'T GO WITH HIM.

13        Q.    WHERE WERE YOU ON THAT OCCASION?

14        A.    A BLOCK AWAY.

15        Q.    DID YOU BOTH COME DOWN FROM SACRAMENTO TOGETHER

16   THAT DAY IN THE SAME CAR?

17        A.    YES.

18        Q.    AND HOW DID IT HAPPEN THAT YOU WERE A BLOCK

19   AWAY FROM MR. MONGER?  WHAT CAUSED YOU TO BE SEPARATED?

20        A.    HE WALKED.

21        Q.    DID YOU PARK THE CAR SOMEPLACE?

22        A.    YEAH, A BLOCK AWAY.

23        Q.    DID HE TELL YOU WHAT HAPPENED AFTER HE CAME

24   BACK?

25        A.    YEAH.  HE TOLD ME HE KICKED IN SOMEBODY'S DOOR.

26   AS SIMPLE AS THAT.

27        Q.    DID HE TELL YOU HE ASSAULTED A WOMAN?

28        A.    NO.

29

1    Q.    DID HE TELL YOU HE HIT A WOMAN?

2    A.    NO.  I DON'T THINK HE DID.

3    Q.    DID YOU SAY HE TOLD YOU HE KICKED IN A DOOR; IS

4    THAT RIGHT?

5    A.    YES.

6    Q.    DID HE TELL YOU WHY HE WENT INTO THIS HOUSE?

7    A.    NO.

8    Q.    DID HE HAVE ANYTHING WITH HIM WHEN HE CAME BACK?

9    A.    NO.

10    Q.    NOW, ON THE 27TH OF SEPTEMBER YOU WERE WITH

11    MR. MONGER ON 90TH AVENUE AT 2124 - 90TH AVENUE.  DO YOU

12    RECALL THAT?

13    A.    YES.

14    Q.    AND DO YOU RECALL YOU AND MR. MONGER -- STRIKE

15    THAT.

16         WHAT HAPPENED AFTER THAT DATE AND TIME?

17    A.    WE WAS RIDING, AND WE SEEN A FEW GUYS.

18    Q.    AND AFTER SEEING THESE GUYS, DID YOU DECIDE

19    TO ROB THEM, YOU AND MR. MONGER?

20    A.    YES.

21    Q.    HAD YOU COME DOWN FROM SACRAMENTO WITH THE

22    SPECIFIC PURPOSE OF ROBBING?

23    A.    I AM NOT SURE.

24    Q.    DO YOU RECALL TAKING A RING FROM A VICTIM THAT

25    EVENING?

26    A.    NO.

27    Q.    YOU DON'T RECALL IT?

28    A.    I AM NOT SURE.

30

1      Q.    BUT YOU DO RECALL COMMITTING A ROBBERY ON 90TH
2  AVENUE ON THAT DAY; IS THAT CORRECT?

3      A.    YES.

4      Q.    AND THAT WAS ABOUT MIDNIGHT OR 12:15 A.M.?

5      A.    I DON'T KNOW.

6      Q.    IT WAS LATE; IS THAT CORRECT?

7      A.    YEAH.

8      Q.    NOW, ON THAT OCCASION DID YOU HAVE A SHOTGUN
9  WITH YOU?

10     A.    NO.  NOT ME.

11     Q.    DID MR. MONGER HAVE A SHOTGUN WITH HIM?

12     A.    YES.

13     Q.    DID YOU HAVE A WEAPON?

14     A.    YEAH.

15     Q.    WHAT DID YOU HAVE?

16     A.    A BILLYCLUB.

17     Q.    DO YOU RECALL WHAT YOU SAID TO MR. MONTGOMERY
18  WHEN MR. MONGER ROBBED HIM?

19     A.    NO.

20     Q.    DID YOU PUT HIM ON THE GROUND?

21     A.    YES.

22     Q.    WHO TOLD HIM TO GET ON THE GROUND?

23     A.    I AM NOT SURE.

24     Q.    DID MR. MONGER POINT THE SHOTGUN AT HIM?

25     A.    YES.

26     Q.    WAS THE SHOTGUN LOADED ON THAT OCCASION,
27  MR. JOHNSON?

28     A.    I AM NOT SURE.

Q.    NOW, IF WE COULD BACK UP FOR JUST A MOMENT. ON OCTOBER 21ST WHEN YOU WERE AT THE ZOO AND YOU WENT BACK TO THE CAR AND GOT THE SHOTGUN, YOU KNEW IT WAS LOADED; DIDN'T YOU?

A.    I DON'T KNOW.

Q.    YOU HAD FIRED THAT SHOTGUN BEFORE, HADN'T YOU, MR. JOHNSON?

A.    YEP.

Q.    DID MR. MONGER TELL YOU THAT THE GUN WAS LOADED?

A.    NO.

Q.    NOW, DO YOU REMEMBER MAKING THIS STATEMENT AGAIN TO AN ATTORNEY FROM OUR OFFICE, A WOMAN?

A.    YEAH.  I REMEMBER TALKING TO HER.

Q.    DO YOU REMEMBER TELLING HER THAT YOU KNEW THE GUN WAS LOADED?

A.    NO.  I DON'T REMEMBER THAT.

Q.    YOUR COUNSEL HAS SHOWN YOU A COPY I BELIEVE OF THE TAPED STATEMENT THAT YOU GAVE TO THE ATTORNEY FROM MY OFFICE.  DOES THAT HELP REFRESH YOUR  RECOLLECTION, MR. JOHNSON?

A.    NO.

Q.    OKAY.  YOU HAVE SEEN THAT, AND YOU STILL DON'T REMEMBER TELLING THE ATTORNEY FROM MY OFFICE THAT?

A.    I AM NOT SURE.

Q.    IT DOES INDICATE, I BELIEVE, AS YOUR COUNSEL HAS SHOWN YOU, THAT YOU TOLD THE OTHER DEPUTY THAT YOU KNEW THE GUN WAS LOADED, CORRECT?

A.    IF THAT IS WHAT IT SAY.

32

1    Q.    NOW, ON THE 27TH, AGAIN ON THE 27TH OF

2    SEPTEMBER AT THE SAME PLACE AT 2124 - 90TH AVENUE, HOW

3    MANY PEOPLE DID YOU AND MR. MONGER ROB AT THAT LOCATION

4    AND TIME?

5    A.    ABOUT THREE.

6    Q.    DO YOU RECALL TAKING SOME KEYS AS WELL AS

7    MONEY OFF OF ONE OF THE VICTIMS?

8    A.    YES.

9    Q.    AND AGAIN, WAS THIS THE SAME OCCASION THAT

10   MR. MONGER HAD THIS RIFLE AND YOU HAD THE BILLYCLUB?

11   A.    YEP -- YES.

12   Q.    WAS THERE EVER AN OCCASION WHEN YOU AND MR. MONGER

13   CAME DOWN TO ROB DRUG DEALERS PRIOR TO THE OCTOBER 21ST

14   SHOOTING AT THE ZOO WHERE ONE OF YOUR VICTIMS WAS ACTUALLY

15   SHOT?

16   A.    EXCUSE ME?  REPEAT THAT.

17   Q.    WAS THERE AN OCCASION PRIOR TO OCTOBER 21ST,

18   1987, AT THE ZOO WHERE YOU AND MR. MONGER CAME DOWN TO

19   OAKLAND FROM SACRAMENTO TO ROB DRUG DEALERS WHERE ONE OF

20   YOUR VICTIMS WAS SHOT WITH A SHOTGUN?

21   A.    YEAH.

22   Q.    DO YOU RECALL WHAT DATE THAT WAS?

23   A.    THE 23RD.

24   Q.    WHO HAD THE SHOTGUN ON THAT OCCASION?

25   A.    ME.

26   Q.    YOU HAD THE SHOTGUN?

27   A.    (WITNESS NODS HEAD.)  OH, YEAH.

28   Q.    DO YOU RECALL WHERE YOU SHOT THE VICTIM?

1    A.    IN THE STOMACH.

2    Q.    NOT ON OCTOBER 21ST.  PRIOR TO THAT DAY?

3    A.    WHAT DO YOU MEAN?

4    Q.    MY QUESTION WAS:  PRIOR TO THE INCIDENT AT THE

5    ZOO, WAS THERE EVER ANOTHER OCCASION?

6    A.    NO.  NO.  NO.

7    Q.    NOW, ON SEPTEMBER 27TH AND AGAIN AT THE SAME

8    PLACE, DO YOU RECALL TAKING SOME SHOES AND A WATCH OFF OF

9    ONE OF YOUR VICTIMS ON SEPTEMBER 27TH, 1987?

10    A.    YES.

11    Q.    WHO TOOK THE SHOES AND THE WATCH?

12    A.    I AM NOT SURE.

13    Q.    ON THE 27TH OF SEPTEMBER AGAIN 1987, DO YOU

14    RECALL BEING INVOLVED WITH TAKING A CAR?

15    A.    YEP.

16    Q.    A 1987 HONDA CIVIC?

17    A.    YES.

18    Q.    WHO TOOK THE CAR?

19    A.    ME.

20    Q.    WHO WAS WITH YOU ON THAT OCCASION?

21    A.    MONGER.

22    Q.    DID YOU AND MR. MONGER DISCUSS TAKING THAT

23    CAR?

24    A.    NO.

25    Q.    WHERE WAS THE CAR WHEN YOU FIRST SAW IT,

26    MR. JOHNSON?

27    A.    PARKED IN THE CAR PORT.

28    Q.    WAS IT LOCKED?

1    A.    THE CAR?

2    Q.    YES.

3    A.    YES.

4    Q.    HOW DID YOU GET INTO THE CAR?

5    A.    WITH A KEY, WITH THE KEY.

6    Q.    YOU HAD THE KEY TO THE CAR?

7    A.    YEAH.

8    Q.    HOW DID YOU GET THE KEY?

9    A.    FROM SOMEBODY.

10   Q.    FROM WHOM?

11   A.    I DON'T KNOW HIS NAME.

12   Q.    DID YOU TAKE THE KEY?

13   A.    YEAH.

14   Q.    HOW DID YOU TAKE THE KEY?  EXPLAIN TO ME HOW

15   YOU GOT THE KEY, MR. JOHNSON?

16   A.    I DON'T KNOW.  I AM NOT SURE.

17   Q.    SOMEONE POINT A GUN AT SOMEONE TO TAKE A KEY?

18   A.    THEY THREW IT TO THE GROUND.

19   Q.    AND THIS PERSON HAD THE KEY TO THE CAR?

20   A.    YES.

21   Q.    AND YOU AND MR. MONGER WERE TOGETHER ON THAT

22   OCCASION?

23   A.    YES.

24   Q.    AFTER YOU GOT THE KEY, WHO DROVE THE CAR?

25   A.    ME.

26   Q.    WHERE WAS MR. MONGER?

27   A.    THE PASSENGER SEAT.

28   Q.    WERE YOU BOTH ARMED ON THAT OCCASION?

1  A.  NO.  OH, I HAD A BILLYCLUB.

2  Q.  AND MR. MONGER?

3  A.  HAD A SHOTGUN.

4  Q.  NOW, ON OCTOBER 16TH OF 1987 DO YOU RECALL

5 COMMITTING A ROBBERY ON EAST 22ND STREET, 1024 EAST 22ND

6 STREET?

7  A.  I DON'T KNOW.  REPEAT THAT.

8  Q.  THIS WAS ON 22ND STREET ON OCTOBER -- STRIKE

9 THAT. OCTOBER 16TH OF 1987, DO YOU REMEMBER THAT?

10  A.  I AM NOT SURE.  EAST 20TH-WHAT?

11  Q.  EAST 22ND STREET?

12  A.  YES.

13  Q.  DO YOU RECALL WHAT TIME THAT WAS, MR. JOHNSON?

14  A.  NO.  I DON'T.

15  Q.  WHO WAS WITH YOU ON THAT OCCASION?

16  A.  STEVE.

17  Q.  AND HAD YOU AND MR. MONGER AGAIN COME DOWN

18 THAT DAY SPECIFICALLY TO ROB DRUG DEALERS, DOWN TO OAKLAND?

19  A.  YES.

20  Q.  DO YOU RECALL HOW MANY PEOPLE YOU ROBBED AT

21 THAT LOCATION AND AT THAT TIME?

22  A.  NO.

23  Q.  WERE YOU ARMED ON THAT OCCASION?

24  A.  YES.  WITH A BILLYCLUB.

25  Q.  YOU HAD A BILLYCLUB?

26  A.  YES.

27  Q.  WAS MR. MONGER ARMED?

28  A.  YES.

1      Q.    WHAT DID HE HAVE?

2      A.    A SHOTGUN.

3      Q.    NOW, THROUGHOUT THESE ROBBERIES DID YOU AND

4   MR. MONGER USE THE SAME SHOTGUN?

5      A.    YES.

6      Q.    AND THIS WAS THE SHOTGUN THAT WAS USED TO SHOOT

7   MR. BRADFORD?

8      A.    YES.

9      Q.    WHEN YOU AND MR. MONGER CONDUCTED THESE

10  ROBBERIES, DID YOU MAKE ANY KIND OF ANNOUNCEMENT THAT

11  YOU WERE POLICE OR THE TASK FORCE OR ANYTHING LIKE THAT?

12     A.    HE DID A COUPLE OF TIMES.

13     Q.    AND EXACTLY WHAT DID HE SAY?

14     A.    I AM NOT SURE.

15     Q.    DO YOU RECALL ANYTHING THAT HE SAID?

16     A.    NO.

17     Q.    BUT YOU DO RECALL HIM SAYING "POLICE OR TASK

18  FORCE"; IS THAT CORRECT?

19     A.    HE YELLED.

20     Q.    HE YELLED "TASK FORCE"?

21     A.    I DON'T KNOW WHAT HE YELLED.  HE YELLED.  THAT

22  IS ALL.

23     Q.    NOW, ON THE 26TH OF OCTOBER OF 1987 DO YOU

24  RECALL BEING INVOLVED WITH ANOTHER ROBBERY AND AGAIN TAKING

25  SOME SHOES?

26     A.    YEAH.  I GUESS.

27     Q.    ON 51ST STREET?

28     A.    51ST STREET?

1      Q.     ON THAT OCCASION?

2      A.     I DON'T REMEMBER THAT.

3      Q.     WAS THERE AN OCCASION WHERE MR. PERRY WAS ALSO

4    WITH YOU AND MR. MONGER?

5      A.     I AM NOT SURE.

6      Q.     DO YOU RECALL AT ALL EVER COMING FROM

7    SACRAMENTO WITH MR. PERRY?

8      A.     YES.  TO VISIT MY MOTHER A COUPLE OF TIMES.

9      Q.     ON ONE OF THOSE OCCASIONS DO YOU RECALL IF

10   HE WAS INVOLVED WITH ONE OF THE ROBBERIES WITH YOU AND

11   MR. MONGER ON OCTOBER 26TH OF 1987?

12     A.     YES.  YES.

13     Q.     WAS THAT THE OCCASION WHEN YOU TOOK SOME SHOES

14   AND SOME MONEY FROM A MR. CALDWELL ON 51ST STREET IN

15   OAKLAND AT ABOUT -- AGAIN ABOUT 12:45 A.M. IN THE MORNING?

16     A.     WHAT TIME?

17     Q.     ABOUT 12:45 A.M. ON OCTOBER 26TH OF 1987?

18     A.     THIS WAS -- ?

19     Q.     THIS WAS AFTER THE OCCURRENCE AT THE ZOO?

20     A.     IN OAKLAND?

21     Q.     YES.

22     A.     YEAH.

23     Q.     AND MR. PERRY WAS WITH YOU ON THAT OCCASION?

24     A.     YES.

25     Q.     WERE YOU ARMED ON THAT OCCASION?

26     A.     I AM NOT SURE.

27     Q.     WAS ANYONE ARMED ON THAT OCCASION?

28     A.     I AM NOT SURE.

1        I DON'T REMEMBER 51ST STREET.

2        MR. FRANKLIN:  I HAVE NO FURTHER QUESTIONS.

3        THE COURT:  ALL RIGHT.

4        MR. COLE:  JUST A MOMENT.

5        THE COURT:  PARDON, MR. COLE?

6        MR. COLE:  JUST A MOMENT.

7                (WHEREUPON, A SHORT DISCUSSION

8                WAS HELD OFF THE RECORD BETWEEN
                  MR. COLE AND MR. JOHNSON.)

9        THE COURT:  ALL RIGHT.  MR. COLE, IS THERE

10  ANYTHING BEFORE I TAKE THE DEFENDANT'S PLEA?

11       MR. COLE:  NO.  I DON'T BELIEVE SO.

12       THE COURT:  ALL RIGHT.  THEN, MR. JOHNSON, TO

13  THE CHARGE OF COUNT ONE OF THIS COMPLAINT, CHARGING YOU

14  WITH A FELONY CRIME OF 187 OF THE PENAL CODE ON OCTOBER

15  THE 21ST, 1987, HOW DO YOU PLEAD, SIR?

16       THE WITNESS:  I PLEAD GUILTY.

17       THE COURT:  THE RECORD WILL SHOW THAT GUILTY

18  PLEA.

19       IT'S FURTHER ALLEGED IN CONNECTION WITH THE

20  COMMISSION OF THE OFFENSE OF 187 OF THE PENAL CODE THAT

21  YOU PERSONALLY USED A FIREARM TO WIT:  A SHOTGUN.

22       DO YOU ADMIT THAT YOU PERSONALLY USED A

23  FIREARM TO WIT: A SHOTGUN IN CONNECTION WITH THE COMMISSION

24  OF THAT OFFENSE?

25       THE WITNESS:  YES.

26       THE COURT:  WITH RESPECT TO COUNT TWO OF THE

27  COMPLAINT THAT CHARGES THAT ON SEPTEMBER THE 25TH, 1987 THAT

28  YOU COMMITTED A FELONY VIOLATION OF SECTION 211 OF THE PENAL

State of California    )
                       )   ss.
County of Alameda      )


    I, SONJA VON KAMPERMANN, Official pro tem reporter,
do hereby certify that I am a pro tem reporter of the Municipal
Court of the State of California and that as such I reported the
proceedings  held in the above-entitled matter at the time and
place set forth herein.

    That my stenograph notes were thereafter transcribed under my
direction;  and that the foregoing pages constitute a full, true
and correct transcription of my said notes and were reduced to
writing to the best of my ability.

SONJA VON KAMPERMANN

OFFICIAL REPORTER
U. S. DISTRICT COURT
SAN FRANCISCO, CALIF. 94103

~ 0023
(415) 769-1676

ACTION EXPRESS LEGAL SERVICE
Historic 1612 Minturn Street Bldg. Alameda, CA 94501

# EXHIBIT B

SML STATUS SUMMARY  TYPE-  D     DVI      ** DISCREPANT **08/10/2000 19:57

| CDC NUMBER | NAME | | ETHNIC | BIRTHDATE |
|---|---|---|---|---|
| D88755 | JOHNSON,LEANDRE,DEMUND | | BLA | 03/07/1969 |

| TERM STARTS | LIFE TERM STARTS | MIN ELIGIBLE PAROLE DTE | |
|---|---|---|---|
| 07/05/1988 | 01/05/1989 | 09/05/2005 | |

| | PAROLE PERIOD |
|---|---|
| BASE TERM 25/00 + ENHANCMTS  2/00 = TOT TERM  27/00 TO LIFE | LIFE |

PRE-PRISON + POST SENTENCE CREDITS
CASE     P2900-5 P1203-3 P2900-1 CRC-CRED MH-CRED P4019   P2931 POST-SENT  TOT
91813         224                                    112             38    364

**INMATE COPY**

NOTIFICATION REQUIRED PER PC296
NOTIFICATION REQUIRED PER PC3058.6

DOC. HEARING: 10/2001    DEFENSE ATTORNEY: WILLIAM COLE
INIT. HEARING: 08/2004   INVESTIGATING AGENCY: OAKLAND P.D.

| RECV DT/ COUNTY/ | CASE | SENTENCE DATE | | CREDIT | OFFENSE |
|---|---|---|---|---|---|
| CNT | OFF-CODE | DESCRIPTION | | CODE | DATE |

CONTROLLING PRINCIPAL & CONSECUTIVE   (INCLUDES ENHANCEMENTS/OFFENSES):

-CONTROLLING CASE --
7/05/1988  ALA   91813      6/06/1988
01 P187      MURDER 1ST                              32  10/31/1987
             (D)UPN
             12022.5 USE                           1

NON-CONTROLLING OFFENSES:
7/05/1988  ALA   91813      6/06/1988
02 P212.5(B)  ROBBERY 2ND                           1  09/25/1987
05 P212.5(B)  ROBBERY 2ND                           1  09/27/1987

| JTTP WAIVER | BEGINNING | CREDIT | TOTAL | TOTAL | NET |
|---|---|---|---|---|---|
| DATE | BALANCE | APPLIED | LOST | RESTORED | TOTAL |
| 07/05/1988 | 4332 | 4332 | 0 | 0 | 4332 |

CREDITS AUTO RE-VESTED PER PC-2934 :   14

| TRAN | | | RULE | D A Y S | | | |
|---|---|---|---|---|---|---|---|
| TYPE | DATE | END DATE LOG NUMBER | NUMBER | ASSESS | LOST | REST | DEAD |

BEG 07/05/1988       ******BEG BAL********

         ****** CONTINUED ******

IPAL STATUS SUMMARY --CONTINUATION--     PAGE     2

CDC NUMBER    |  NAME
   D08755     |   JOHNSON,LEAHBRE,DEAUKO

   CURRENT PC BALANCE:    761          CURRENT BC BALANCE:    2382

parole pursuant to paragraph (3) and shall be a period chronologically determined. Time during which parole is suspended because the prisoner has absconded or has been returned to custody as a parole violator shall not be credited toward any period of parole unless the prisoner is found not guilty of the parole violation. However, in no case, except as provided in Section 3064, may a prisoner subject to three years on parole be retained under parole supervision or in custody for a period longer than four years from the date of his or her initial parole, and, except as provided in Section 3064, in no case may a prisoner subject to five years on parole be retained under parole supervision or in custody for a period longer than seven years from the date of his or her initial parole or from the date of extension of parole pursuant to paragraph (3).

(6) The Department of Corrections shall meet with each inmate at least 30 days prior to his or her good time release date and shall provide, under guidelines specified by the parole authority, the conditions of parole and the length of parole up to the maximum period of time provided by law. The inmate has the right to reconsideration of the length of parole and conditions thereof by the parole authority. The Department of Corrections or the Board of Prison Terms may impose as a condition of parole that a prisoner make payments on the prisoner's outstanding restitution fines or orders imposed pursuant to subdivision (a) or (c) of Section 13967 of the Government Code, as operative prior to September 28, 1994, or subdivision (b) or (f) of Section 1202.4.

(7) For purposes of this chapter, the Board of Prison Terms shall be considered the parole authority.

(8) The sole authority to issue warrants for the return to actual custody of any state prisoner released on parole rests with the Board of Prison Terms, except for any escaped state prisoner or any state prisoner released prior to his or her scheduled release date who should be returned to custody, and Section 3060 shall apply.

(9) It is the intent of the Legislature that efforts be made with respect to persons who are subject to subparagraph (C) of paragraph (1) of subdivision (a) of Section 290 who are on parole to engage them in treatment.

Added Stats 1976 ch 1139 § 278, operative July 1, 1977. Amended Stats 1977 ch 2 § 5, effective December 16, 1976, operative July 1, 1977, ch 165 § 42, effective June 29, 1977, operative July 1, 1977; Stats 1978 ch 582 § 1; Stats 1979 ch 255 § 17; Stats 1981 ch 1111 § 3; Stats 1982 ch 1406 § 2. Amended Stats 1992 ch 695 § 12 (SB 97), effective September 14, 1992; Stats 1993 ch 585 § 14 (AB 10), effective September 28, 1993; Stats 1st Ex Sess 1993–94 ch 53 § 1 (SB 32 X), effective November 30, 1994; Stats 1995 ch 313 § 13 (AB 817), effective August 3, 1995; Stats 1996 ch 462 § 3 (AB 3130), effective September 13, 1996; Stats 2000 ch 142 § 3 (AB 1300), effective July 19, 2000; Stats 2001 ch 485 § 3 (AB 1004), ch 854 § 49.5 (SB 205); Stats 2002 ch 829 § 1 (AB 2539).

## § 3000.05.  Collection of debt from parolees failing to make restitution payments

(a) The Department of Corrections may contract with a private debt collection agency or with the Franchise Tax Board, whichever is more cost-effective, to make collections, on behalf of a victim, from parolees who

have failed to make restitution payments according the terms and conditions specified by the departmen

(b) If a debt is referred to a private collection agen or to the Franchise Tax Board pursuant to this sectic the parolee shall be given notice of that fact, either the department in writing to his or her address record, or by his or her parole officer.

Added Stats 1996 ch 705 § 1 (SB 580).

## § 3000.1.  Life parole for first or second degree murder offense; Discharge; Revocation

(a) In the case of any inmate sentenced under Secti 1168 for any offense of first or second degree murd with a maximum term of life imprisonment, the peri of parole, if parole is granted, shall be the remainder the inmate's life.

(b) Notwithstanding any other provision of law, whe any person referred to in subdivision (a) has bee released on parole from the state prison, and has bee on parole continuously for seven years in the case any person imprisoned for first degree murder, and fi years in the case of any person imprisoned for secol degree murder, since release from confinement, tl board shall, within 30 days, discharge that person fro parole, unless the board, for good cause, determine that the person will be retained on parole. The boal shall make a written record of its determination ar transmit a copy of it to the parolee.

(c) In the event of a retention on parole, the parol shall be entitled to a review by the board each yea thereafter.

(d) There shall be a hearing as provided in Sectior 3041.5 and 3041.7 within 12 months of the date of ar revocation of parole to consider the release of tr inmate on parole, and notwithstanding the provisior of paragraph (2) of subdivision (b) of Section 3041.! there shall be annual parole consideration hearing thereafter, unless the person is released or otherwis ineligible for parole release. The panel or board sha release the person within one year of the date of th revocation unless it determines that the circumstance and gravity of the parole violation are such that col sideration of the public safety requires a more length period of incarceration or unless there is a new prisol commitment following a conviction.

(e) The provisions of Section 3042 shall not apply t any hearing held pursuant to this section.

Added Stats 1982 ch 1406 § 3. Amended Stats 2000 ch 142 § 4 (A 1300), effective July 19, 2000; Stats 2001 ch 854 § 50 (SB 205).

## § 3001.  Discharge from parole

(a) Notwithstanding any other provision of law, whe any person referred to in paragraph (1) of subdivisio (b) of Section 3000 who was not imprisoned for commii ting a violent felony, as defined in subdivision (c) c Section 667.5, has been released on parole from th state prison, and has been on parole continuously fo one year since release from confinement, within 3 days, that person shall be discharged from parole unless the Department of Corrections recommends t

EXHIBIT "A"

PAROLE AND REVOCATION PERIODS
(EFFECTIVE 5/1/80)

| Date of Commitment Offense and date of Parole if Relevant | Type of Offense | Discharge Review | Period of Parole | Maximum Period of Parole | Revocation Period |
|---|---|---|---|---|---|
| Commitment offense on or before 12/31/78 | Life | None | 3 years | 4 years | 6 months |
| Commitment offense on or before 12/31/78 | Nonlife | None | 1 year | 10 months | 6 months |
| Commitment offense on or after 1/1/79 | Life | During 37th month of continuous parole | 5 years | 7 years | 12 months |
| Commitment offense on or after 1/1/79 | Nonlife | During 13th month of continuous parole | 3 years | 4 years | 12 months |

CR/22 (3-16-81)

PAROLE AND REVOCATION PERIODS

| DATE OF COMMITMENT OFFENSE | TYPE OF OFFENSE | DISCHARGE REVIEW | PERIOD OF PAROLE | MAXIMUM REVOCATION PERIOD | MAXIMUM PERIOD OF PAROLE JURISDICTION |
|---|---|---|---|---|---|
| on or before 12/31/78 | Non-Life Violent + Non-Violent Felonies | None | 1 year | 6 months | 18 months |
| on or after 01/01/79 | Non-Life Violent + Non-Violent Felonies | 13 months of continuous parole | 3 years | 1 year | 4 years |
| on or after 09/26/88 | Non-Life Non-Violent Felonies | 13 months of continuous parole | 3 years | 1 year | 4 years |
| on or after 09/26/88 | Non-Life Violent Felony (667.5(c)) | within 30 days of completion of 2 years continuous parole | 3 years | 1 year | 4 years |
| on or before 12/31/78 | Life | None | 3 years | 6 months | 4 years |
| on or after 01/01/79 | Life | 37th month of continuous parole | 5 years | 1 year | 7 years |
| on or after 01/01/83 | Murder 1st | within 30 days of completion of 7 years continuous parole | Life | 1 Year | Life |
| | Murder 2nd | within 30 days of completion of 5 years continuous parole | Life | 1 year | Life |
| on or after 09/26/88 | Life Violent Felony (667.5(c)) | within 30 days of completion of 3 years continuous parole | 5 years | 1 year | 7 years |



| California Department of Corrections OPERATIONS MANUAL | Chapter: 80000 Parole Operations |
| | Subchapter: 81000 Field Agent Guide |
| | Section: 81080 Discharge and Pardon |

## PAROLE AND REVOCATION PERIODS

| Date of Commitment Offense | Type of Offense | Discharge Review | Maximum Period of Parole | Maximum Revocation Period* | Max. Period of Parole Jurisdiction |
|---|---|---|---|---|---|
| Commitment offense on or before 12/31/78 | Life | None | 3 years | 6 months | 4 years |
| Commitment offense on or before 12/31/78 | Non-Life | None | 1 year | 6 months | 18 months |
| Commitment offense on or after 1/1/79 but prior to 12/31/82 | Life | During 37th mo. of cont. parole | 5 years | 1 year | 7 years |
| Commitment offense on or after 1/1/79 | Non-Life | During 13th mo. of cont. parole | 3 years | 1 year | 4 years |
| Commitment offense on or after 1/1/83 | Life (Murder 1st Degree) | Within 30 days of completion of 7 years cont. parole | Life | 1 year | Life |
| Commitment offense on or after 1/1/83 | Life (Murder 2nd Degree) | Within 30 days of completion of 5 years cont. parole | Life | 1 years | Life |
| Commitment offense on or after 9/26/88 | Violent Felony (PC 667.5) | Within 30 days of completion of 2 years of cont. parole | 3 years or 5 yrs. | 1 year | 4 years or Life based on commitment offense |

*Multiple revocation terms may be imposed.

v.
om

Section 1700 - <u>Discharge Policy</u>.

1. A parolee may be recommended for discharge at any time when case factors or other considerations support early discharge.

2. Discharge review periods are specified in the Penal Code. Discharge review periods and maximum parole jurisdiction, depending on date and type of commitment offense, are:

PAROLE AND REVOCATION PERIODS

| DATE OF COMMITMENT OFFENSE | TYPE OF OFFENSE | DISCHARGE REVIEW | MAXIMUM PERIOD OF PAROLE | MAXIMUM REVOCATION PERIOD* | MAXIMUM PERIOD OF PAROLE JURISDICTION |
|---|---|---|---|---|---|
| Commitment offense on or before 12/31/78 | Life | None | 3 years | 6 months | 4 years |
| Commitment offense on or before 12/31/78 | Non-Life | None | 1 year | 6 months | 18 months |
| Commitment offense on or after 1/1/79 but prior to 12/31/82 | Life | During 37th month of continuous parole | 5 years | 1 year | 7 years |
| Commitment offense on or after 1/1/79 | Non-Life | During 13th month of continuous parole | 3 years | 1 year | 4 years |
| Commitment offense on or after 1/1/83 | Life (Murder 1st Degree) | Within 30 days of completion of 7 years of continuous parole | Life | 1 year | Life |
| Commitment offense on or after 1/1/83 | Life (Murder 2nd Degree) | Within 30 days of completion of 5 years of continous parole | Life | 1 year | Life |
| Commitment offense on or after 9/26/88 | Violent Felony (PC 667.5) | Within 30 days of completion of 2 years of continous parole | 3 years or 5 years (Life) | 1 year | 4 years or Life based on commitment offense |

* Multiple revocation terms may be imposed.

3. Continuous parole means the BPT has not interrupted the parole period by suspending or revoking a parolee who has been found guilty of an offense. Suspended PAL time does not count toward maximum time limits unless BPT makes a good cause finding to exclude at-large time from the parole period.

ge: 1 Document Name: untitled

```
PTBM20              OFFENDER BASED INFORMATION SYSTEM              01/31/2006
PPTBP20                PAROLE PERIOD TABLE QUERY                   03:59 PM

DATE OF OFFENSE          TYPE OF OFFENSE                  PAROLE PERIOD
- - - - - - - - - - -    - - - - - - - - - -             - - - - - - - -

ON OR BEFORE 12/31/1978  NON-LIFE                            1 YEAR

                         LIFE                                3 YEARS

ON OR AFTER 01/01/1979   NON-LIFE                            3 YEARS
                         (***NOT INCLUDING SPECIFIC SEX
                         OFFENSES AFTER 07/19/2000 ****)

01/01/1979-12/31/1982    LIFE                                5 YEARS

ON OR AFTER 01/01/1983   LIFE (OTHER THAN MURDER 1ST AND 2ND)  5 YEARS

                         LIFE (MURDER 1ST and 2ND ONLY)       LIFE

ON OR AFTER 7/19/2000    SEX OFFENSES PER PC 3000(B)(1)       5 YEARS
 ***TO QUERY SPECIFIC SEX AND MURDER OFFENSES PRESS PF5
Enter-PF1---PF2---PF3---PF4---PF5---PF6---PF7---PF8---PF9---PF10--PF11--PF12---
               BACK        QUERY                            MENU   QUIT
```

# EXHIBIT C

# EXHIBIT D

SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA          Dept. No. 9

Date: April 26, 2006        Hon. LARRY J. GOODMAN, Judge        Terri Turner, Deputy Clerk.
                                                                Not Reported, Reporter

IN RE

                                            Counsel appearing       No Appearance
**LEANDRE DEMUND JOHNSON**                                          for Petitioner
                    Petitioner

vs.                                         Counsel appearing       No Appearance
                                            for Respondent
PEOPLE OF THE STATE OF CALIFORNIA
                    Respondent

Nature of Proceedings:  **ORDER OF THE COURT**
                        **REGARDING PETITION FOR WRIT OF HABEAS CORPUS**

                                            **Case No. 91813A**
                                            **PFN: ARP654**
                                            **CEN: 7098081**


Petition for writ of habeas corpus is denied.  The Petition fails to state a prima facie case for relief.  Since Petitioner was not promised a specific parole date at the time of his plea there has been no violation of the plea agreement. Further since Petitioner has not been released on parole, the length of his parole at this time is not an issue to be addressed by habeas relief.  Finally, with the charges that were facing Petitioner at he time of his plea, Petitioner has failed to demonstrate that he has been prejudiced or that he would not have plead if told he would be on parole for longer than five years.


### CLERK'S CERTIFICATE OF MAILING

I certify that the following is true and correct: I am the clerk of the above-named court and not a party to this cause. I served **ORDER OF THE COURT** by placing copies in envelopes addressed as shown below and then by sealing and placing them for collection, stamping or metering with prepaid postage, and mailing on the date stated below, in the United States mail at Alameda County, California, following standard court practices.


LeAndre Johnson CDC#88755
P.O. BOX 4000
Vacaville, CA.  95696-4000


Dated:  May 3, 2006

By: _Terri Turner_ _____
         Terri Turner, Deputy Clerk


Writ- Johnson, Leandre

# EXHIBIT E

COPY

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

**FILED**

SEP 2 8 2006

Court of Appeal - First App. Dist.
DIANA HERBERT

By_____
        DEPUTY

In re LEANDRE JOHNSON,

on Habeas Corpus.

A115252

(Alameda County
Super. Ct. No. 91813A)

BY THE COURT:

The petition for writ of habeas corpus is denied. Although it appears petitioner was misadvised as to the length of his parole period, petitioner has not demonstrated prejudice. (See *People v. Avila* (1994) 24 Cal.App.4th 1455, 1459-1460; see also *In re Moser* (1993) 6 Cal.4th 342, 352.) In addition, petitioner's claim that he was promised a release date is not supported by the transcript of the guilty plea he has provided this court.

(Ruvolo, P.J., Reardon, J., and Sepulveda, J., joined in the decision.)

Date: _SEP 2 8 2006_____    **RUVOLO, P.J.** P.J.

# EXHIBIT F

S149398

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

---

In re LE'ANDRE JOHNSON on Habeas Corpus

---

The petition for writ of habeas corpus is denied.  (See *In re Miller* (1941) 17 Cal.2d 734; *In re Robbins* (1998) 18 Cal.4th 770, 780; *In re Clark* (1993) 5 Cal.4th 750.)

SUPREME COURT
# FILED

JUN 2 0 2007

Frederick K. Ohlrich Clerk

DEPUTY

GEORGE
Chief Justice

# EXHIBIT G

INITIAL PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS


In the matter of the Life )
Term Parole Consideration )
Hearing of:               )        CDC Number D-88755
                          )
LEANDRE JOHNSON           )        **INMATE**
                          )        **COPY**
_____)


CALIFORNIA STATE PRISON, SOLANO

VACAVILLE, CALIFORNIA

SEPTEMBER 23, 2005

9:48 AM



PANEL PRESENT:

Mr. Terry Farmer, Presiding Commissioner
Mr. Chuck Wolk, Deputy Commissioner




OTHERS PRESENT:
Mr. Leandre Johnson, Inmate
Mr. Bennett Davey, Attorney for Inmate
Correctional Officer, Unidentified




CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____  No      See Review of Hearing
_____  Yes     Transcript Memorandum

**Judy K. Farncomb**       **Peters Shorthand Reporting**

ii

## INDEX

|                                   | PAGE |
|-----------------------------------|------|
| Proceedings                       | 1    |
| Case Factors                      | 13   |
| Pre-Commitment Factors            | 18   |
| Post-Commitment Factors           | 47   |
| Parole Plans                      | 33   |
| Closing Statements                | 57   |
| Recess                            | 66   |
| Decision                          | 67   |
| Adjournment                       | 79   |
| Transcriber Certification         | 80   |

--oOo--

1

1                    P R O C E E D I N G S

2          **DEPUTY COMMISSIONER WOLK:**  We're on

3    record.

4          **PRESIDING COMMISSIONER FARMER:**  Okay,

5    thank you.

6          **PRESIDING COMMISSIONER FARMER:**  The time

7    is now 9:48 A.M.  We are on record in the

8    Parolee Parole Consideration Hearing for

9    Leandre, did I pronounce that correctly?

10          **INMATE JOHNSON:**  Leandre.

11          **PRESIDING COMMISSIONER FARMER:**  Leandre,

12    okay.  Spelled, L-E-A-N-D-R-E, Johnson.

13    Number D-88755.  Today's date is September 23,

14    2005.  We are at California State Prison,

15    Solano.  Mr. Johnson was received into the

16    Department of Corrections on July 5, 1988.  His

17    life term commenced on May 7, 1989, committed

18    out of the County of Alameda, and their Case

19    Number 91813.  Convicted of murder in the first-

20    degree, with use of a deadly weapon, in

21    violation of Penal Code Sections 187 and

22    12022.5.  His life term is 25 to life, plus two

23    years for the use of a weapon, his minimum

24    eligible parole date of January 2, 2006.  Also,

25    committed in conjunction with that primary

26    (indiscernible) conviction for robbery in the

27    second degree as expressed in Counts 2 of that

2

1    same complaint in violation of Penal Code

2    Sections 212.5b (indiscernible) in the second

3    degree as expressed in Count 5 of that same

4    complaint, also in violation of Penal Code

5    Section 1255 - 121.5b.  Mr. Johnson, what we are

6    next going to do is identify everybody, you can

7    see microphones in front of us, all of this is

8    being recorded and will be subsequently

9    transcribed.  So in order to identify the

10   persons presence in the room, we will start by

11   (throat clearing) each of us stating our full-

12   names, spelling our last names, and when we get

13   to you, if you could also include your CDC

14   number.  My name is Terry Farmer, F-A-R-M-E-R.

15   I'm the Commissioner.

16            **DEPUTY COMMISSIONER WOLK:**  I'm Chuck

17   Wolk, W-O-L-K, Deputy Commissioner.

18            **PRESIDING COMMISSIONER FARMER:**  All

19   right.

20            **INMATE JOHNSON:**  I'm Leandre Johnson,

21   D-88755.

22            **DEPUTY COMMISSIONER WOLK:**  Spelling of

23   your last name, sir.

24            **INMATE JOHNSON:**  J-O-H-N-S-O-N.

25            **ATTORNEY DAVEY:**  Bennett Davey, D-A-V-E-

26   Y.  Thank you.

27            **PRESIDING COMMISSIONER FARMER:**  The next

3

1   thing that I wanted to cover, Mr. Johnson, is

2   the possible disability and affect of this

3   proceeding.  In looking at BP Form 1073, which

4   was supposedly signed in April 18th of this

5   year, staff review indicated that there was no

6   disabilities identified and then you indicated

7   that you do not need any assistance for your

8   Parole Hearings.  I will next ask you attorney

9   whether not he has reviewed that form and

10  discussed any potential disability issues with

11  you and whether or not he believes that there

12  are any that need to be addressed.

13      **ATTORNEY DAVEY:**  Yes, sir.  I have

14  discussed the 1073 Form with Mr. Johnson and

15  there are no disabilities that need

16  accommodations.  We are ready to proceed.

17      **PRESIDING COMMISSIONER FARMER:**  Okay.  Do

18  you agree with that, Mr. Johnson.

19      **INMATE JOHNSON:**  Yes.

20      **PRESIDING COMMISSIONER FARMER:**  Now, let

21  me go through the procedure that we are going to

22  be following.  This is your Initial Hearing, so

23  listen to the procedure as I outline it for you.

24  If you have any questions, when I ask for them,

25  feel free to ask them.  I want to make sure that

26  you will understand what is about and how we are

27  going to proceed.  Okay.  The Hearing is being

4

1    conducted pursuant to Penal Code Sections 3041

2    and 3042, and the Rules and Regulations of the

3    Board of Parole Hearings, which govern the

4    Parole Consideration for life inmates.  The

5    purpose of today's Hearing, is to consider your

6    suitability for parole.  In doing so we will

7    consider the number and nature of the crimes for

8    which you were committed, any prior criminal

9    history you have, your social history, and your

10   behavior and programming since your commitment.

11   We have available and we have had the

12   opportunity to review your Central File.  You

13   are given the opportunity to correct any errors

14   that you believe exist in that record.  We will

15   consider your progress since your commitment.

16   We will look at your counselor's report; we'll

17   look at your psychological report and we will

18   talk about your parole.  If there is any change

19   in the parole plans since the time of the

20   counselor's report, which talks about that, you

21   should bring it them to our attention.  We will

22   reach a decision today and we will inform you

23   whether or not we find you suitable of parole

24   and the reason for our decision.  If you are

25   found suitable for parole, the length of your

26   confinement will be explained to you.  Before we

27   go any further, as this is your Initial Hearing,

5

1    to the extent, to the extent that you agree to
2    speak with us about the matters at issue here,
3    and we'll talk about that in a minute, I want to
4    advise you how important that it is for you to
5    be honest and candid.   There are time when there
6    are people that who come in here and less than
7    candid, less than forthright.   Everything that
8    is indicated has been recorded, and if you are
9    not granted a date, future Hearing Panels will
10   have it.   And if you are less than candid and
11   forthright that will (indiscernible) to your
12   advantage.   So to the extent that you agree to
13   speak with us it is very important that you be
14   honest and forthright.   Do you understand what
15   I'm saying to you?
16            **INMATE JOHNSON:**  Yes.
17            **PRESIDING COMMISSIONER FARMER:**  Okay.
18   Now, we are not here to retry your case.
19   Nothing that happens here is going to change the
20   findings of the Court.   If you want to quarrel
21   with anything that happened in Court you have to
22   go back to Court.   We're just here to determine
23   whether or not you suitable based upon your
24   conviction.   We assume the conviction is valid;
25   we have no information to disagree with that.
26   If you have any quarrels with the Judge that
27   sentenced you or the D.A. that prosecuted you or

6

1  the lawyer that represented you with the plea

2  process, if you have any of those quarrels, this

3  is not the place for it.  We are just here

4  assuming that what you did is accurate and to

5  determine, based upon that, and the other

6  factors that I've talked about that you are

7  suitable for parole.  Do you understand?

8          **INMATE JOHNSON**:  Yes.

9          **PRESIDING COMMISSIONER FARMER**:  Okay.

10  Now, we're going to conducted in Hearing in two

11  phases.  I will discuss with you your commitment

12  offense, any prior criminal record that you

13  have, your social history, your parole plans,

14  and any letters that we've received, either in

15  support of you or in opposition to you.  Then

16  Deputy Commissioner Wolk will discuss with you

17  what you have done in the institution, any

18  disciplinaries that you have received, if any,

19  your programming, your work assignments, your

20  counselor's report, and your psychological

21  report, all the history that you have within the

22  institution.  After that if we have questions

23  about any of those areas, we will have the

24  opportunity to ask those.  Your attorney will,

25  likewise, have the opportunity to ask you

26  questions if he believes thee are important

27  points that he wants to bring out.  After we go

7

1  through that process, then your attorney will

2  have the opportunity to give us a closing

3  argument, closing statement, as to why he

4  believes you are suitable, and then it's your

5  turn, if you chose to do so, to speak with us

6  directly about why you believe that you are

7  suitable for parole.  Or you can rely upon your

8  attorney, if you want to, but you also have the

9  chance to talk to us directly.  After that and

10  we have received all the information available,

11  we will adjourn the proceeding and deliberate

12  and arrive at a decision, and call you back in

13  and announce that decision, too.  Do you

14  basically understand the process?  Do you have

15  any questions about any of this?

16      **INMATE JOHNSON:**  I understand the

17  process.

18      **PRESIDING COMMISSIONER FARMER:**  Okay, now

19  let me talk to you a little bit about the rules,

20  which govern our procedure.  We operate pursuant

21  to the California Code of Regulations.  Those

22  Regulations states as follows:  Regardless of

23  time served, the life inmate shall be found

24  unsuitable for and denied parole if, in the

25  judgment of the Panel, the inmate would pose an

26  unreasonable risk of danger to society if

27  released from prison.  And in this process you

8

1    have certain rights.  Those rights include:

2    timely notice of this Hearing; the right to

3    review your Central File; and the right to

4    present relevant documents.  And I'm going to

5    ask your attorney if he believes your rights

6           **ATTORNEY DAVEY:**  Yes, sir.

7           **PRESIDING COMMISSIONER FARMER:**  Okay, do

8    you agree with that, Mr. Johnson?

9           **INMATE JOHNSON:**  Yes.

10          **PRESIDING COMMISSIONER FARMER:**  Okay.

11   You also have the right to be, have this Hearing

12   conducted by an impartial Hearing Panel.

13   Mr. Wolk and I will be the ones listening and

14   absorbing the information and we have reviewed

15   the file and we will be making the decision in

16   this case.  Do you have any reason to believe

17   that we are not impartial in this matter and

18   cannot give you a fair hearing?

19          **INMATE JOHNSON:**  You have not given me

20   any indication.

21          **PRESIDING COMMISSIONER FARMER:**  Okay,

22   then do I assume that you do not object to us

23   hearing your case?

24          **INMATE JOHNSON:**  No.  I don't object.

25          **ATTORNEY DAVEY:**  Counsel has not

26   objection at this time.

27          **PRESIDING COMMISSIONER FARMER:**  Okay.

9

1    Now, you will receive a copy of our tentative
2    written decision today.  When we say tentative,
3    what we do here today is final.  Within the next
4    120 days, the decision today is subject to
5    review.  It's reviewed in Sacramento, by what's
6    referred to as the Decision Review Unit.  And
7    they look at the transcript and determine
8    whether or not, they believe, there are any
9    errors or (indiscernible) of law contained in
10   there.  Then, also, subject to review by all of
11   the Commissioners sitting as a body, there are
12   nine of us now, and that's called an En Banc
13   session.  All that will happen within the next
14   120 days.  At the end of 120 days the decision
15   becomes final.  Then after that it is subject,
16   it's given 30 more days for review by the
17   Governor, who, also, has the power to change or
18   reverse anything that happens here.  Do you
19   understand that?
20           **INMATE JOHNSON:**  Yes.
21           **PRESIDING COMMISSIONER FARMER:**  Okay.
22   There have also been changes in the Appeal
23   process that governs these proceedings.  It was
24   formerly an Administrative Process, if you
25   disagreed with the decision of the Board Panel
26   or the review, you would appeal that
27   administratively through the Board.  That

10

1   process has been eliminated.  Now if you

2   disagree with what the Panel does or the review

3   process does, the remedy is to take that concern

4   to Court or appeal directly to the Court.  Do

5   you understand?

6          **INMATE JOHNSON:**  Yes.

7          **PRESIDING COMMISSIONER FARMER:**  If you do

8   have any further questions about that process,

9   you should consult the prison law library or ask

10  your attorney.  All right, please pay particular

11  attention to this that I'm going to tell you

12  right now.  You are not required to admit your

13  offense.  You are not required to discuss your

14  offense if you do not wish to do so.  However,

15  as indicated, the Panel does accept as true the

16  Findings of the Court.  You are invited to

17  discuss the facts and circumstances of offense,

18  if you so desire.  We will review and consider

19  any prior statements that you have made or given

20  regarding this offense as we determine your

21  suitability for parole.  I must next asked your

22  attorney whether or not you intend to speak with

23  us regarding the offense for which you were

24  committed and other aspects of the case?

25         **ATTORNEY DAVEY:**  Commissioner, my client

26  will discuss all relevant issues related to this

27  case, including the life crime offense.

11

1    **PRESIDING COMMISSIONER FARMER:**  Do you
2    understand what I've said?  And do you agree
3    with (indiscernible) counsel?
4    **INMATE JOHNSON:**  Yes.  I understand and
5    agree.
6    **PRESIDING COMMISSIONER FARMER:**  Thank
7    you.  Next I am going to ask the Deputy
8    Commissioner if there is any confidential
9    material in the file and whether or not we will
10   be using any of that material in our Hearing?
11   **DEPUTY COMMISSIONER WOLK:**  Yes.  There is
12   a considerable amount of confidential
13   information in file.  However, we will not be
14   using it today.
15   **PRESIDING COMMISSIONER FARMER:**  Thank
16   you.  Okay, we're close to getting the
17   preliminary mattes out of the way.  I will asked
18   counsel to take a look at the checklist,
19   (indiscernible) whether or not he has received
20   the items contained thereon and if so, please
21   initial and date that.
22   **ATTORNEY DAVEY:**  I believe I have all of
23   those documents, sir.
24   **PRESIDING COMMISSIONER FARMER:**  Okay.
25   **ATTORNEY DAVEY:**  I have initialed the
26   documents and send them back to you, sir.
27   **PRESIDING COMMISSIONER FARMER:**  Thank

12

1   you.  Since the corporation of the Hearing

2   packets, we have received additional material,

3   in the form of a letter of opposition, dated

4   August 4, 2005, from the Oakland Police

5   Department.  We've, also, received a letter of

6   support, dated September 9, 2005, from

7   Tammeessi, that's spelled, T-A-M-M-E-E-S-S-I,

8   Johnson, Sacramento, California.  And we will

9   refer to those at the appropriate time.  Have

10  you received those documents, counsel?

11        **ATTORNEY DAVEY:**  Yes, sir.  I have.

12        **PRESIDING COMMISSIONER FARMER:**  Is there

13  any other material that we should be reviewing

14  and considering?

15        **ATTORNEY DAVEY:**  Yes, sir.

16  Unfortunately, I have just received, in the last

17  couple of days, some additional support letters

18  that my client's wife faxed to my office,

19  including her support letter, which was faxed to

20  my office evidently last night.  My client also

21  has some recent chronos and, I believe, a couple

22  achievement certificates and other documents

23  that we would ask the Panel to consider at this

24  time.  Perhaps (indiscernible) Panel.

25        **PRESIDING COMMISSIONER FARMER:**  I

26  received the support letters that you mentioned

27  and we will discuss those at the appropriate

13

1   time.

2        **ATTORNEY DAVEY:**  (indiscernible)

3        **PRESIDING COMMISSIONER FARMER:**

4   Commissioner Wolk has the institutional material

5   and he will discuss that at the appropriate

6   time.  Are there any objections, preliminary

7   objections?

8        **ATTORNEY DAVEY:**  I have none, sir.

9        **PRESIDING COMMISSIONER FARMER:**  Okay.

10  And as you will be speaking with us,

11  Mr. Johnson, I'm going ask that you raise your

12  hand and I'm going to sear you in, your right

13  hand.  Thank you.  Do you solemnly swear or

14  affirm that the testimony that you give at this

15  Hearing will be the truth, the whole truth and

16  nothing but the truth?

17       **INMATE JOHNSON:**  I do.

18       **PRESIDING COMMISSIONER FARMER:**  Okay,

19  thank you, sir.  Now, I'm going to start by

20  examining the commitment offense and reading

21  into the record a description of that offense as

22  it was contained in your Life Prison Evaluation

23  Report.  And looking, if you want to follow

24  along with me, I'm reading under Commitment

25  Factors, Offense Summary, which reads as

26  follows:

27            On September 26, 2987, two young

14

1      men and a young woman were walking

2      in the area of Tenth Avenue and

3      East 14th Street when two men,

4      peren, (one black, one white)

5      close peren, came out of the

6      bushes behind them and shouted,

7      quote, "Task force," close quote.

8      The black man pointed a shotgun

9      and told them to get onto the

10     ground.  He then put the shotgun

11     on the woman's neck.  At this

12     point a car drove up and stopped

13     for a while and then drove away.

14     The complaining party asked the

15     black man for a badge and in

16     response was hit in the head with

17     the shotgun.  The white man took

18     $12 in cash and his Reebok tennis

19     shoes from the complaining party,

20     and then hit the complainant five

21     more times in the head.  On

22     October 16, 1987, two men were

23     waiting for a bus at Tenth Avenue

24     and East 22nd Street, the

25     defendant with two passengers

26     stopped and the defendant asked,

27     quote, "What's happening?" close

15

1    quote.  The victims felt that the

2    defendant was reaching for a

3    weapon and they ran.  Two of the

4    co-defendants chased them with

5    firearms, peren, (a revolver and

6    sawed-off shotgun), close peren,

7    and cornered them at the end of an

8    apartment complex.  The white co-

9    defendant, identified himself as a

10   police officer, and ordered the

11   victims to lie down.  He struck

12   one of the victims in the head

13   with his shotgun barrel and stole

14   $40 in cash from one of the two

15   people.  Both victims described

16   the defendants as nonchalant and

17   confident.  On October 21, 1987,

18   at the Nolan Park Zoo, witnesses

19   saw the defendant and white co-

20   defendant, peren, (who was

21   carrying a blue albumin baseball

22   bat), close peren, arguing with

23   the victim.  The witness saw the

24   white man hit the victim in the

25   lower-left leg with the bat.

26   Words were exchanged by all three

27   and, at this point, the witness

16

1        noted that the defendant had a

2        blue-barrel, brown-stock shotgun

3        pointed at the victim.  He saw the

4        defendant fire once and then saw

5        both defendants run out of the

6        park.  The witness ran to the

7        parking lot and tired a telephone,

8        and while doing so, saw the two

9        defendants run through the parking

10       lot.  When the police arrived, the

11       victim was unconscious and it was

12       determined that he had been hit in

13       the stomach.  He was pronounced

14       dead at the hospital.  On

15       October 26, 1987, a car identical

16       to the one used in the previous

17       incident, stopped in front of the

18       victim, who was waiting for a bus

19       at Ninth Avenue and East 15th

20       Street.  The defendant was a

21       passenger and the co-defendant was

22       in the backseat.  The defendant

23       got out of the car holding a

24       revolver and said he was a police

25       officer.  He told the victim and

26       the witness not to move or look up

27       and immediately thereafter the

17

1    witness was struck with an object

2    and fell to the ground.  The

3    victim saw the white defendant

4    holding the small rifle as he

5    stood over the witness.  The two

6    then took the victim jacket and

7    sneakers and $16 in cash.  They

8    returned the money when they

9    discovered that the victim worked

10   for a living and was not a drug

11   dealer.  The Police Report that

12   through October 26, 1987, seven

13   separate incidents, all similar to

14   the first three reported

15   robberies, were reported in

16   Oakland.  Two men: one black, one

17   white, and another man driving the

18   car would approach victims and

19   claim to be the police or the

20   narcotic task force and rob

21   people.  On October 28, 1987, it

22   was learned that the Vallejo

23   Police Department had three men,

24   matching the description of the

25   suspects in the above car used in

26   the offenses, under arrest.  The

27   police recovered a sawed-off

18

1          shotgun, a long-barrel pellet gun

2          at the time of the arrest.  The

3          men had been stopped because the

4          police had had two reports of

5          similar type robberies in a high

6          narcotics selling area in Vallejo.

7          Shots had been fired during one of

8          the robberies.  The defendant was

9          contacted at the Solano City Jail,

10         advised of his rights, and elected

11         to waive them.  He admitted to

12         being involved in, at least, six

13         robberies, auto thefts and

14         numerous assaults.  He also

15         identified the two men arrested

16         with him as being his co-

17         participants.  He stated that he

18         had accompanied his friends

19         through Oakland and it was the

20         white defendant's, Steven

21         Munger's, idea to rob drug

22         dealers, stating, quote, "This was

23         the white guy's thing, robbing

24         dope dealers.  He's always been a,

25         quote, 'want to be a police

26         officer,'" close quote.

27  This information comes from Probation Report,

19

```
 1   prepared, in your case, Mr. Johnson, and I'll

 2   ask you, is the defendant described in this

 3   report, you?  And is it accurate?

 4        INMATE JOHNSON:  Yes.  It is.

 5        PRESIDING COMMISSIONER FARMER:  We'll ask

 6   questions about that later.  But at this point,

 7   let's talk briefly about your prior record.

 8   And, again, referring to the Life Prison

 9   Evaluation Report, Pre-Conviction Factors, on

10   Page 3, which describes your record as follows:

11             On January 16, 1985, arrest by the

12             Oakland Police Department for

13             selling and furnishing marijuana,

14             which was referred to the Juvenile

15             Court on January 22, 1985, you

16             stipulated to violation of 11359

17             of the Health and Safety Code and

18             you were placed into wardship and

19             given 15 days in juvenile hall.

20   Is that an accurate description of that

21   incident, sir?

22        INMATE JOHNSON:  Yes.

23        PRESIDING COMMISSIONER FARMER:  Okay.  On

24   November 28, 1986, the Oakland Police

25   Department, arrest for battery, stipulated to

26   violation of Penal Code Section 242, and

27   continuing wardship and you were released to
```

20

1    home supervision by the Juvenile Court on

2    January 27, 1987, after doing six days in

3    juvenile hall.  There is further notation on

4    that incident that on November 6, 1987, you

5    failed to attend school, failed to report to

6    juvenile hall, subsequent failures to report to

7    juvenile hall, and that your probation was

8    terminated and you were given 30-days in

9    juvenile hall.  Is that accurate?  Probation was

10   terminated on 1987.  Is that accurate?  Did you

11   go to the Hall as a result of those violations?

12          **INMATE JOHNSON:**  Yes.

13          **PRESIDING COMMISSIONER FARMER:**  Okay.

14   And then the next entries were with theses

15   offenses we just described.  Is that an accurate

16   description of your arrests, of you involvement

17   with the law prior to this incident?

18          **PRESIDING COMMISSIONER FARMER:**  Yes.  It

19   is.

20          **PRESIDING COMMISSIONER FARMER:**  Then the

21   Report goes on to describe personal factors.  In

22   that same report indicating, here's what it

23   indicates:

24          Prisoners is the product of a

25          casual relationship between his

26          mother, Denise Grayson, spelled

27          G-A-Y-S-O-N, and Leo Johnson.  The

21

1          defendant knows who is father is,

2          the father has never actively

3          involved himself in the prison's

4          life.  The prison's natural father

5          has a criminal history of

6          narcotics offenses and theft

7          related offenses.  While his

8          mother was pregnant with the

9          prison, she met married another

10         man, how remained in the family

11         home until the prison was five.

12         At that point the mother and

13         stepfather was separated.  The

14         mother then began a non-marital

15         relationship with a third man and

16         had three children by him.  At

17         that the time of the commitment

18         offense the prison's was mother

19         was supported by AFDC.  According

20         to the prison, his mother has

21         always lived in an area known for

22         drug abuse and describes his

23         mother as an alcohol, who goes on

24         binges.  In 1986, the prison moved

25         to Sacramento, California, and

26         lived with his grandmother.  He

27         states it was his idea to get away

22

 1          from the high crime area of

 2          Oakland.  He visited his mother

 3          and stepfather on weekends.  And

 4          it appears that during these

 5          visits he began the robbery

 6          (indiscernible).  The prison did

 7          not attend high school in Alameda

 8          County.  He did attend Grant High

 9          School in Sacramento through the

10          tenth grade.  On November 13,

11          1996, he completed and passed his

12          GED test.  At the time of the

13          commitment offense the prison had

14          never married and has no children.

15          Since his reception into CDC, the

16          prison has been married twice.

17          His first marriage was on March 8,

18          1996, at California State Prison,

19          Solano, to Ms. Brenda Smithy,

20          spelled S-M-I-T-H-Y,

21          (indiscernible) divorced on June

22          30, 2000.  On October 7, 2000, he

23          married a Sandra Tobias, spelled

24          TO-B-I-A-S, at DVI, the

25          (indiscernible) remains in tact.

26          He has never been in the military;

27          he has no employment history.  He

23

```
 1          states his health is good.  He

 2          started drinking at 16, used

 3          marijuana on an infrequent basis

 4          since 12.  He first denied using

 5          and abusing narcotic or dangerous

 6          drugs but later admitted to using

 7          crack when he was 16 or 17.
```

 8  And this summary (indiscernible) comes from,

 9  again, the Probation Department.  And I'll ask

10  you if that's an accurate description of your

11  life before your (indiscernible) crime?

12          INMATE JOHNSON:  Yes.

13          PRESIDING COMMISSIONER FARMER:  Okay.

14  What got you to go up to Sacramento to

15  (indiscernible)?

16          INMATE JOHNSON:  The neighborhood that I

17  was living in was poverty struck and just

18  problems at home.  And, you know, I wanted to

19  finish school so I figured I would have a better

20  chance if I got out of the environment that I

21  was in.

22          PRESIDING COMMISSIONER FARMER:  The

23  letter that we got from (indiscernible), did I

24  pronounce that correctly?

25          INMATE JOHNSON:  Yes.

26          PRESIDING COMMISSIONER FARMER:  Okay.

27  She was living in Sacramento?

24

1          **INMATE JOHNSON:**  Yes.

2          **PRESIDING COMMISSIONER FARMER:**  Who were

3   you staying with up there?

4          **INMATE JOHNSON:**  My grandmother and my

5   aunt.

6          **PRESIDING COMMISSIONER FARMER:**  Is that

7   your idea to go up, to move up there?

8          **INMATE JOHNSON:**  Yes.

9          **PRESIDING COMMISSIONER FARMER:**  And how

10  was that working out?  How did you get from

11  making the decision to go up there to do this?

12         **INMATE JOHNSON:**  Well as a result of

13  missing my family, my brothers, my sisters, and

14  my mother, I would go back and visit them.  And

15  in the process of going back and visiting , you

16  know, I would start to see, you know, that

17  conditions hadn't changed really.  And it was

18  just a lot of (indiscernible), it was just bad

19  in the house.

20  d   **DEPUTY COMMISSIONER WOLK:**  Who took care

21  of your siblings when you left?

22         **INMATE JOHNSON:**  My mother took car of

23  them.

24         **PRESIDING COMMISSIONER FARMER:**  How did

25  you hook up with your crime partner?

26         **INMATE JOHNSON:**  I was in (indiscernible)

27  --

25

 1          PRESIDING COMMISSIONER FARMER:

 2   Mr. Munger.

 3          INMATE JOHNSON:   -- relative, that they

 4   had been friends before I got to Sacramento.

 5          PRESIDING COMMISSIONER FARMER:   So you

 6   met him and known him in Oakland before you went

 7   to Sacrament?

 8          INMATE JOHNSON:   No.

 9          PRESIDING COMMISSIONER FARMER:   You were

10   living in Sacramento and visiting --

11          INMATE JOHNSON:   Yes.  I was living in

12   Sacramento.  And a relative had introduced him

13   to me, introduced us.

14          PRESIDING COMMISSIONER FARMER:   Uh huh.

15          INMATE JOHNSON:   Because they had been

16   friends before I met either one of them.  And

17   that's how I met him.

18          PRESIDING COMMISSIONER FARMER:   And then

19   how did you get going on this crime spree?

20          INMATE JOHNSON:   Well, at the time I

21   didn't have an automobile to visit my mother and

22   them, so he would take me down there.  And in

23   the process, I guess, that's basically how we

24   got started.

25          PRESIDING COMMISSIONER FARMER:   Whose car

26   were you using?

27          INMATE JOHNSON:   Mr. Munger's.

26

1        **PRESIDING COMMISSIONER FARMER:**  Who got

2   the guns?

3        **INMATE JOHNSON:**  That would be me.

4        **PRESIDING COMMISSIONER FARMER:**  And where

5   did you get the guns?

6        **INMATE JOHNSON:**  I bought them from some

7   guy in the apartment complex.

8        **PRESIDING COMMISSIONER FARMER:**  Okay.

9   When did you go to Sacramento?  In '86?

10       **INMATE JOHNSON:**  Yes.

11       **PRESIDING COMMISSIONER FARMER:**  Is that

12  the connection with your involvement with

13  Juvenile Court?  Was Juvenile Court aware of you

14  moving to Sacramento?

15       **INMATE JOHNSON:**  I really don't remember

16  whether or not they (indiscernible).

17       **PRESIDING COMMISSIONER FARMER:**  Here's

18  what I'm seeing here, you recognized that maybe

19  there's problems in Oakland and maybe Sacramento

20  is a way to get out away from this

21  (indiscernible).  So you move up there -- how

22  was school going?

23       **INMATE JOHNSON:**  School was going great.

24       **PRESIDING COMMISSIONER FARMER:**  You liked

25  going to school there?

26       **INMATE JOHNSON:**  Yes.

27       **PRESIDING COMMISSIONER FARMER:**  You liked

27

1    the living situation there?

2            **INMATE JOHNSON:** Yes.

3            **PRESIDING COMMISSIONER FARMER:** Then you

4    had a chance to get away from that, and you

5    obviously messed it up.  What was going on?

6            **INMATE JOHNSON:** As I stated, I went

7    back, started going back to visit my family and

8    while doing that, you know, a lot of times I

9    would go back on the weekends to visit my

10   brothers and sisters and they didn't have

11   anything to eat.  And the main reason that they

12   didn't have anything to eat was because, at the

13   time, my mother was using drugs.  So some of the

14   money, if not all the money, would go to the

15   guys in the neighborhood that was selling drugs.

16   So I just felt, I just felt, you know, I guess,

17   (indiscernible) to feed them.  And in the

18   process, you know, the same guys that was in the

19   neighborhood that was collecting the money was

20   the same guys that I was getting money from, or

21   robbing them, to make sure that my brothers and

22   sisters had food and the lights stayed on.

23           **PRESIDING COMMISSIONER FARMER:** Well, you

24   didn't make a whole lot of money from these

25   robberies.  Are there others that you did better

26   on?

27           **INMATE JOHNSON:** Yes.  There was others

28

1   that I probably did that I didn't get caught

2   for.

3        **PRESIDING COMMISSIONER FARMER:**  And why

4   did you feel a need to carry a loaded shotgun?

5        **INMATE JOHNSON:**  Well at the time I

6   wasn't thinking, you know, with my head.  I was

7   young and there was just no excuse.

8        **PRESIDING COMMISSIONER FARMER:**  In your

9   version of the commitment offense, as described

10  in this report, you indicated that, "A guy got

11  hurt, a guy got killed; it was an accident."

12  What was accidental?

13       **INMATE JOHNSON:**  It was more of an

14  incident than an accident.  Initially, we went

15  to the zoo, you know, to look around and, you

16  know.

17       **PRESIDING COMMISSIONER FARMER:**  Look

18  around?  Look around for what?

19       **INMATE JOHNSON:**  Just look around and

20  have fun that day.

21       **PRESIDING COMMISSIONER FARMER:**  With a

22  shotgun?

23       **INMATE JOHNSON:**  Yeah.  With a shotgun.

24       **PRESIDING COMMISSIONER FARMER:**  You don't

25  go to see the lions and tigers with a shotgun.

26       **INMATE JOHNSON:**  No.  You don't.

27       **PRESIDING COMMISSIONER FARMER:**  You were

29

1    going there looking for people to rob.  Yes?

2    No?

3           **INMATE JOHNSON:**  That's not what we went

4    there for.  I didn't go there to rob somebody

5    (indiscernible).

6           **INMATE JOHNSON:**  Why did you feel the

7    need to carry a sawed-off, a loaded sawed-off

8    shotgun to the zoo.

9           **INMATE JOHNSON:**  Well, it was in the

10   automobile.

11          **PRESIDING COMMISSIONER FARMER:**  Were you

12   in the car when you confronted these people?

13   How did you go from the car -- where did you run

14   across the people that you ended up shooting?

15          **INMATE JOHNSON:**  I happened to see the

16   young man while we were there.

17          **PRESIDING COMMISSIONER FARMER:**  You were

18   there inside the zoo?

19          **INMATE JOHNSON:**  Yeah.  We were there

20   inside the zoo, looking around, sightseeing, so

21   to speak.  And in the process, I went back to

22   the car and got the weapon.

23          **PRESIDING COMMISSIONER FARMER:**  Why did

24   you do that?

25          **INMATE JOHNSON:**  I wasn't thinking.

26          **PRESIDING COMMISSIONER FARMER:**  I beg to

27   differ with you.  I think you were thinking a

30

1    lot.  You looked at this guy and you decided

2    that this was the guy that you were going to go

3    after.  But why?

4         INMATE JOHNSON:  Well, because I believed

5    that he was a drug dealer.

6         PRESIDING COMMISSIONER FARMER:  So you

7    guys were looking for and targeting people that

8    you thought were drug dealers?

9         INMATE JOHNSON:  Yes.

10        PRESIDING COMMISSIONER FARMER:  Okay, why

11   them?

12        INMATE JOHNSON:  Well, why them is

13   because those were some of the guys that were,

14   in my opinion, was taking food out of my

15   brothers and sisters mouths, and just causing a

16   lot of stuff in the neighborhood.

17        PRESIDING COMMISSIONER FARMER:  Did you

18   know this guy?

19        INMATE JOHNSON:  No.  I didn't.

20        PRESIDING COMMISSIONER FARMER:  Why did

21   you think he was a drug user?

22        INMATE JOHNSON:  Because of the way that

23   he carried himself (indiscernible).

24        PRESIDING COMMISSIONER FARMER:  Do drug

25   dealers have a certain look about them?

26        INMATE JOHNSON:  At times.

27        PRESIDING COMMISSIONER FARMER:  And you

31

1   thought this guy had that look?

2           **INMATE JOHNSON:**  Yes.

3           **PRESIDING COMMISSIONER FARMER:**  So you

4   went back to your car and got the shotgun and

5   then where was it that you confronted him?

6           **INMATE JOHNSON:**  At the zoo, by a

7   telephone.

8           **PRESIDING COMMISSIONER FARMER:**  Okay.

9   How far was that from the car?

10          **INMATE JOHNSON:**  Probably about 80 yards.

11          **PRESIDING COMMISSIONER FARMER:**  Did you

12  have a big coat on or something?

13          **INMATE JOHNSON:**  Yes.

14          **PRESIDING COMMISSIONER FARMER:**  Where you

15  could conceal the weapon.  And it was the three

16  of you that were together that day?

17          **INMATE JOHNSON:**  Yes.

18          **PRESIDING COMMISSIONER FARMER:**  So then -

19  - I'm still trying to find out, figure out what

20  was accidental about it, the shooting.

21          **INMATE JOHNSON:**  Well, I didn't mean to

22  shoot the guy (indiscernible).  My intentions

23  was not to shoot him.  That's why I called it an

24  accident, but as time went on it was an

25  incident; more than an accident.

26          **PRESIDING COMMISSIONER FARMER:**  Well your

27  conviction was a murder.

32

1          INMATE JOHNSON:  Yes.

2          PRESIDING COMMISSIONER FARMER:  You had a

3    loaded shotgun, you were there for the purpose

4    of robbing him.  How did the gun go off?

5          INMATE JOHNSON:  I pulled the trigger.'

6          PRESIDING COMMISSIONER FARMER:  What's

7    accidental about that?

8          INMATE JOHNSON:  Nothing was accidental

9    about.

10         PRESIDING COMMISSIONER FARMER:  You're

11   use to that word, your description of the

12   incident is a minimizing of what occurred.  You

13   were out to rob the guy.  You had a loaded

14   shotgun.  You knew exactly what you were doing.

15   And you pulled the trigger, that's what first-

16   degree murder is all about; it's not an

17   accident.  Do you understand what I'm saying?

18         INMATE JOHNSON:  Yes.

19         PRESIDING COMMISSIONER FARMER:  That's

20   all I have at this point.  I'll turn you over to

21   Commissioner Wolk, talk about what you've been

22   doing since you've been I prison.  I'm sorry,

23   I'm sorry, (indiscernible) we have to talk about

24   (indiscernible).

25         DEPUTY COMMISSIONER WOLK:  Are you going

26   to get into parole plans?

27         PRESIDING COMMISSIONER FARMER:

33

1   (indiscernible).  Okay, we've talked about your

2   commitment offense, your background, your

3   personal factors.  Let's discuss what you would

4   do if you were granted a date today.  You were

5   told that you had -- that you would be released

6   in three months, what would be your plans?

7         INMATE JOHNSON:  My plans would be to go

8   out there and get a job in optics.  I would join

9   AA, a local group.  And I would also continue to

10  go to church and make sure that I keep all my

11  values in tact and that I continue to help the

12  at-risk youth --

13        PRESIDING COMMISSIONER FARMER:  Let's

14  just start with something as kind of specific as

15  you are aware of right now.  Do you know where

16  you would live?

17        INMATE JOHNSON:  Sacramento.  I would

18  live in Sacramento.

19        PRESIDING COMMISSIONER FARMER:  All

20  right, and with your wife?

21        INMATE JOHNSON:  Yes.

22        PRESIDING COMMISSIONER FARMER:  She

23  stated an address there.  Is that where she

24  resides?

25        INMATE JOHNSON:  Yes.

26        PRESIDING COMMISSIONER FARMER:  Okay,

27  does she own that house?  Is that a rental?

34

1          **INMATE JOHNSON:**  Naw, she owns the home.

2          **PRESIDING COMMISSIONER FARMER:**  Okay.

3    And what does she do?

4          **INMATE JOHNSON:**  Right now, she's the

5    manager at a major hotel.

6          **PRESIDING COMMISSIONER FARMER:**  Okay.  So

7    you have a place to reside.  You indicate in

8    your report here that you will contact various

9    agencies.  Have you had the chance to do any

10   direct contact with any of these people at this

11   point to explore employment opportunities?

12         **INMATE JOHNSON:**  I haven't had an

13   opportunity to contact any of those people on

14   that list, right, that you have in front of you.

15   However, I was just enrolled in a program,

16   continuum program, offered by Orange County, I

17   gave you guys some supporting documents as to

18   that.  That did my resume for me and they're

19   whole premise for having the program is to make

20   sure that I'm employable and that they will find

21   me a job as well.

22         **PRESIDING COMMISSIONER FARMER:**  Okay.  So

23   she works out of Sacramento Parole Office and

24   they're describing the program.  That's Cindy

25   Turner, employed as a consultant for the Orange

26   County Department of Education, but she is

27   contracting and physically located in

35

1   Sacramento?

2         **INMATE JOHNSON:**  Yes.

3         **PRESIDING COMMISSIONER FARMER:**  How did

4   you find out about this opportunity?

5         **INMATE JOHNSON:**  From the program, they

6   had flyer's up on the wall.  And what I did, was

7   (indiscernible) assignment lieutenant and they

8   assigned me to the class for three weeks.  In

9   the class I had the opportunity to meet

10  Mr. Turner personally, and get my resumes

11  updated and finding out more about the program

12  and the opportunities available for people in my

13  chosen field.

14        **PRESIDING COMMISSIONER FARMER:**  Which is?

15        **INMATE JOHNSON:**  Optics.

16        **PRESIDING COMMISSIONER FARMER:**  You're in

17  the lab program?

18        **INMATE JOHNSON:**  Yes.

19        **PRESIDING COMMISSIONER FARMER:**

20  (indiscernible), do you like that work?

21        **INMATE JOHNSON:**  Yes.

22        **PRESIDING COMMISSIONER FARMER:**  Okay.  Is

23  it something that you see yourself pursuing?

24        **INMATE JOHNSON:**  Yes.

25        **PRESIDING COMMISSIONER FARMER:**  And you

26  are learning how to explore employment

27  opportunities in (indiscernible)?

36

1          **INMATE JOHNSON:**  Yes.

2          **PRESIDING COMMISSIONER FARMER:**  Okay.

3    Let's talk about support letters that we have

4    received.  We send out notices pursuant to 3042

5    of the Penal Code to a varied of effected

6    parties.  From that we have received a letter in

7    opposition for the City of Oakland Police

8    Department, dated August 4, 2005, from Richard

9    Andreotti, A-N-D-R-E-O-T-T-I, Sergeant for the

10   Oakland Police Department.  They describe

11   reviewing facts of your crime and submit their

12   opposition based that.  We also received support

13   letters from Edwin and Jessie Jones, dated

14   July 11, 2005, tell me about Mr. and Mrs. Jones.

15         **INMATE JOHNSON:**  Mr. and Mrs. Jones are

16   some nice people that I had the opportunity to

17   meet some years ago.  They are very supportive

18   of me and they have opened their arms up to me

19   in terms of a job offer in cleaning some of

20   their real estate properties and just doing

21   commercial maintenance.

22         **PRESIDING COMMISSIONER FARMER:**  How --

23   did you know them before your commitment?

24         **INMATE JOHNSON:**  No.  I didn't.

25         **PRESIDING COMMISSIONER FARMER:**  You met

26   them -- how did you meet them?

27         **INMATE JOHNSON:**  I met them, their son

37

1    is, also, unfortunately, in prison.  And I had

2    the opportunity of meeting him.

3           **PRESIDING COMMISSIONER FARMER:**  Okay.

4    And do you see them?

5           **INMATE JOHNSON:**  Yes.

6           **PRESIDING COMMISSIONER FARMER:**  Is he

7    located, also, here, at Solano?

8           **INMATE JOHNSON:**  Yes.

9           **PRESIDING COMMISSIONER FARMER:**  So how

10   often would you say you saw them?

11          **INMATE JOHNSON:**  Well I think I see them,

12   probably, about once a month.

13          **PRESIDING COMMISSIONER FARMER:**  And they

14   talk about offering a job in Oakland with rental

15   property.  And I understand it is your first

16   choice, if you are able to parole to Sacramento

17   County, is to pursue lens --

18          **INMATE JOHNSON:**  Yes.

19          **PRESIDING COMMISSIONER FARMER:**  --

20   crafting (indiscernible) in that area.

21          **INMATE JOHNSON:**  Yes.

22          **PRESIDING COMMISSIONER FARMER:**  Then are

23   older letters that are indicated in the file,

24   including letters support for yourself, which is

25   appropriate.

26          **INMATE JOHNSON:**  Yes.

27          **PRESIDING COMMISSIONER FARMER:**  If your

38

1    not going to support yourself, who else would,

2    right?

3            INMATE JOHNSON:  Yes.

4            PRESIDING COMMISSIONER FARMER:  And

5    that's dated September 20, 1996.  A letter from

6    your former wife, Brenda Smithy Johnson,

7    likewise, on October 15, 1996, you are no longer

8    married.  She hasn't submitted another letter in

9    opposition so (indiscernible).  There's other

10   letters of opposition that were submitted

11   July 11, 2005, from Alameda County District

12   Attorney's Office, reciting the items contained

13   in the report, authored by Tricia Ector, spelled

14   E-C-T-O-R, urging denial.  And she outlines,

15   again, the factors indicated in the report and

16   argues it merits a lengthy period of denial.

17   Also, another letter from the City of Oakland,

18   dated June 24, 2005, signed by the same Richard

19   Andreotti, virtually identical in text to the

20   later letter urging denial.  And then we have

21   the support letter received from Tammessi

22   Johnson.  And again, her relationship -- you

23   told me, right?

24           INMATE JOHNSON:  Her relationship is

25   she's my aunt.

26           PRESIDING COMMISSIONER FARMER:  And

27   you're close to the same age?

39

1      **INMATE JOHNSON:**  Yes.

2      **PRESIDING COMMISSIONER FARMER:**  Because

3  you were going to high school together?

4      **INMATE JOHNSON:**  Yes.

5      **PRESIDING COMMISSIONER FARMER:**  It's an

6  interest point to read, when you were together

7  at that one point and you made a decision to go

8  to Grant, you go back commit murder, robbery, up

9  here, and she goes on to San Jose State and

10  appears to be doing quite well.  It's sad.  But

11  she offers continuing support.  And where is she

12  now?  Is she back in Sacramento (indiscernible)?

13  What is she doing?

14      **INMATE JOHNSON:**  She works for a State

15  agency.

16      **PRESIDING COMMISSIONER FARMER:**  Doing

17  what?

18      **INMATE JOHNSON:**  Secretary at the

19  Capital.

20      **PRESIDING COMMISSIONER FARMER:**  Is she

21  married?  Does she have children?

22      **INMATE JOHNSON:**  She's not married and

23  has no children.

24      **PRESIDING COMMISSIONER FARMER:**  How often

25  do you see her?

26      **INMATE JOHNSON:**  I see her about once

27  every three months.

40

1      **PRESIDING COMMISSIONER FARMER:**  All

2  right, anything else that we should be

3  considering that we don't have?

4      **ATTORNEY DAVEY:**  I think the letters

5  faxed to my office by my client's wife are

6  relevant.

7      **PRESIDING COMMISSIONER FARMER:**  Okay,

8  thank you.  A letter dated September 22, 2005, -

9  -

10     **ATTORNEY DAVEY:**  Do you need a magnifying

11  glass? (Indiscernible).

12     **PRESIDING COMMISSIONER FARMER:**  There's

13  nothing wrong with my eyes -- from Sandra

14  Johnson.  You met in here.  How often is your

15  wife able to come down?

16     **INMATE JOHNSON:**  Twice a month.

17     **PRESIDING COMMISSIONER FARMER:**  She

18  offers support, a place to live.  She's

19  employed, as indicated in the letter.  Another

20  letter from Edwin and Jessie Jones,

21  (indiscernible), previously described a letter

22  from them.  This one is dated July 11, 2005.

23     **ATTORNEY DAVEY:**  That might be a

24  duplicate, Commissioner Farmer, I'm not sure.

25     **PRESIDING COMMISSIONER FARMER:**  Well, if

26  it isn't a duplicate, it's certainly similar in

27  tone offering support.  (indiscernible).

41

1  Another letter dated July 5, 2005, by Wanda

2  Johnson.  Who's Wanda?

3      **INMATE JOHNSON:**  She's a friend of the

4  family.

5      **PRESIDING COMMISSIONER FARMER:**  All

6  right, in what context, how (indiscernible)?

7      **INMATE JOHNSON:**  Her and my wife are

8  friends.

9      **PRESIDING COMMISSIONER FARMER:**  Okay.

10     **INMATE JOHNSON:**  And she goes to an

11 (indiscernible) standing church and, I guess,

12 she was offering a letter of support

13 (indiscernible).

14     **PRESIDING COMMISSIONER FARMER:**

15 (indiscernible) which this is.  Do you see her?

16     **INMATE JOHNSON:**  Yes.  I see her, also.

17     **PRESIDING COMMISSIONER FARMER:**  She comes

18 down with your wife (indiscernible)?

19     **INMATE JOHNSON:**  Yes.

20     **PRESIDING COMMISSIONER FARMER:**  And you

21 met her through your wife?

22     **INMATE JOHNSON:**  Yes.

23     **PRESIDING COMMISSIONER FARMER:**  A letter

24 from Mona Manley [phonetic], of Prisoner's

25 Rights Union, dated September 7, 2005.  She

26 indicates that she has known you through

27 correspondence with the agency.  Have you met

42

1    personally or it because --

2          INMATE JOHNSON:  No.  Correspondence.

3          PRESIDING COMMISSIONER FARMER:  She urges

4    you on release.  Denise Grayson.

5          ATTORNEY DAVEY:  My client's mother.

6          PRESIDING COMMISSIONER FARMER:  Okay.

7    She says she's known you all of your life.  Are

8    you able to get together?

9          INMATE JOHNSON:  I see her from time-to-

10   time.

11         PRESIDING COMMISSIONER FARMER:  How

12   often?

13         INMATE JOHNSON:  About twice a year.

14         PRESIDING COMMISSIONER FARMER:  And how

15   is she doing?

16         INMATE JOHNSON:  She's not doing well, in

17   terms of her health, but her spirits are

18   (indiscernible).

19         PRESIDING COMMISSIONER FARMER:  She had

20   hard times when you were younger, about the time

21   of this commitment offense, as you've described.

22   Did she kick those problems?

23         INMATE JOHNSON:  Yes.

24         PRESIDING COMMISSIONER FARMER:  Okay,

25   that's good, that's good.  Did I get all the

26   letters?

27         ATTORNEY DAVEY:  I believe so,

43

1  Commissioner.

2      **PRESIDING COMMISSIONER FARMER:**  I believe

3  so, too, thank you.  Okay, now I'll turn you

4  over to Mr. Wolk, who will discuss with you what

5  you've been doing since you've been in the

6  institution.

7      **DEPUTY COMMISSIONER WOLK:**  Okay.  Do you

8  have your lens, your Optical Certificate?

9      **INMATE JOHNSON:**  No.  I haven't completed

10  the course yet.

11      **DEPUTY COMMISSIONER WOLK:**  How much

12  longer.

13      **INMATE JOHNSON:**  I'd say another 12

14  months.

15      **DEPUTY COMMISSIONER WOLK:**  Okay.  How

16  long have you been in the program?

17      **INMATE JOHNSON:**  Approximately 11 months.

18      **DEPUTY COMMISSIONER WOLK:**  But you do

19  have a silkscreen completion.  Is that right?

20      **INMATE JOHNSON:**  Yes.

21      **DEPUTY COMMISSIONER WOLK:**  Would you be

22  able to work in that capacity?

23      **INMATE JOHNSON:**  Yes.

24      **DEPUTY COMMISSIONER WOLK:**  What could you

25  do?

26      **INMATE JOHNSON:**  In terms of silk-

27  screening, I've actually, like I've said, I

44

1    completed it.  So I'm able to do stencil

2    training.  I'm able to do frame repair, messing,

3    as well as reclaiming some of the materials once

4    you use the solvents, stuff like that.

5        **DEPUTY COMMISSIONER WOLK:**  Are there any

6    companies in Sacramento that you could get a job

7    with?

8        **INMATE JOHNSON:**  I don't have any record

9    of any companies in Sacramento.  But I'm sure

10   that there are companies available.

11       **DEPUTY COMMISSIONER WOLK:**  Is this

12   something that you don't really wish to do?

13       **INMATE JOHNSON:**  Well, I figure optics is

14   in high demand, right now.  So that would be a

15   more marketable job to get into, as apposed to

16   silk-screening, because right now silk-screening

17   is kind of obsolete, because you've got graphics

18   and computers that do these designs, now.  But

19   I'd still be willing to work in that area.

20       **DEPUTY COMMISSIONER WOLK:**  Okay.  You've

21   also worked in Voc Landscape, Education.  And

22   some of the other jobs that you've held were

23   tier tender, grounds maintenance, yard crew,

24   housing porter, you also worked in the book

25   bindery, recreation.  Let's see, you actually

26   coordinated the recreation program at Vacaville

27   --

45

1          INMATE JOHNSON:  Well that was here.

2          DEPUTY COMMISSIONER WOLK:  Oh, here?

3          INMATE JOHNSON:  Yeah.

4          DEPUTY COMMISSIONER WOLK:  And you've

5    been a culinary clerk.  You've worked, pretty

6    much, throughout your stay.  You got your GED in

7    '96.  You've taken several FEMA courses.  And

8    you have two courses from Coastline Community

9    College?

10          INMATE JOHNSON:  Yes.

11          DEPUTY COMMISSIONER WOLK:  Do you have a

12   goal in that area?

13          INMATE JOHNSON:  Well I would like to get

14   an Associates Degree in Health and Science.

15          DEPUTY COMMISSIONER WOLK:  Okay.  Have

16   you done anything else educationally since you

17   came to prison?

18          INMATE JOHNSON:  Well, I've taken

19   numerous courses:  Infectious disease --

20          DEPUTY COMMISSIONER WOLK:  All the FEMA

21   courses?

22          INMATE JOHNSON:  No.  This is outside of

23   all the FEMA --

24          DEPUTY COMMISSIONER WOLK:  Okay.

25          INMATE JOHNSON:  -- courses.  Infectious

26   disease, smoking sensation.  Just other little

27   courses that were available to me.

46

1          DEPUTY COMMISSIONER WOLK:  I show that

2     you've been an active participant in AA since

3     approximately '96.

4          INMATE JOHNSON:  Yes.

5          DEPUTY COMMISSIONER WOLK:  You went from

6     '88 to '96, you didn't -- did you drink when you

7     were out?

8          INMATE JOHNSON:  Yes.

9          DEPUTY COMMISSIONER WOLK:  How much?

10          INMATE JOHNSON:  Well, I would drink,

11     probably, a quart of beer a day.

12          DEPUTY COMMISSIONER WOLK:  Did you use

13     drugs?

14          INMATE JOHNSON:  Yes.  I did.

15          DEPUTY COMMISSIONER WOLK:  Were you under

16     the influence of anything when you committed the

17     offense?

18          INMATE JOHNSON:  Alcohol.

19          DEPUTY COMMISSIONER WOLK:  How much had

20     you had to drink?

21          INMATE JOHNSON:  Probably about a quart.

22          DEPUTY COMMISSIONER WOLK:  What time of

23     day was it?

24          INMATE JOHNSON:  In the morning.

25          DEPUTY COMMISSIONER WOLK:  Okay.  So you

26     have been continuously involved in AA and also

27     some NA.  You've taken Anger Management; Parole

47

1   Recidivism Prevention; Ethics and Values; Self-
2   Confrontation; Time and Management; Bible
3   Studies; you took a Parenting Program; Cessation
4   from Smoking; and you made a financial donation
5   to the Men of DVI Scholarship Fund.  You also
6   took a Stress Management Class, this year.
7          INMATE JOHNSON:  Yes.
8          DEPUTY COMMISSIONER WOLK:  And
9   participated in the AmeriCan Program back in
10  '93.  Anything else to report in the area of
11  self-help?
12         INMATE JOHNSON:  No.  I don't think so.
13         DEPUTY COMMISSIONER WOLK:  Okay, tell me
14  what tools you have acquired through your AA
15  participation that would attribute to your
16  ability to refrain from any negative behavior?
17         INMATE JOHNSON:  Would you repeat that?
18         DEPUTY COMMISSIONER WOLK:  Tell me about
19  the tools --
20         INMATE JOHNSON:  Oh, okay.
21         DEPUTY COMMISSIONER WOLK:  -- that you've
22  acquired through your AA participation that
23  would assist you in maintaining a crime free
24  life.
25         INMATE JOHNSON:  Well, first of all, I
26  know that doing my sobriety every day has to
27  deal with that, because that is something that I

48

1  have to deal with.  So one of the tools that

2  I've been able to gain from AA was admitting

3  that I have an alcoholism problem, as well as

4  being able to sit in a group of people and be

5  able to communicate to them what my problem was.

6  So what that does is give me -- it allows me the

7  opportunity to bounce off other people the

8  adverse effect that alcohol has had on me.  So

9  what that does is, again, give me the

10  opportunity to know that I have practice my

11  sobriety one-day at a time, take things to heart

12  and know that it is serious, dealing with

13  alcohol.

14      **DEPUTY COMMISSIONER WOLK:**  Okay.  Do you

15  stay in touch with any of your co-defendants?

16      **INMATE JOHNSON:**  Yes.

17      **DEPUTY COMMISSIONER WOLK:**  Both of them?

18      **INMATE JOHNSON:**  No.

19      **DEPUTY COMMISSIONER WOLK:**  Which one.

20      **INMATE JOHNSON:**  I stay in which with

21  Monitor [phonetic].

22      **DEPUTY COMMISSIONER WOLK:**  Monitor?

23      **INMATE JOHNSON:**  Yes.

24      **DEPUTY COMMISSIONER WOLK:**  Is he here?

25      **INMATE JOHNSON:**  Yes.

26      **DEPUTY COMMISSIONER WOLK:**  Okay, we're

27  going to review your disciplinary record.  You

49

1  have five CDC 115s that you got in 1988:

2  Failing to report to work; possession of inmate

3  manufactured alcohol; failing to report to work;

4  leaving job assignment without permission;

5  responsibility count.  And then you didn't get

6  another one until `95, and that was for

7  participation on a work stoppage.  And then in

8  '99 you got your last one, and that was for

9  sexual misconduct during visiting.  You have 12

10  CDC 128As.  The most recent was in 2001, and

11  that was for excessive contact with a female

12  visitor in visiting.  The rest of them are

13  mostly failing to report to work.  You had an

14  inmate manufactured tattoo gun; cassette tape;

15  stereo; altered State clothing; and a Walkman

16  tape player; improper use of State phone.  So

17  you've been free of any disciplinaries since

18  2001.  And free of any 115s since '99.  Is that

19  correct?

20        **INMATE JOHNSON:**  Yes.

21        **DEPUTY COMMISSIONER WOLK:**  Your custody

22  level is Medium A, your classification score is

23  19.  And let's see, I have a chrono that I would

24  like to read here.  This is a chrono dated

25  July 7, 2002:

26             Inmate Johnson has worked under my

27             supervision as the culinary clerk

50

1       for the past two years.  His
2       primary duties consist of
3       preparing inmate wake-up lists,
4       which includes scheduling up to
5       200 inmates reporting to work at
6       various times.  Other duties are
7       maintaining new inmate assignments
8       and inmate reassignments and memos
9       and general clerical duties.
10      Johnson has maintained an accurate
11      list of inmates scheduled to work,
12      which is very important in
13      facilitating institutional
14      feeding.  He has maintained a
15      positive attitude and exceptional
16      work ethic toward the job, staff,
17      and inmates alike.  During this
18      time period, Johnson has appeared
19      to make positive changes in his
20      life, including the willingness to
21      help others.  Based on my 20 years
22      of experience, I attribute
23      Johnson's changes to his voluntary
24      involvement in various self-help
25      groups and activities.  Signed
26      Correctional Sergeant Morani
27      [phonetic].

51

```
1   You have numerous laudatory chronos in your
2   file, which recognize your professionalism and
3   hard work.  This is a completion of chrono for
4   the Stress Management Class.  Participation in
5   AA chronos, and this is an achievement chrono
6   regarding your receiving above-average scores in
7   almost all categories of the work supervisor
8   report:
9           "Johnson has maintained above-
10          average work attendance and shows
11          a desire to learn the occupation
12          of optical goods work.  He has an
13          interest in obtaining the American
14          Board of Opticianry National
15          Certificate.  He is respectful
16          towards staff and his conduct is
17          above-average."
18  In a psych report, let's see if I can find it.
19  Psych report, which is dated January 6, 2005,
20  which I find to be, apparently, fairly accurate,
21  it's done by Dr. Davis, Preston Davis.
22          Mr. Johnson comes from an
23          impoverished background, with
24          parents that abused drugs and
25          didn't work regularly or at all,
26          and who were not positive role
27          models for him.  Given his
```

52

1    environment, Mr. Johnson's past is

2    not filled with arrests and he was

3    not involved with gang activity.

4    He did not finish high school, and

5    he became involved with negative

6    associates.  He was irresponsible

7    and had little regard for others.

8    This lead him down the path of

9    illegal activities and eventually

10   making the mistake of murdering

11   someone.  Since his incarceration,

12   Mr. Johnson has done much sole-

13   searching and self-growth.  He

14   fully regrets his past criminal

15   activities and involvement with

16   negative associates, his up-

17   brining, and his involvement in a

18   murder.  He feels tremendous

19   remorse for the victim and for the

20   victim's family and friends.

21   These feelings and thought have

22   developed over time and he has

23   developed insight into his past,

24   his crime, and where he wants to

25   be in his future.  He understand

26   that his murder that the victim

27   cannot have a future, and that his

53

1   behavior might have negatively

2   effected many other people's lives

3   in the victim's family.

4 How about in your family?

5   **INMATE JOHNSON:** My family is

6 (indiscernible).

7   **DEPUTY COMMISSIONER WOLK:** How did your

8 siblings turn out, the ones that you were caring

9 for when you were 12?

10   **INMATE JOHNSON:** Excuse me.

11   **DEPUTY COMMISSIONER WOLK:** That's okay.

12 You don't have to answer.

13   Mr. Johnson has been grateful.

14   Has employed the benefit of

15   numerous educational opportunities

16   within the CDC.  He earned his

17   GED, which helped him to think and

18   process information in more

19   abstract, mature and intelligent

20   ways.  He completed many

21   certificate courses, which gave

22   him much practical knowledge and

23   employable skills.  He fully

24   benefited from multiple

25   therapeutic courses that he

26   finished while an inmate.  He

27   learned healthy coping skills, how

54

1      to manage anger, how to
2      effectively communicate with
3      others, and many more helpful way.
4      He learned about the consequences
5      for his actions, whether good or
6      bad.  He embraced religious
7      doctrine and learned some positive
8      morals and values to live his
9      life.  He learned about how his
10     actions on this earth may effect
11     his eternal sole.  He learned
12     about live, fear, retribution,
13     redemption, and salvation.
14     Mr. Johnson seems to have
15     effectively blended, absorbed, and
16     integrated all that he has learned
17     from his educational, therapeutic,
18     and religious studies.  He did not
19     have to participate in all that he
20     has but he did so to become a
21     better person.  He has a place to
22     live, support from his wife and
23     family, and idea for employment
24     upon release from the CDC.  He has
25     not used illegal drugs or alcohol
26     and has made sure that he has the
27     important mental tools to fortify

55

1           him against future use.  He
2           appears to show a low risk of
3           dangerousness and violence if
4           released to the public, at this
5           time.  If he is provided with a
6           stable living environment and
7           employment and does not associate
8           with negative individuals, he will
9           have a better chance of coping
10          with his release.
11  That's quite a supportive letter.  Do you have
12  anything that you would like to add at this
13  time, regarding any programming or anything that
14  we've talked about?
15          **INMATE JOHNSON:**  Well, one thing that I
16  would like to add is one thing that I've
17  learned, over the course of time, is that the
18  incident that happened, not only effected my
19  life and my families life, but the victim also
20  had family and people that I effected.  And I
21  take the time, some time ago -- and one of the
22  Steps that NA, in order to get through these
23  Steps, you have to try to make amends, whenever
24  possible.  And I haven't had that opportunity to
25  address that issue.  So I never got the
26  opportunity to get past the Eight Step.  What it
27  is, I wrote a letter that I would like to read

56

1    to the victim's family.

2          **DEPUTY COMMISSIONER WOLK:**  Could you

3    speak up, just a little bit, when your reading

4    it?

5          **INMATE JOHNSON:**  Yes.

6          To the Bradford Family, Alameda

7          County, and the Great Citizens of

8          California.  I, Leandre Johnson,

9          write this letter of apology for

10         my irresponsibility and lawless

11         actions, which lead to the

12         shortness of a young man's life.

13         I take responsibility for my

14         actions, which I am not proud of.

15         There is absolutely no justifiable

16         reason for my past actions.  I am

17         remorsefully sorry for the

18         enormous pain and void that I have

19         caused this young man and his

20         family and so many others.  I can

21         only hope that the measure of my

22         actions will be forgiven as I do

23         carry the burden of my biggest

24         mistake.  And I hope to use my

25         testimony to help some wayward

26         youths not to make the very same

27         mistake as I.  Remorsefully,

57

1          Leandre Johnson.

2          **DEPUTY COMMISSIONER WOLK:**  When did you

3     write that letter?

4          **INMATE JOHNSON:**  I wrote this letter last

5     year.

6          **DEPUTY COMMISSIONER WOLK:**  At this time I

7     will turn the microphone back to my colleague.

8          **PRESIDING COMMISSIONER FARMER:**  I have no

9     further questions.  Do you have any other

10    questions in any other areas?

11         **DEPUTY COMMISSIONER WOLK:**  No.

12         **PRESIDING COMMISSIONER FARMER:**  Okay.

13    Counsel, do you have any questions?

14         **ATTORNEY DAVEY:**  No, sir.  I have no

15    questions of my client.

16         **PRESIDING COMMISSIONER FARMER:**  We will

17    then move to closing statements.

18         **ATTORNEY DAVEY:**  Thank you, sir.

19    Mr. Johnson admits his participation in this

20    murder, freely admits it, freely discusses it

21    with the Panel.  And has expressed his remorse

22    to the Panel, to the family through his last

23    statements on the record, regarding the letter

24    that he wrote to the victim's family and the

25    citizens of California.  When I review this

26    file, you know, I looked at Mr. Johnson's

27    history, and I said, "Gees, what in the world

58

1   was going on," just as Commissioner Farmer did.

2   And it appears that he had kind of a hard up

3   brining, living in Oakland, as a lot of young

4   men do.  He did reach out to his family in

5   Sacramento and moved over there.  He completed

6   two or three years of high school there,

7   satisfactorily.  But, unfortunately, he feel

8   back into the criminal activity, that was

9   described in this file, when he went back to

10  visit his extended family for weekends, in the

11  Oakland area.  Again, we're not sitting here

12  apologizing for that, I'm sorry, denying any of

13  that, but he does accept his responsibilities

14  for participating in those activities.  Any

15  murder of a human being is a horrendous crime.

16  This gentleman was killed in an attempted

17  robbery, it appears, and Mr. Bradford's family

18  lost they're son; there's no other explanation.

19  But we have to move away from the crime at some

20  point in time, and focus on rehabilitation of an

21  inmate suitable for parole to define risks in

22  the community, or potential risks in the

23  community.  Mr. Johnson, although he had, as

24  Mr. Wolk described, write-ups when he first came

25  into prison, in '88, I think, he had half-a-

26  dozen or close that in various incidents.  He

27  went approximately ten years without any further

59

1  write-ups and last one was in 1999 for the

2  incident that happened in the visitation area,

3  at one of the prison's he was incarcerated in.

4  I think he knows the rules.  He knows how to

5  apply the rules.  He knows how to abide by the

6  rules of the prison system.  He's been

7  disciplinary free, no serious 115s since 1999.

8  What else has he done?  He's gain a vocation in

9  silk-screening; he's gain, about, one year in

10  the vocational lens lab, here at CSP, Solano,

11  with his desire to finish that occupation; he

12  has worked in other areas of the prison system

13  during his approximately 17 plus years, as

14  described by Commissioner Wolk, in landscaping,

15  boarder, book bindery.  And it appears that

16  throughout the work history he's gotten average

17  to above-average, to and including, exceptional

18  work reports, including the chrono that was read

19  into the record by Commissioner Wolk from the

20  Culinary Services Sergeant.  He's not been

21  sitting still worrying about what's going to

22  happen, when it's going to happen; he's tried to

23  improve himself.  As described in the

24  psychological report, generated for this

25  proceedings, he has gained insight, he has

26  learned through his self-help programs, most of

27  which were not mandatory but he took it upon

60

1  himself and participated in how to be a better
2  man, how to be a better person, how to be a
3  better citizen, whether he's sitting in State
4  prison or on the street in the free community.
5  He's completed correspondence courses; he's
6  completed his GED, prior; and he's still taking
7  correspondence courses.  He has accomplished a
8  number of years in AA slash NA.  And he's
9  indicated to the Panel that's been very helpful
10  in his recovery process and his ability to
11  remain substance, control substance and/or
12  alcohol free.  I note in my review of the
13  record, that he only had one write-up for inmate
14  alcohol and that was way back in 1988.  So he
15  has not had a problem with that, it appears,
16  since that point and time.  He practices the
17  NA/AA Steps, as indicated by his making amends
18  to (indiscernible), informally, on the record
19  here, the victim's family.  He's taken Anger
20  Management courses; he's taken Ethics courses;
21  he's taken Bible Studies; parenting classes; the
22  Quite Smoking Program.  I'm not going into
23  everything that he's done, but there are
24  numerous laudatory chronos in the file about the
25  good things that he's accomplished since he's
26  been in custody.  Mr. Johnson has accomplished a
27  lot and they are very positive accomplishments.

61

1   And I hope the Board does give him recognition

2   for that at the appropriate time.  Mr. Johnson

3   was not a good boy when he was young.  He got in

4   trouble in the juvenile arena.  He does admit

5   that he did have contact with the Juvenile Court

6   on several occasions, the last being six months

7   or a year before the commitment offense.  The

8   commitment offense is his only adult arrest and

9   conviction.  Again, it's a biggie, robbery and

10  murder.  Mr. Johnson's personal factors and his

11  home stability were somewhat mixed.  Again,

12  that's been discussed.  He did attempt to move

13  to Sacramento to "get away," quote, unquote,

14  from the crime-ridden area that he was living in

15  in Alameda County slash Oakland.  And did

16  complete several years in Grant Union High

17  School in Sacramento.  He still has the support

18  of his family in Sacramento, visa via the letter

19  from his aunt, who, I believe, is at least one

20  of the persons he was living with at that point

21  in time, and is very supportive his request for

22  parole.  He is married.  He's been married for

23  five years to Ms. Sandra Johnson, who is very

24  supportive of his release and writes a letter

25  accordingly.  There are letters in the file

26  submitted on behalf of Mr. Johnson's request for

27  parole from various other relatives, including

62

1  his mother, including acquaintances. And there

2  are at least two job offers that I found in the

3  letters that were submitted, including the one

4  from Orange County employment opportunities and

5  they're ability to help Mr. Johnson find a job

6  in the Sacramento area, and the property

7  management job in Oakland, from the friends

8  there in Oakland, and that's an alternative

9  placement for him. His desire is, obviously, to

10  parole to Sacramento to his wife. And, again,

11  his re-entry into society is better in

12  Sacramento. I believe, he will do good on

13  parole. He is requesting the Panel find him

14  suitable for parole at this time. And I'm not

15  going to go into each line-item of the

16  psychological report, but Mr. Wolk did in his

17  assessment, he read, pretty much the whole

18  conclusionary statement and the estimated future

19  dangerousness in the community into the record,

20  with the bottom line finding of Preston Davis,

21  Ph.D., on this evaluation of January of this

22  year, that "Mr. Johnson would be a low risk of

23  dangerousness and violence if released to the

24  public at this time." He further states, "If

25  he's provided with stable living environment and

26  employment and does not associate with negative

27  individuals, he would have a better chance of

63

1   coping upon his release." And as noted,
2   previously, he's got a stable home. He's got a
3   stable home with his wife. He's got employment
4   possibilities out there that are either promised
5   or in the promise of being activated for him.
6   He is putting together a resume to send out to
7   prospective employers. And it is his hope that
8   if he is not granted parole, at this point in
9   time, that he will further be able to complete
10  his vocational lens craft and get his American
11  Optical Certification so that he has another
12  viable occupation that he can obtain employment
13  in the community. There is one other issue,
14  which Mr. Johnson wishes me to raise. And that
15  is, during his sentencing at the Trial Court
16  level, he did plea out on this one, murder and
17  the associated robberies, as indicated by the
18  record which indicates that he did that on
19  advise of counsel and advice of the district
20  attorney and, to a lesser extent, family members
21  that were helping him make his decision. It was
22  his belief and, I think it's probably a mistake
23  on the Trial Court's Judge's statement, but it's
24  his belief that he was sentenced to a fixed
25  term, not an indeterminate term, and he is
26  asking the Board to review the transcript,
27  wherein -- I don't have a page number, but it's

64

1    about ten or 12 pages in, where the inmate asked

2    that, "I would have a release date," the Court

3    responded, "Well, you will, indeed, that is an

4    automatic with the Department of Corrections.

5    They will set that date." And it goes on on a

6    previous page, at about Page 11, where his

7    defendant counsel, on a similar statement to the

8    Court, from Mr. Johnson indicates, "How many

9    years will I have to do of that?" The Court

10   says, "Your attorney can advise you." Mr. Cole

11   indicated a statement that "It is essentially up

12   to the Department of Corrections. And we had

13   discussed, currently, what the rough estimate

14   is." He further states that, "You will be

15   released in due course on parole and essentially

16   that would be up to the Department of

17   Corrections, and that would depend on your

18   sentence and conduct in prison." It was

19   Mr. Johnson's belief that he would or could,

20   potentially, be released on his minimum eligible

21   parole date. I have talked to Mr. Johnson about

22   that and calculated, at this point, his minimum

23   eligible date would be January 20, 2006, which

24   is next January, the upcoming January. His

25   request of this Panel is that he be released on

26   that date. And we would submit the matter with

27   that, that he be granted parole. Thank you.

65

1        **PRESIDING COMMISSIONER FARMER:**

2   Mr. Johnson, this is now you opportunity, if you

3   wish, to address us directly, as to why you

4   believe you are suitable.

5        **INMATE JOHNSON:**  I believe I'm suitable

6   because over the years I've taken the time to

7   really get to value, value life.  I've had

8   opportunity to mature and, of course,

9   participate in a bunch of different programs

10  that provide me the necessary tools to think; to

11  be a more responsible person; to be more

12  compassionate towards everybody.  It's also my

13  belief that there's no excuse for my actions.

14  But at the same time, I would like to be given

15  the opportunity to be a part of society and

16  having a second chance.  And I ask the Panel to

17  grant that.

18       **PRESIDING COMMISSIONER FARMER:**  Okay.

19       **ATTORNEY DAVEY:**  Commissioner, I did, and

20  I hate to do this, but I did forget one area and

21  it's a very important area for the Panel to

22  hear.  You heard Mr. Johnson's statement, I

23  think a couple of answers to Mr. Wolk regarding

24  his alcohol and narcotics anonymous program, and

25  he plans (indiscernible) participating in that

26  in the community should he be granted parole and

27  he would not object, obviously, to the

66

1    conduction that he participate in that program.

2    Thank you.

3            **PRESIDING COMMISSIONER FARMER:**    All

4    right, thank you very much Mr. Johnson.    The

5    time is now 11:18.    We will adjourn and call you

6    back when we have a decision.

7                        **R E C E S S**

8                        --oOo--

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

67

1        **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                    **D E C I S I O N**

3        **DEPUTY COMMISSIONER WOLK:**  Okay.  We're

4    on record.

5        **PRESIDING COMMISSIONER FARMER:**  The time

6    is 11:40.  We're back on record in the matter of

7    the case of Leandre Johnson, D-88755.

8    Mr. Johnson, we have reviewed all information

9    contained in your file, received from the

10   public, and discussed during the course of the

11   Hearing, and relied upon the following

12   circumstances to conclude that you are not

13   unsuitable for parole at this time and you pose

14   an unreasonable risk of danger to society or a

15   threat to public safety if released from prison.

16   This is your first time through this process and

17   I've talked to you a little bit about that,

18   particularly in light of counsel's comments,

19   regarding some contentions that you made

20   regarding your understanding of that at the time

21   of sentencing.  I indicated to you and, I

22   discussed the procedure, we operate under State

23   Statutes, Regulations, Court rules, and

24   Government Parole Consideration Hearing, as

25   described, and set forth the factors that we

26   we're to discuss and look at to determine

27   **LEANDRE JOHNSON D-88755 DECISION PAGE 1 9/23/05**

68

```
 1   whether or not you are suitable.  Now, under our
 2   system, your eligibility is not set at the time
 3   of sentencing for the type of sentence for which
 4   you were committed.  You were given an
 5   indeterminate term, which had a minimum sentence
 6   of 27 years, in your case, with appropriate
 7   credit times are computed, to life.  That means,
 8   pursuant to Court decisions that you could be
 9   incarcerated for the rest of your life.  It
10   doesn't mean that that has to happen, but there
11   certainly is no guarantee that it would be
12   anything less.  That depends on all the factors
13   that we've talked about.  That's what these
14   Hearing are about.  Now, your attorney made some
15   comments regarding your understandings about
16   what you believed would happen at the time of
17   your sentencing.  If you believe that there was
18   a legal error at the time of your sentencing,
19   what you do is take that back to the Court,
20   consult with an attorney and file appropriate
21   documents.  If you believe that you were
22   erroneously sentenced or that there was a
23   problem with that, you need to go back to Court.
24   Another avenue that I might suggest is that I
25   talked about the Notice under 3042, we send
26   notices to the Police Department, District
27   LEANDRE JOHNSON D-88755 DECISION PAGE 2 9/23/05
```

69

1   Attorney's Office, the attorney that represented

2   you, lots of different people, inviting comments

3   from them regarding your Hearing.  They get

4   notice of this and they have the opportunity to

5   come here.  The District Attorney's Office sent

6   a letter, sometimes they appear.  The Police

7   Department sent a letter.  There was a letter

8   also sent to your sentencing Judge, okay, who

9   has the ability to comment and make

10  recommendations.  It's not often that we receive

11  letters, sometimes we do; sometimes we receive

12  letters in favor of the inmate.  And so, if you

13  think it appropriate, you may wish to contact

14  the sentencing Judge, you write a letter to the

15  sentencing Judge and see if he has

16  (indiscernible) regarding your case

17  (indiscernible) allow you to intervene.  I give

18  you that information just as information.  We do

19  not -- we are not bound -- there's been no Court

20  Order restricting our ability to process your

21  case any differently than we process any other

22  case.  I want to start off in saying that you're

23  unsuitable for parole, based upon our process.

24  Now, let me go through that process and tell you

25  where this goes from here and what happens next.

26  We have indicated that you are unsuitable for

27  **LEANDRE JOHNSON D-88755 DECISION PAGE 3 9/23/05**

70

1   parole and when we look, when we make that

2   determination, we first look at the commitment

3   offense, (indiscernible) facts of that

4   commitment offense will never change, and that's

5   true they won't.  But those are facts that will

6   always be addressed.  And the significance of

7   those facts, in your case is that you have

8   committed, through the primary commitment

9   offense of the murder and the totality of all

10  the crimes for which you were committed, is an

11  extremely aggravated case, which gives you a

12  steep mountain to have to climb.  And you need

13  to be aware of that and deal with it, which is

14  that the offense was carried out in an

15  especially, in the regulatory language

16  conclusions which I'm reading, in an especially

17  cruel and callous manner, in that, by the series

18  of crimes, multiple victims were attacked and

19  injured and one was killed, in separate

20  incidents, all of which were charged and

21  prosecuted within the same complaint.  And that

22  the motives for these crimes were trivial in

23  relation to the offense, the amount of moneys --

24  it's unclear whether your motive was, as you

25  indicated, (indiscernible) band of retribution

26  for the drug dealers or whether you were out to

27  **LEANDRE JOHNSON D-88755 DECISION PAGE 4 9/23/05**

71

1  go after people that you though had money or get

2  their money by ill-gotten means, or a

3  combination of all of those.  But, in any event,

4  nobody appointed a band of vigilantes to go out

5  and clean up the drug traffic (indiscernible).

6  And certainly it was not all that financially

7  rewarding, that you could have gotten minimal

8  amounts of money in tennis shoes or going out

9  and beating these people up, terrorizing them,

10 armed with weapons, sawed-off shotguns, loaded,

11 carried.  You were an aggressive gang of thugs.

12 And, fortunately, you were identified and

13 stopped in time, because it's not difficult to

14 speculate that having succeeded to the extent

15 that you had succeeded, there is a high

16 likelihood that somebody else would have died,

17 because you would have continued doing what you

18 were doing until you were caught.  And it's this

19 almost mini-reign of terror, certain, that had

20 that result and resulted in the death of the

21 victim in this case.  But, I think, it's

22 important to say what things are, and it wasn't

23 an accident, it wasn't an incident, it was

24 murder.  And you were well advised to address it

25 in that context.  You loaded your guns, you took

26 your guns, you went out, you knew what you were

27 **LEANDRE JOHNSON D-88755 DECISION PAGE 5 9/23/05**

72

1   about to do and you did it.  And I don't know,

2   I'm not saying that you went out with specific

3   intent to kill this guy, but you were certainly

4   prepared to do that.  And when whatever

5   happened, whether he said something back at the

6   wrong time or he didn't move fast enough, or you

7   were feeling particularly aggressive that day, I

8   don't know the immediate dynamics, but you

9   pointed that gun at him and you pulled the

10  trigger and that's murder.  And you are well

11  advised to say it just like it is.  This crime

12  was a culmination of kind of a short but

13  significant, I think, juvenile history, where

14  you got in trouble a few times, enough to come

15  to the attention of the authorities, come to the

16  attention of the Juvenile Court.  We've

17  described those offenses and it gets a little

18  more serious each time and Juvenile Court tries

19  to intervene and you were declared a ward to

20  address those issues so that you won't end up

21  where you are now.  And obviously you were not

22  receptive to that message and it didn't take.

23  So that demonstrates an escalating pattern of

24  criminal conduct.  It also indicates that you

25  have failed to profit from society's previous

26  attempts to correct your criminal behavior

27  **LEANDRE JOHNSON D-88755 DECISION PAGE 6 9/23/05**

73

1    through the juvenile process, as we have

2    described.  So that gets you here.  And you have

3    been in custody for a significant period of

4    time.  And we really have no quarrel with your

5    institutional behavior, and, in fact, commend

6    you for what you've done.  You do appear to have

7    gone through a process of very positive change.

8    You have upgraded yourself educationally,

9    vocationally.  You've engaged in self-help.  We

10    can always sit here and say you should do more,

11    and, I think, it always is important as a

12    continuing life-long process.  That's not

13    something that, as I think, you appreciate,

14    that, you know, it starts on one day and ends

15    and you say, "well, I'm okay now."  This is

16    something that you have to continue to be

17    involved in during the time here.  So we commend

18    you for what you've done and we want you to

19    continue doing that.  We've considered the

20    psychological report, prepared by Preston Davis,

21    on January 6, 2005, and, again, it's positive.

22    All of which says to us that you are moving in

23    the right direction.  We don't want to

24    discourage you by what we say today, but we also

25    want to be realistic with you, that in balancing

26    the good that is accomplished against the

27    **LEANDRE JOHNSON D-88755 DECISION PAGE 7 9/23/05**

74

1     enormity of the crimes that occurred, this
2     process requires a period of time to ensure that
3     the gains that you have made and your appearance
4     before us and what you say to us is, not only
5     sincere in the way it sounds, but sincere in the
6     way it is demonstrated over a length of time.
7     And the more serious your crime, the more
8     cautious we are to ensure that what you say is
9     not only true today but it's going to be true
10    for the rest of your life.  So that when we
11    release you, authorize your release, we can
12    assure anybody in the community, anybody who
13    might be your neighbor, anybody who might be
14    walking to the zoo, that you're not going to
15    revert back to (indiscernible) with the sawed-
16    off shotgun and rob and murder (indiscernible).
17    So you are on a journey, which is going the way
18    that the Board would like to see it go.  Your
19    parole plans, as they are developed now, and as
20    you indicated, they are continuing to evolve.
21    (indiscernible) the lens business, which you
22    haven't completed that program, and we know it
23    is your intent to do so; that's appropriate and
24    we encourage you to do it.  And as you get that
25    Certificate then you are going to be better able
26    to market yourself to prospective employers.
27    **LEANDRE JOHNSON D-88755 DECISION PAGE 8 9/23/05**

75

1   It's a good program, there are jobs out there

2   for that program (indiscernible) has the

3   opportunity for big reward.  As indicated, this

4   process does not happen overnight.  And based

5   upon the significance of your crimes and where

6   you are on that journey, we believe and in a

7   separate decision we find that it is not

8   reasonable to conclude that you would be

9   eligible for parole and you are denied parole

10   for a period of three years, because, again, the

11   serious nature of the crime and where you are on

12   that journey.  The danger (indiscernible) in

13   relationship to the crime that occurred and

14   where you are have to be viewed as recent and

15   you must continue to demonstrate, over an

16   extended period of time.  What we see today is

17   not just a good presentation from what is

18   obviously an intelligent man, I think, that

19   letter from your aunt, is in reality, -- it's

20   like a sister of your same age and two people in

21   the same place, she ends up going to San Jose

22   State and you end up here.  Sometimes the

23   decisions we make in life have fairly

24   significant consequences, as you obviously have

25   perceived.  But you do have a good core of

26   support there and it is important that you

27   **LEANDRE JOHNSON D-88755 DECISION PAGE 9 9/23/05**

76

1  continue to utilize.  You're wife is, from what
2  we can read here and we've seen you for what,
3  two hours, and we really don't know a whole lot
4  about you other than what we've read here, but
5  you make a good presentation here.  You appear
6  to have good abilities, you've got good family
7  by your words.  You give responses that make you
8  hopeful.  So when I say, "Yes, you've been
9  sentenced to a life-term." That doesn't mean
10  that you have to spend the rest of your life
11  here.  But if you continue to do the things that
12  you are doing for this next period of time, as
13  I've suggested, then there is a very good
14  likelihood that you will be given a date and be
15  released.  We have considered the input from the
16  District Attorney from Alameda County, by
17  they're letters.  Also, the Police Department of
18  the City of Oakland, by their letters, as well
19  as the letters submitted on your behalf.  We
20  want to emphasize that it's important that you
21  take from this the recommendations that you
22  continue to do what you are doing, and most
23  especially to be disciplinary free.  Continue
24  with AA.  Those are the kinds of things that the
25  Panel will always look at.  The slightest
26  infraction on your disciplinary record will
27  **LEANDRE JOHNSON D-88755 DECISION PAGE 10 9/23/05**

77

1   significantly impair your chances to be granted

2   a date in the future.  So I can't emphasize that

3   enough, how important that it is.  That you

4   continue to upgrade, both vocationally,

5   educationally, you continue to go to the self-

6   help programs that you have engaged in and that

7   you remain disciplinary free.  I think, sir,

8   that you have the possibility of a bright

9   future.  We want you to continue on the path and

10  make the most of those opportunities.  That

11  concludes my remarks.

12      **DEPUTY COMMISSIONER WOLK:**  You have an

13  exceptionally bright future.  Don't let anybody

14  get in the way of it.  Every minute of the day,

15  you have the opportunity to make a choice, make

16  the right choices and you'll get out of here.

17  Don't get any 128s or 115s.  Keep going where

18  you're going, doing what you're doing.  Keep a

19  strong spiritual foundation and you'll get out

20  of here someday.  And maybe not too far in the

21  future.

22      **PRESIDING COMMISSIONER FARMER:**  I don't

23  know what your expectations were when you came

24  in here.  Sometimes people come in to the first

25  Hearing and go, "I'm reformed, I'm good, I'm

26  going to get a date."  It doesn't work that way.

27  **LEANDRE JOHNSON D-88755 DECISION PAGE 11 9/23/05**

78

1  And now you see the reality of that.  But I also

2  hope that you take to heart the comments that we

3  have given.  We see a lot of people.  A lot of

4  people are going to stay here the rest of their

5  lives.  You have the ability not to have that

6  happen.  Don't let it slip away.  The time is

7  now --

8          **ATTORNEY DAVEY:**  Commissioner, I'm sorry

9  to interrupt.  In light of the multi-year

10 denial, I would request a new psychological

11 evaluation, put an (indiscernible) to include,

12 you know, what he's done between now and then.

13         **PRESIDING COMMISSIONER FARMER:**  And that

14 is appropriate and we have made --

15         **ATTORNEY DAVEY:**  Thank you.

16         **PRESIDING COMMISSIONER FARMER:**  -- that

17 recommendation.  I'm sorry that I didn't mention

18 it.

19         **ATTORNEY DAVEY:**  Okay.

20 ///

21 ///

22 ///

23 ///

24 ///

25 ///

26 ///

27 **LEANDRE JOHNSON D-88755 DECISION PAGE 12 9/23/05**

79

1          **PRESIDING COMMISSIONER FARMER:**  The time

2    is now 11:58, and we will adjourn the

3    proceedings.  Good luck to you, sir.

4                       --oOo--

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    **PAROLE DENIED THREE YEARS**

24    **THIS DECISION WILL BE FINAL ON:**_____

25    **YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT**

26    **DATE, THE DECISION IS MODIFIED.**

27    **LEANDRE JOHNSON D-88755 DECISION PAGE 13 9/23/05**

28

80

CERTIFICATE AND

DECLARATION OF TRANSCRIBER


I, JUDY K. FARNCOMB, a duly designated

transcriber, PETERS SHORTHAND REPORTING, do hereby

declare and certify under penalty of perjury that I

have transcribed tape(s) which total One in number and

cover a total of pages numbered 1 - 79, and which

recording was duly recorded at CALIFORNIA STATE

PRISON, SOLANO, VACAVILLE, CALIFORNIA, in the matter

of the INITIAL PAROLE CONSIDERATION HEARING OF LEANDRE

JOHNSON, CDC NO. D-88755, on SEPTEMBER 23, 2005, and

that the foregoing pages constitute a true, complete,

and accurate transcription of the aforementioned tape

to the best of my ability.

I hereby certify that I am a disinterested

party in the above-mentioned matter and have no

interest in the outcome of the hearing.

Dated October 17, 2005, at Sacramento,

California.


JUDY K. FARNCOMB
TRANSCRIBER
PETERS SHORTHAND REPORTING